No. 2015-5057, -5061

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## LIBERTY AMMUNITION, INC.,
*Plaintiff-Cross-Appellant,*

v.

## UNITED STATES,
*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS,
IN 11-CV-84, JUDGE CHARLES F. LETTOW

## BRIEF OF THE DEFENDANT-APPELLANT, THE UNITED STATES

**BENJAMIN C. MIZER**
**Principal Deputy Assistant Attorney General**

**JOHN J. FARGO**
**Director**

Of Counsel:                        **WALTER W. BROWN**
**CONRAD J. DeWITTE, JR.**          **Attorney**
**Department of Justice**          **Commercial Litigation Branch**
                                   **Civil Division**
                                   **Department of Justice**
                                   **Washington, DC  20530**
May 26, 2015                       **Telephone:    (202) 307-0341**
                                   **Facsimile:     (202) 307-0345**

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................ii

TABLE OF AUTHORITIES ................................................................................v

TABLE OF ABBREVIATIONS .........................................................................x

STATEMENT OF RELATED CASES ................................................................1

STATEMENT OF APPELLATE JURISDICTION ..............................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

STATEMENT OF THE CASE..............................................................................3

STATEMENT OF FACTS ...................................................................................5

I.     INDEPENDENT DEVELOPMENT OF THE A1 PROJECTILES ...............5

     A.    Phase I...............................................................................................6

     B.    Interim Period Before Phase II........................................................7

     C.    Phase II ...........................................................................................10

     D.    Final M855A1 Product ...................................................................12

     E.    M80A1 Development ......................................................................14

II.    ORIGINS OF THE '325 PATENT ..........................................................14

     A.    Army Interactions .........................................................................15

     B.    SOCOM Interactions.....................................................................19

     C.    New Liberty Designs After Fielding of M855A1 ........................20

III.   THE '325 PATENT....................................................................................21

     A.    '325 Patent Claims ........................................................................23

B.     P ROSECUTION OF THE '325 P ATENT ........................................24

SUMMARY OF THE ARGUMENT ....................................................26

ARGUMENT ........................................................................................30

I.     STANDARDS OF REVIEW .......................................................30

II.    THE TRIAL COURT IMPROPERLY FOUND THAT THE A1
PROJECTILES INFRINGE DUE TO OVERLY BROAD
CONSTRUCTIONS OF THE "INTERMEDIATE OPPOSITE ENDS,"
"REDUCED AREA OF CONDUCT," AND "CONTROLLED
RUPTURING" LIMITATIONS. ..................................................31

A.    "I NTERMEDIATE O PPOSITE E NDS " AND "R EDUCED A REA OF C ONTACT "32

1.    Claim 32 and its Dependents Are Not Infringed Under Proper
Construction of "Intermediate Opposite Ends." ......................33

2.    Claim 1 and its Dependents Are Not Infringed Under Proper
Construction of "Reduced Area of Contact" ...........................37

B.    "S TRUCTURED TO PROVIDE CONTROLLED RUPTURING " ........................45

III.   THE COURT COMMITTED NUMEROUS LEGAL ERRORS IN
HOLDING THAT THE ASSERTED CLAIMS WERE NOT OBVIOUS, IF
INFRINGED. ..............................................................................49

A.    I NCONSISTENT A PPLICATION OF "C ONTROLLED R UPTURING "
C ONSTRUCTION ...................................................................51

1.    Leussler '416 patent ................................................52

2.    M855/M855 LFS Projectiles, As Disclosed in the McElroy
Patent ......................................................................53

3.    Nosler '420 patent ...................................................56

B.    I MPROPER L EGAL F RAMEWORK FOR E VALUATING O BVIOUSNESS ........58

1.    The Trial Court Improperly Applied Teaching-Suggestion-
Motivation Test. .......................................................58

2.    The Trial Court Used Perspective of the Inventor, Not a Person of Ordinary Skill. ......................................................................61

3.    Liberty's Evidence of Secondary Considerations Lacks a Nexus with the Claimed Invention.......................................................63

IV.    THE TRIAL COURT EXCEEDED ITS JURISDICTION BY AWARDING A RUNNING ROYALTY.............................................................................63

CONCLUSION ...........................................................................................65

# TABLE OF AUTHORITIES

## Cases

*ActiveVideo Network, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ...................................................61

*Agriza, Inc. v. Woodstream Corp.*,
  520 F.3d 1337 (Fed. Cir. 2008) ...................................................30

*Alcon Res., Ltd. v. Apotex Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012) ...................................................31

*Allergan, Inc. v. Sandoz Inc.*,
  726 F.3d 1286 (Fed. Cir. 2013) ...................................................50

*Alza Corp. v. Mylan Labs., Inc.*,
  464 F.3d 1286 (Fed. Cir. 2006) ...................................................30

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
  119 F.3d 953 (Fed. Cir. 1997) ....................................................62

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
  73 F.3d 1573 (Fed. Cir. 1996) ....................................................43

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
  No. 2012-1289, 2015 WL 1883265 (Fed. Cir. Apr. 27, 2015) ....................39

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
  334 F.3d 1294 (Fed. Cir. 2003) ...................................................34

*Casler v. United States*,
  15 Cl. Ct. 717 (1988) ..............................................................31

*Corning Glass Works v. Sumitomo Elec. USA, Inc.*,
  868 F.2d 1251 (Fed. Cir. 1989) ...................................................36

*Crozier v. Krupp*,
  224 U.S. 290 (1912)...............................................................64

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2004) ...................................................43

*Dippin' Dots, Inc. v. Mosey*,
   476 F.3d 1337 (Fed. Cir. 2007) ....................................................36

*Emery Worldwide Airlines, Inc. v. United States*,
   264 F.3d 1071 (Fed. Cir. 2001) ....................................................31

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010) ....................................................39

*Exxon Res. & Eng'g Co. v. United States*,
   265 F.3d 1371 (Fed. Cir. 2001) ....................................................39

*First English Evangelical Lutheran Church v. Los Angeles Cty.*,
   482 U.S. 304 (1987).....................................................................65

*Graham v. John Deere Co. of Kan. City*,
   383 U.S. 1 (1966)................................................................ 31, 50

*Halliburton Energy Servs. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ....................................................36

*Hearing Components, Inc. v. Shure Inc.*,
   600 F.3d 1357 (Fed. Cir. 2010) ....................................................39

*In re GPAC Inc.*,
   75 F.3d 1573 (Fed. Cir. 1995) ......................................................63

*In re Heck*,
   699 F.2d 1331 (Fed. Cir. 1983) ....................................................53

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ......................................................59

*In re McDaniel*,
   293 F.3d 1379 (Fed. Cir. 2002) ....................................................51

*In re Papst Licensing Digital Camera Patent Litig.*,
   778 F.3d 1255 (Fed. Cir. 2015) ....................................................30

*Ind. Mich. Power Co. v. United States*,
   422 F.3d 1369 (Fed. Cir. 2005) ....................................................65

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) ...................................................60

*Irving Air Chute Co. v. United States*,
    93 F. Supp. 633, 636-37 (Ct. Cl. 1950) .......................................64

*Kloster Speedsteel AB v. Crucible, Inc.*,
    793 F.2d 1565 (Fed. Cir. 1986) ...................................................62

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)........................................................ 59, 60, 62

*Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533 (Fed. Cir. 1991) ...................................................31

*Leesona Corp. v. United States*,
    599 F.2d 958 (Ct. Cl. 1979)..........................................................64

*Liberty Ammunition, Inc. v. United States*,
    101 Fed. Cl. 581 (2011)..................................................................3

*Liberty Ammunition, Inc. v. United States*,
    111 Fed. Cl. 365 (2013)..................................................................4

*Liberty Ammunition, Inc. v. United States*,
    119 Fed. Cl. 368 (2014)..................................................................4

*Life Techs., Inc. v. Clontech Labs., Inc.*,
    224 F.3d 1320 (Fed. Cir. 2000) ...................................................62

*Lucent Techs., Inc. v. Gateway, Inc.*,
    525 F.3d 1200 (Fed. Cir. 2008) ...................................................35

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007) ...................................................48

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)........................................................... 39, 43

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015) ...................................................46

*Penda Corp. v. United States*,
    29 Fed. Cl. 533 (1993) ...................................................................64

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348, 1349 (Fed. Cir. 2007) .................................... 58, 60

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................32

*Pitcairn v. United States*,
    547 F.2d 1106 (Ct. Cl. 1976) .......................................................64

*Princeton Biochemicals v. Beckman Coulter*,
    411 F.3d 1332 (Fed. Cir. 2005) ...................................................59

*Promega Corp. v. Life Techs. Corp.*,
    773 F.3d 1338 (Fed. Cir. 2014) ...................................................36

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
    717 F.3d 929 (Fed. Cir. 2013) .....................................................46

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ...................................................31

*SciMed v. Advanced Cardiovascular Sys.*,
    242 F.3d 1337 (Fed. Cir. 2001) ...................................................46

*Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*,
    731 F.2d 818 (Fed. Cir. 1984) .....................................................39

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) .....................................................48

*Spectrum Int'l, Inc. v. Sterlite Corp.*,
    164 F.3d 1372 (Fed. Cir. 1998) ...................................................36

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ..................................................................30

*Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*,
    988 F.2d 1165 (Fed. Cir. 1993) ...................................................36

*Therasense, Inc. v. Becton, Dickinson and Co.*,
    593 F.3d 1289 (Fed. Cir. 2010) .......................................................53

*Upsher-Smith Labs. v. Pamlab, LLC*,
    412 F.3d 1319 (Fed. Cir. 2005) .......................................................53

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................32

*W.L. Gore & Assoc. Inc. v. Garlock Inc.*,
    842 F.2d 1275 (Fed. Cir. 1988) .............................................. 56, 57

## Statutes

28 U.S.C. § 1292 ...........................................................................1

28 U.S.C. § 1295 ...........................................................................1

28 U.S.C. § 1498 ................................................................. passim

35 U.S.C. § 103 ...................................................................... 30, 50

35 U.S.C. § 112 ...........................................................................38

35 U.S.C. § 271 ...........................................................................31

Leahy-Smith America Invents Act, Pub. L. 112-29, 125 Stat. 284 (2011) .............38

## Rules

R. Ct. Fed. Cl. 12 ..........................................................................3

# TABLE OF ABBREVIATIONS

## *Parties*

| | |
|---|---|
| Liberty | Plaintiff Liberty Ammunition, Inc. |
| Government | Defendant United States |

## *Patent-in-suit*

| | |
|---|---|
| '325 patent | U.S. Patent No. 7,748,325 B2 (issued to Marx) |

## *Other Entities*

| | |
|---|---|
| ARDEC | U.S. Army Armament, Research, Development and Engineering Center |
| ARL | U.S. Army Research Laboratory |
| Army | U.S. Army |
| ATK | Alliant Techsystems Inc. |
| BRL | The U.S. Army Ballistic Research Laboratory |
| DCD | Directorate of Combat Development |
| DOD | U.S. Department of Defense |
| IPT | Integrated Product Team |
| JSWB-IPT | Joint Services Wound Ballistics-Integrated Product Team |
| LCAAP | Lake City Army Ammunition Plant |
| NATO | North Atlantic Treaty Organization |
| PM-MAS | Program Manager-Maneuver Ammunition Systems |

| | |
|---|---|
| SOCOM | U.S. Special Operations Command |
| Trial court | United States Court of Federal Claims |

### *Prior Art*

| | |
|---|---|
| Auxier '287 patent | U.S. Patent No. 2,958,287 (issued to Auxier) |
| Cooke reference | U.S. Patent No. 6,817,299 B1 (issued to Cooke) |
| Frey '017 patent | U.S. Patent No. 3,154,016 (issued to Frey) |
| Frost publication | Frost, George E., *Ammunition Making: An Insider's Story*, Publication of the National Rifle Association of America, May 1990 |
| Hotchkiss reference | U.S. Patent No. 29,272 (issued to Hotchkiss) |
| Katzmann '172 patent | U.S. Patent No. 4,753,172 (issued to Katzmann et al.) |
| Kruse '508 patent | U.S. Patent No. 4,884,508 (issued to Kruse) |
| Leussler '416 patent | U.S. Patent No. 1,967,416 (issued to Leussler) |
| Nosler '420 patent | U.S. Patent No 3,003,420 (issued to Nosler) |
| Strandli reference | U.S. Patent No. 5,388,524 (issued to Strandli *et al.*) |

### *Exhibit References*

| | |
|---|---|
| (__:__) | Column and line number of cited patents |
| A___ | Citation to Joint Appendix |
| DTX | Defendant's Trial Exhibit |
| JTX | Joint Trial Exhibit |
| PTX | Plaintiff's Trial Exhibit |

### *Other Abbreviations*

| | |
|---|---|
| '261 application | U.S. Patent Application No. 11/255,261 |
| A1 projectiles | M855A1 and M80A1 small-arms projectiles |
| CEO | Chief Executive Officer |
| EPIC | Enhanced Performance Incapacitative Composite |
| NDA | Non-Disclosure Agreement |
| SBIR | Small Business Innovative Research |

**STATEMENT OF RELATED CASES**

No other appeal in, or from, the civil action in the lower court was previously before this or any other appellate court.  To counsel's knowledge, no other cases pending before this or any other court will directly affect or be affected by the Court's decision in this appeal.


**STATEMENT OF APPELLATE JURISDICTION**

Liberty brought this action, *inter alia*, for patent infringement pursuant to 28 U.S.C. § 1498(b).  A78-79.  The Court of Federal Claims entered final judgment against the government on December 19, 2014.  A45.  The government timely filed its Notice of Appeal on February 17, 2015.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1292(c) and 1295(a)(3).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Under 28 U.S.C. § 1498, liability for unauthorized manufacture or use is determined under the same standards as patent infringement.  Claims are to be construed to give meaning to all words in the claim and to be consistent with the usage of a claim term in the specification and prosecution history.  Moreover, the same interpretation is to be applied when determining infringement and comparing with the prior art to determine validity.

In determining whether claims are invalid for obviousness, the Supreme Court holds that obviousness must be considered from the standpoint of one skilled in the art, and not limited to the problem as viewed by the individual inventor.  And, the rigid teaching-suggestion-motivation test employed in earlier cases is not proper in determining obviousness.

Section 1498 sets forth a compensatory remedy steeped in eminent domain concepts and does not permit equitable relief, nor provide for compensation for future takings of a patent license.

Accordingly, the following issues are presented on appeal:

1.     Did the trial court err in construing "intermediate opposite ends," "reduced area of contact," and "controlled rupturing" so as to encompass the reverse jackets of the accused A1 projectiles?

2.      Did the trial court err in finding the asserted claims nonobviousness by applying an improper test of obviousness, inconsistently applying a narrower construction of "controlled rupturing," and ignoring clear prior-art disclosures of it?

3.      Did the trial court lack jurisdiction to award a running royalty as damages for future patent infringement?

## STATEMENT OF THE CASE

Liberty filed suit in the Court of Federal Claims on February 25, 2011. On July 11, 2011, Liberty filed an Amended Complaint alleging three claims: (1) breach of contract based on three non-disclosure agreements (NDAs); (2) patent infringement under 28 U.S.C. § 1498(a); and (3) unfair competition under the Lanham Act and Florida state law. The government moved to dismiss the breach-of-contract and unfair-competition claims on jurisdictional grounds under R. Ct. Fed. Cl. 12(b)(1). The trial court granted the motion in part, ruling that it lacked jurisdiction for the pendent unfair-competition claim, but did for the contract claim as pled by Liberty. *Liberty Ammunition, Inc. v. United States*, 101 Fed. Cl. 581, 586-92 (2011) (A83-95); A14.

On March 22, 2013, the trial court conducted a *Markman* hearing to determine the meaning of 15 limitations in the asserted claims of the '325 patent, and issued its decision on June 13, 2013. *Liberty Ammunition, Inc. v. United*

*States*, 111 Fed. Cl. 365 (2013) (A46-63). An 11-day trial was subsequently held from June 23 to July 8, 2014, with closing arguments on October 24, 2014. A2. On December 19, 2014, the trial court issued final judgment in favor of Liberty, finding that the accused projectiles infringed all asserted claims of the '325 patent and that the claims were valid. *Liberty Ammunition, Inc. v. United States*, 119 Fed. Cl. 368 (2014) (A1-43). As to the contract claim, however, the court found that the signatories to the NDAs lacked express or implied actual authority to contract on behalf of the government. Thus, Liberty could not establish a valid contract and the court dismissed the claim.[1] A41-42. As to damages, the trial court awarded (i) $15,617,533.68 for past procurement of the M855A1 and M80A1 into Fiscal Year 2013 and (ii) a running royalty of 1.4 cents per round for future procurement through 2027, when the patent expires. A42-43.

---

[1] Because the court found that Liberty did not have a valid contract with the government, it did not reach the issues of (i) whether the government breached any NDA and (ii) whether Liberty's claim was barred by the Anti-Assignment Act, A42, n.53.

**STATEMENT OF FACTS**

## I.    INDEPENDENT DEVELOPMENT OF THE A1 PROJECTILES

The accused M855A1 and M80A1 projectiles (the A1 projectiles)[2] have

their origins in a 1993 Executive Order, which broadly mandated the removal of

hazardous materials from military weapon systems.  A4; A11952 (ARDEC

engineer John Middleton, A11948-52).  In 1995, the U.S. Army initiated the Green

Ammunition Program, an effort to eliminate lead from the Army's small-caliber

ammunition (including the predominately used 5.56 mm M855) and thereby reduce

amounts of lead deposited at training ranges.  A4; A11953-54 (Middleton);

A13240-42.  The M855 had been the Army (and NATO) standard 5.56 mm round

since the early 1980s.  A11975-76 (Middleton); A13615-16.  It features a full-

metal jacket, with a lead slug and steel penetrator.  A13351.

By 1999, initial production of lead-free M855 rounds (also known as M855

LF or M855 LFS) began.  A11954 (Middleton).  At that time, the Army did not

change the M855's design, but simply replaced its lead slug with a non-lead

material of similar density.  A11954-57 (Middleton).  The Army experimented

with both tungsten-nylon and tungsten-tin materials, but ultimately settled on a

tungsten-nylon slug.  A13227, A13240; A11955 (Mansfield).  Large-scale

---

[2]    Consistent with the art, this brief uses the terms "bullet" and "projectile" interchangeably.  For a bullet that is provided with a ready-to-fire cartridge case (also known as "loaded"), this brief generally references the entire unit as a "round."

production began and the round was fielded.  But by February 2003, problems

arose with a small number of production lots, leading to bullets that flew

erratically.  A13238; A11516-18 (Newill); A11834-36 (Mansfield).

### A.    Phase I

Production was suspended, and in September 2003, "Phase I" of the Green

Ammunition Program was initiated to (1) determine the cause of the erratic flight

problems as well as (2) solicit industry for alternative materials and projectiles.

A13240; A11516-17 (Newill); A11834-38; A11956 (Mansfield); A13095-98.

Army's PM-MAS, who led program management, asked ARL scientists, led by Dr.

James Newill (A11501-11), to assist them and ATK.[3]  A11511 (Newill).

Specifically, the ARL team was asked to apply advanced experimental techniques

it used to develop large-caliber ammunition to new small-caliber design efforts.

A13205-07; A11504, A11512-14 (Newill).

By mid-2004, the Army had determined that the "erratic flight" problems

were caused by a manufacturing error.  A11519-21 (Newill); A11838-40

(Mansfield).  By then, however, the price of tungsten had dramatically increased,

but identified industry alternatives were also tungsten-based.  A13098; A11837

(Mansfield); A11521 (Newill); A13227-30; A13240.  Others raised environmental

---

[3]    ATK was, and remains, the contractor that operates LCAAP (located in Independence, Missouri), where most Army small-caliber ammunition is made. A12033-35 (Hanzl).

concerns about using tungsten as a replacement material.  A13248; A11522-23,

A11841 (Newill).  As a result, future efforts moved away from tungsten.  A11570-

71, A11842 (Newill); A13240-41.

Improving the M855's lethality also became a priority.  A13253; A11541-42

(Newill) (discussing A13923-24).  By 2003, soldier reports from Iraq and

Afghanistan raised concerns about the lethality of the M855.  A13063-64; A11523-

24 (Newill).  This led to the formation of the JSWB-IPT (generically known as the

"Lethality Program" or "Lethality IPT"), which evaluated the lethality of the M855

and other commercially available rounds.  A11525 (Newill); A13264.  Through

work from 2004 to 2006, the JSWB-IPT determined that the M855 was

inconsistent because it was yaw-sensitive (or dependent), meaning that at a low

"yaw angle" the projectile tended to penetrate further before turning and

fragmenting (leading to problems with through-and-through hits).[4]  A11525-27

(Newill).  Over time, these efforts would inform Phase II.

## B.    Interim Period Before Phase II

By summer 2004, Phase I of the program had concluded, and the Army

began formulating its strategy for a "Phase II."  A13240-42 (JTX 32).  While some

in the Army considered soliciting industry again, others believed that this would

---

[4]        In this context, "yaw" refers to the rotation of a bullet along its
longitudinal axis, and "yaw angle" refers to the degree that the bullet's longitudinal
axis deviates from its flight line.  *See* A3, n.7.

not be productive.  A13241-42; A13253; A11533 (Newill).   Many also recognized

that the projectile would be redesigned.  Accordingly, Dr. Newill, and Daniel

Mansfield, an ATK engineer, A11827-34, began formulating new designs in late

2004 and early 2005.  A13923-37; A11531-39 (Newill); A11844-46 (Mansfield).[5]

Mr. Mansfield submitted early concepts based on ATK jacket designs

already being made.  A11851-52 (Mansfield).  In late 2004, he began making

"sketches and napkin drawings" based on "the different ways you can make a

jacket, because we pretty much knew we were going to stick with a copper jacket

of some kind."  A11844-45 (Mansfield).  Mr. Mansfield envisioned three jacket

designs:  (i) "a closed-based projectile," (ii) "an open-based projectile," and (iii)

one with "some kind of partition in the middle."  A11845 (Mansfield).  These

designs were memorialized in a February 2005 briefing, which listed the same

three designs:  an open-base or full-metal jacket (designated "FMJ"), a reverse (or

closed-base) jacket (designated "RJ"), and a modular jacket (designated "MOD").[6]

A16908, A16917; A11848-54 (Mansfield).

---

[5]      By early 2005, ARL had already determined that 62 grains was the
optimal weight for a 5.56 bullet.  A14947, A14959 (DTX 156); A11552-64
(Newill).  Army engineers also knew that the new bullet's weight needed to be
similar to the M855 in order to be compatible with existing weapons.  A1326
(Riggs).

[6]      With a "full-metal jacket" (as seen with M855), the jacket encloses
the forward portion of the bullet and is open at the bullet's tail end.  With a

The FMJ and RJ concepts became known, respectively, as Concept 1 (also known as Concept A) and Concept 2 (also known as Concept B and B1). A11549-50 (Newill), A11864-65 (Mansfield).  Concept B (which evolved into the M855A1) was based upon an armor-piercing 50-caliber bullet (with a two-piece design) that ATK was marketing in September 2003.  A14893, A14896-97; A11872-82 (Mansfield).  By 2003, ATK had also applied this design to the 5.56 mm caliber, calling it the multipurpose or "MP" round.  A14788, A14807-09 (DTX 103); A11881-82, A11886-89 (Mansfield).  Like the 50-caliber version, the MP bullet featured a steel penetrator and reverse copper jacket.  A11881-82 (Mansfield).  It was later modified to become Concept B, by adding a copper slug, thereby making it a three-piece projectile.  A11891-92 (Mansfield).

No participants built any concepts before Phase II formally began, as both contractual details and industry participation were being debated.  A11579 (Newill).  Ultimately, the Army decided on an Army-ATK-only redesign effort, which was announced at a May 11, 2005, Industry Day.  A13278-99; A12110-11 (Riggs).

---

"reverse" jacket, the tail is enclosed and the jacket is open at the forward portion (like the accused A1 projectiles).

### C.    Phase II

With a formal contract in place, Phase II of the Green Ammunition Program began with a July 26, 2005, kick-off meeting.  A13095-137.  Its stated goals were to produce a lead-free projectile that performed at least as well as the M855 and increased cost no more than 15%.  A13098; A11571-72, A11581-82 (Newill).  Working with ATK, the program involved efforts from several different Army components: (i) ARDEC; (ii) PM-MAS; (iii) ARL; and (iv) user representatives from Ft. Benning, Georgia.  A13243, A13256; A11575-76 (Newill).  Structurally, the team was broken into program-oriented and technically-oriented IPTs.  A13115.  The Design IPT (which included Dr. Newill and Mr. Mansfield) was specifically tasked with developing new bullet designs.  A11585-89 (Newill).

At the outset, there was significant pressure on the engineering components to build, test and evaluate concept projectiles.  A13131; A11589-92 (Newill).  Ultimately, more than 21 concepts were built.  A13035-59; A11589 (Newill).  Between ARL and ATK, ARL focused more on "high risk" designs that were often more complex to build, whereas ATK focused on more conventional designs that could be built at LCAAP.  A11594-95 (Newill).  Not surprisingly, ATK created the first two concepts in Phase II:  Concepts 1 and 2 (later known as A and B).  A11603, A11610 (Newill).

By August 19, 2005, ATK had generated formal drawings of Concept B. A15195-98; A11629-33 (Newill), A11865-72 (Mansfield).  The drawings show a reverse-jacket projectile with similar dimensions, materials, and weight as the future M855A1.  A15196-98.  By October 2005, the design team was finalizing the drawings by analyzing the concept's large-scale manufacturability and strength of design (*via* computer simulation).  A11646-53 (Newill); A14885-92; A16858-64. By mid-January 2006, ATK had manufactured Concept B prototypes, which were then tested through April 2006.  A11657, A11659-70 (Newill); A16858-64 (DTX 575) (documenting build); A16919, A17004-07, A17032 (DTX 604) (discussed at A11899-904(Mansfield)); A13873, A13879 (JTX 76).

Testing showed that Concept B exhibited yaw-independent behavior, but it was not rated as the top-performing concept, as the team wanted a different slug at that time.  A13880; A11676-77 (Newill).  By October 2006, however, the basic ideas behind Concept B were revisited through Concept L, which featured a reverse jacket, a steel arrowhead penetrator, and similar behavior on impact. A13155, A13179 (JTX 24); A11688 (Newill).  Various iterations of Concept L were evaluated, and the final design, featuring a bismuth-tin slug, was ultimately chosen in May 2007.  A11626-28, A11687-89 (Newill).

Following the Critical Design Review (on the bismuth-tin prototype) in February 2008, the round then proceeded to qualification testing.  A13374, A1384

(JTX 46); A11692-95 (Newill).  During qualification, the slug was switched to

copper and the round was successfully qualified.  A11695-96 (Newill).  The Army

fielded the M855A1 in June 2010.  A11694 (Newill); A13076.

### D.    Final M855A1 Product

The fielded 62-grain M855A1 included many of the basic features seen in

Concept B:  a reverse copper jacket, a copper slug, and a similarly shaped

arrowhead penetrator.



**Diagram of M855A1 bullet.  A13.**

As a yaw-independent bullet, the M855A1 is more consistent and lethal than the

M855.  A11707 (Newill).  On impact, the M855A1 consistently breaks apart

(regardless of yaw and without tumbling), by fracturing of the jacket, which allows

separation of the slug and penetrator.  A11471-73, A11707-11 (Newill); A11423-

24 (Hanzl) (discussing A13638-39).

The M855A1, however, also defines an increased contact area or bearing

surface[7] along its jacketed surface as compared to the M855.  A11082-83 (ARL

Engineer Dr. Joseph South, A11064-65).  The bearing surface was deliberately

---

[7]    The terms "bearing surface" and "contact area" are used
interchangeably.  A15149 (¶ 45).

increased to create consistent barrel engraving (contact), so as to impart proper spin to the projectile and thereby improve flight stability.  A12010-13 (PM-MAS engineer Frank Hanzl, A11998-2002); A15161 (¶69).  This increase was also a natural consequence of using slug material (*e.g.* copper) less dense than lead to obtain the same weight as the M855.  A15161 (¶69); A11082-83 (South).

The M855A1 has also been shown to increase barrel friction and erosion (though within acceptable limits).  Because the eventual M855A1 would likely use a harder core material (than lead), the Army first tested the BE concept projectile, a reverse-jacketed projectile with a unitary steel core.  A12014-17 (Hanzl) (discussing A15199-226); A11605-08 (Newill) (discussing A13039).  This testing showed that bore resistance (barrel friction) was increased, albeit within acceptable ranges.  A12016 (Hanzl).  A subsequent M855A1 Production Qualification Test (measuring bullet velocity drop over time) showed barrel erosion more than 40% greater than the M855–results largely attributed to the completed M855A1's increased bearing surface.[8]  A15227; A12021-22 (Hanzl).  Subsequent Army tests have generated similar results.  A12023 (Hanzl).

---

[8]    Other aspects of the M855A1 round contribute to increased barrel erosion, namely a harder copper slug and new propellant.  But "probably the main reason" is increased bearing surface.  A12021 (Hanzl).

### E.    M80A1 Development

The development of the M80A1 began in the spring of 2006.  A11440

(Hanzl); A14970, 14974-76.  At that time, the Army decided to investigate whether

the leaded M80 projectile could be redesigned to have the same performance gains

achieved in the new M855A1, while removing lead.  A11440-42 (Hanzl); A14976.

Similar to the M855, the M80 had been the longtime NATO (and Army) standard

7.62 mm bullet, having been fielded by the early 1960s.  A2, n.2; A11976-77

(Middleton).  The metal-jacketed bullet features a one-piece lead core.  A16001-

02.

The M80A1 is not a direct scale-up of the M855A1, but is very similar in

terms of dimensions, materials and performance.  A11443-45 (Hanzl); A14782.  At

the time of trial, the M80A1 was not yet a fielded round, but had nearly completed

qualification testing.  A12023 (Hanzl).  This included testing that showed a 50%

increase in barrel erosion over the M80.  A17121-23; A12025-33 (Hanzl).  Again,

this is largely attributed to the M80A1's increased bearing surface.  A12031-33

(Hanzl).

## II.    ORIGINS OF THE '325 PATENT

Though ostensibly inspired by the September 11, 2001, terror attacks, PJ

Marx, the named inventor of the patent-in-suit, did not begin working with

ammunition until 2003[9] and did not conceive the patented technology until summer 2004.  A10359-60 (Marx).  "[T]o try to make a contribution to the war effort," Mr. Marx was seeking a new higher-density 5.56 mm projectile in the "115 gr[ain] range" that was similar to a higher-weight civilian bullet being marketed in a different caliber.[10]  A10289, A10294-96 (Marx).

### A.    Army Interactions

By late 2004, Mr. Marx began contacting Army components in an effort to commercialize his 5.56 mm "EPIC" prototype projectiles.  A13026-27.  He ultimately scheduled two meetings with Army personnel.  A10056-62 (Dean); A10350-51 (Marx); A11319-20, A12098-99 (Riggs); A13026-31.  On February 16, 2005, Mr. Marx met with PM-MAS engineer Paul Riggs at Picatinny Arsenal, New Jersey.  A10350 (Marx ); A11320, A12074-76, A12098-99 (Riggs).  At the time, Mr. Riggs was involved with management of the Green Ammunition Program, which was then contemplating Phase II.  A11308-12 (Riggs).  Mr. Marx showed Mr. Riggs a box of 50 loaded EPIC rounds (with cartridge cases) as well

---

[9]    Mr. Marx worked in a variety of other fields prior to his work on the patent-in-suit, and apparently held no ammunition-specific experience or education prior to 2003.  A10359-60 (Marx); A14461-62.  He also had no experience in mass producing ammunition.  A10359-60.

[10]    The trial court asserts that Mr. Marx was specifically seeking a M855 replacement, but Marx's cited testimony does not support that conclusion.  A6 (citing A10289-93).  He did, however, want to make a new bullet compatible with existing Army weapons.  A10295 (citing M4, M16 rifles).

as an EPIC projectile (without a cartridge case). A10350-51 (Marx); A12100-03 (Riggs).

Mr. Riggs told Mr. Marx that there were a number of problems with his prototypes. He explained that the resulting bullet (of 100 grains) was too heavy, as the program had to create a bullet of roughly 60 to 70 grains in order to match the ballistics of existing weapon systems. A10358-59 (Marx); A11326, A12102-03 (Riggs). He also stated that the EPIC bullet was too expensive because it contained tungsten and was difficult to manufacture. A11326, A12102-03 (Riggs).

On the next day, February 17, 2005, Mr. Marx held a face-to-face meeting at Ft. Benning with Lt. Col. Glenn Dean[11] and John Amick, a government contractor assisting Dean. A10321, A10352, A10361 (Marx); A10496-501 (Amick). Lt. Col. Dean was serving as Chief of the Small Arms Branch of the DCD, and as part of his duties, frequently met with industry representatives regarding new technologies potentially useful for soldiers. A10119, A10129-30 (Dean). In that capacity, he and Mr. Amick also worked to develop Army performance requirements for small-arms ammunition, but neither had expertise in designing ammunition. A10118-19 (Dean); A10512 (Amick).

---

[11] Dean was a Major in 2005, but a Lieutenant Colonel at the time of trial. A10041-49 (Dean).

After signing an NDA, A13023-25, Mr. Marx then gave Lt. Col. Dean the fifty rounds of EPIC ammunition originally shown to Mr. Riggs as well as a lone EPIC projectile.  A10066-71 (Dean); A10351, A10361 (Marx); A10491-92 (Amick); A13032.  Mr. Marx also presented bullet-velocity data, but did not leave those materials at Ft. Benning.  A10067-108 (Dean); A10361 (Marx).

Though not discussed by the trial court, the 2005 EPIC projectiles differed greatly in structure, materials, and weight from the M855A1.  All meeting participants (including Mr. Marx) agree that the EPIC design was very similar to the design on the cover of the '325 patent.  It featured an abbreviated cylindrical interface that did not reach either end of the projectile.  A10108-13 (Dean); A14795 (Dean drawing); A10354-55, A10364-65 (Marx); A10547-48 (Amick); A11321-22, A11337, A12101 (Riggs).  The interface also included several annular grooves, designed to reduce contact and friction with the barrel.  A10113 (Dean); A10365 (Marx); A10547-48 (Amick).  Other than the copper-alloy interface, all projectile components were made from tungsten-based material.  A10112 (Dean); A10355 (Marx).  Due to the high-density tungsten, these projectiles each weighed 100 grains—roughly 60% more than the 62-grain M855 (and ultimately the M855A1).  A10364 (Marx); A13275-76.

After meeting with Mr. Marx, Lt. Col. Dean emailed various Army and SOCOM personnel to assist Mr. Marx in making additional connections.  A10075

(Dean); A13032. Dean's email stated that the Marx technology was "very intriguing," but acknowledged that "without some more formal testing I cannot speculate on what the actual performance is." A13032. Lt. Col. Dean thus recommended that Marx's projectile be evaluated as part of the Green Ammunition or Lethality Programs. *Id.* Per Dean's request, Mr. Amick subsequently sent a subset of Marx's rounds to Mr. Riggs in early March 2005. A12108-09 (Riggs); A13300.

By this time, however, the Green Ammunition Program was moving away from an industry-based solution. As discussed, this culminated with a May 11, 2005, Industry Day, co-hosted by Mr. Riggs and attended by Mr. Marx, when industry representatives were informed that the program was progressing without industry involvement. A10365-66 (Marx); A12110-12 (Riggs); A13280, A13295-96.

There is no evidence that the EPIC rounds were ever tested as part of the Green Ammunition or Lethality Programs. Ultimately, only Ft. Benning personnel tested them. On November 1, 2005, Ft. Benning's USAMU shot ten of the fifty EPIC rounds provided by Marx, reporting poor results in terms of muzzle velocity, accuracy, and hard-target capability. A15193-94; A16857; A10120-24 (Dean); A10535-46 (Amick). Afterwards, there were very limited contacts between Mr. Marx and Army officials. A10119-24 (Dean); A10374-75 (Marx).

### B.   SOCOM Interactions

Mr. Marx's involvement with SOCOM[12] began in May 2005, when he was introduced by SOCOM personnel to Tucker Campion, a contractor working as a SOCOM user representative.  A10337-38 (Marx); A10956-63 (Campion).  Mr. Campion learned that Mr. Marx was working on a heavier small-arms projectile and wanted to assist Marx in pursuing a SBIR contract.  A10963-64 (Campion).

Thereafter, Mr. Marx shared details of his EPIC technology, including a sample projectile provided on August 8, 2005.  A13494-95; A10981-82 (Campion).  This projectile, the EPIC 115, also had a design "very similar" to the cover of the '325 patent, but weighed 115 grains.  A10364 (Marx); A14447.

On January 13, 2006, Liberty submitted a proposal that led to a SBIR contract.  A14447-72.  Consistent with earlier disclosures, the proposal only described designs featuring an abbreviated interface with an exposed penetrator and slug and frequently called for use of heavier tungsten materials.  A14449-50, A14455, A14465.  While several bullets featured interfaces without annular grooves, none possessed a jacket that encloses either projectile end.[13]  A14455-57.

---

[12]    Separate from the Army, SOCOM oversees the various special-operations components of the DOD and makes its own procurement decisions regarding small-arms ammunition.  A10765-67 (Bennett).

[13]    For example, the only bullet actually test-fired under the eventual contract was a 116-grain bullet with the open-ended interface, but lacking annular grooves.  A14473-75; A10388-89 (Marx).

The proposal also described the EPIC projectiles as yaw-dependent, just like the

M855. A14451 (describing gel shot as suggesting "yaw induced fragmentation");

A14465 (describing bullet that "tumbles and breaks").

### C.    New Liberty Designs After Fielding of M855A1

Mr. Marx unequivocally testified that, in 2005, he only shared projectiles

with the design depicted on the cover of the '325 patent, A10365, and had not

made a reverse-jacket (or cup) design before his meeting at Ft. Benning. A10404

(Marx). Nevertheless, Liberty began producing bullets similar in materials and

design to the new M855A1, but the only documented efforts post-date the

M855A1's fielding in June 2010. On September 8, 2010, for example, Liberty

demonstrated a 4.6 mm caliber bullet to SOCOM employee John Bennett

(A10751-59), which featured a reverse copper jacket, a copper slug, and steel

penetrator. A13946-47. While he noted the similarities to the M855A1, A13, Mr.

Bennett testified that he did not personally know whose design came first.

A10778-800 (acknowledging second-hand information). Notably, during the same

time period, Liberty principals asserted that Liberty was the "designer of the

M855A1" in commercial interactions with foreign governments and militaries.

A12531-34 (former Liberty CEO Brent Willis (2009-12), A12468-71, A12484-90;

A12527-30).

## III.   THE '325 PATENT

In the midst of his interactions with the Army and SOCOM, Mr. Marx filed

the '261 application on October 21, 2005.  A17188.  It issued as the '325 patent,

A17124-36 (PTX 1), and discloses embodiments very similar to the 2005 EPIC

projectiles.  The patent generally discloses a three-piece projectile with (1) a nose,

(2) a tail, and (3) an exterior, interconnecting surface called an "interface."  *Id.*

Much of what the patent discloses and claims as novel relates to two key features

of the "interface" structure:  (1) that it reduces the area of contact between the

bullet and the firearm barrel, and (2) that it is structured to provide "controlled

rupturing."

First, to improve the barrel life of the firearm, the patented technology

"eliminates the use of a jacketed projectile" by having "an exterior surface that

engages the rifling along a reduced contact area" as compared to traditional

jacketed lead projectiles.  A17132 (1:35-41, 62-66); *see also* A17134-35 (6:63 to

7:4).  By reducing contact area, barrel friction is reduced, thereby decreasing barrel

wear and fouling.  A17132 (2:7-12, 45-49), A17134 (7:6-9).

While the patent purports to enable projectiles in many calibers, A17132

(2:24-30), only one example of a traditional projectile is discussed, the leaded

M855.  A17132 (1:35-43).  The specification proposes an improved bullet (using

denser materials) that could have the "same physical dimensions" as the M855, and

yet weigh 107 grains, "a 72 percent weigh increase." *Id.* (1:37-41). No other criteria or examples for identifying traditional jacketed lead projectile are discussed.

Like Mr. Marx's 2005 EPIC projectiles, the patent discloses one principal "interface" embodiment that could create a reduced area of contact. This interface is repeatedly described as being "disposed intermediate opposite ends" of the projectile body, *e.g.* A17132 (2:54-55), and repeatedly shown (in the drawings) as an exterior surface that does not reach (or enclose) either end of the projectile. A17126-31 (Figs. 1, 1A, 1B, 1C, 4, 7).

Second, in addition to creating a reduced contact area, the interface also interconnects the nose and tail portions, but allows them to separate from one another upon striking a target. A17132 (2:54-67). The patent initially describes this separation in terms of a "controlled fragmentation" that is "facilitated by one or both of the nose and tail portions being removably attached or connected to the interface." *Id.* (2:62-67). The specification then describes how, according to the "present invention," the interface "rupture[s]" due to the "tumbling" of the bullet upon penetrating a target:

> [T]he interface is structured to rupture in certain instances, such as, but not limited to, when the projectile strikes a predetermined target such as a human or animal target. *More specifically, when the projectile body of the present invention penetrates a soft target it begins to "tumble" typically resulting in the interface rupturing.*

A17132-33 (2:67 to 3:11) (emphasis added).  The patent does not disclose other mechanisms for creating separation of the nose and tail portions, other than rupturing caused by tumbling.

### A.    '325 Patent Claims

Consistent with the specification, the two independent claims of the patent, claims 1 and 32, each include limitations directed to an "interface" that defines a reduced contact area and that is structured to provide "controlled rupturing" on impact.

Claim 1 reads:

1.  A projectile structured to be discharged from a firearm, said projectile comprising:

a body including a nose portion and a tail portion,

said body further including an interface portion disposed in interconnecting relation to said nose and tail portions, said interface portion *structured to provide controlled rupturing* of said interface portion responsive to said projectile striking a predetermined target,

said interface portion disposed and dimensioned to define a *reduced area of contact* of said body with the rifling of the firearm, said interface portion maintaining the nose portion and tail portion in synchronized rotation while being fixedly secured to one another by said interface portion whereby upon said projectile striking said predetermined target said interface portion ruptures thereby separating said nose and tail portions of said projectile.

A17135 (7:57 to 8: 5) (emphases added).  Claim 1 does not require the interface be disposed at "intermediate opposite ends," but does require that it define a "reduced area of contact" with the firearm's rifling.

Claim 32 reads:

32.  A projectile structured to be discharged from a firearm, said projectile comprising:

a body including a nose portion and tail portion,

said body further including an *interface portion disposed intermediate opposite ends* of said body in interconnecting relation to said nose and tail portions, said interface portion *structured to provide controlled rupturing* of said interface portion responsive to said projectile striking a predetermined target, said interface portion maintaining said nose portion and tail portion in synchronized rotation while being fixedly secured to one another by said interface portion whereby upon said projectile striking said predetermined target said interface portion ruptures thereby separating said nose and tail portions of the projectile; and

said exterior surface of said interface portion disposed and structured to define a primary area of contact of said body with an interior barrel surface of said firearm.

A17136 (9:55 to 10:17) (emphases added).  Unlike claim 1, claim 32 specifically recites an interface "disposed intermediate opposite ends of said [projectile] body" rather than a "reduced area of contact."  *Id.*  Claims 1 and 32 both recite an interface that is "structured to provide controlled rupturing."

## B.    Prosecution of the '325 Patent

In the brief prosecution of the '325 patent, the Examiner initially rejected all pending claims,[14] A17210-18, (i) under 35 U.S.C. § 112, first paragraph, for failing to enable interface embodiments lacking "annular grooves" and (ii) under

---

[14]      Original claim 43 contained the "intermediate opposite ends" limitation and ultimately issued as independent claim 32.  A17216-17.

35 U.S.C. § 102(b) as being anticipated or rendered obvious by the Cooke,

Hotchkiss and Strandli references.  A17243-50; A180-86 (Cooke); A169-72

(Hotchkiss); A173-79 (Strandli).

The Applicant (Mr. Marx) responded by amending the independent claims to

specifically recite, *inter alia*, "annular grooves disposed in spaced relation to one

another along a length of said interface," arguing that these amendments

distinguished the claims from the cited art.  A17254-73.  In response, the Examiner

issued a restriction requirement addressed in two subsequent Office Actions,

A17278-91, and did not address the earlier claim rejections.  *Id.*

Following a successful election of claims, A17295-303, the Applicant

attended an interview with the Examiner on January 12, 2010, to discuss the

pending claims.  A17322-25.  In his interview summary (and accompanying

amendment), the Applicant asserted that he convinced the Examiner that "annular

grooves" were "never disclosed to be essential" and their absence "did not render

the claimed invention inoperable."  A17309-19.  The Applicant amended his

independent claims accordingly, removing the "annular grooves" language and

adding language requiring "said interface portion [to be] structured to provide

controlled rupturing of said interface portion responsive to said projectile striking a

predetermined target . . . ."  A17310, A17315-16.  In turn, he argued that the

Hotchkiss, Strandli, and Cooke references did not teach interfaces "structured to

provide controlled rupturing" and further that the Strandli and Cooke interfaces did not "define a reduced area of contact with the rifling." A17318-19. These amendments and arguments led to issuance of the patent. A17334-35.

## SUMMARY OF THE ARGUMENT

The trial court fundamentally erred (1) by construing the asserted claims too broadly in its infringement analysis, and in turn, (2) by applying narrower constructions in an obviousness analysis further flawed by the court's reliance on overly rigid and improper legal standards. In doing so, the court found that the A1 projectiles infringe even though they possess jackets that significantly differ from the claimed "interfaces." In turn, the court refused to find the claims obvious by failing to properly consider prior-art disclosures of three-piece projectiles with jackets that facilitate projectile breakup upon impact, the essential features required under the court's constructions.

Regarding infringement, the trial court erred by construing the terms "reduced area of contact," "intermediate opposite ends." and "controlled rupturing" so broadly as to encompass reverse jackets of the A1 projectiles. The asserted claims are directed to three-piece bullets containing a nose portion, a tail portion, and an outer "interface" that holds them together. The disputed claim terms all relate to the interface structure.

- 26 -

Both asserted independent claims (and thus all asserted claims) include a limitation requiring an interface that defines a reduced area of contact with the rifling of a firearm.  Claim 32 specifically requires an interface "disposed at intermediate opposite ends" of the projectile body.  Here, the patentee has clearly claimed a particular embodiment that reduces contact area.  The patent clearly describes and claims this as an open-ended structure that does not extend to either projectile end.  The trial court, however, rejected such a construction.  Citing an open-transition claim term ("including"), the trial court erred by construing "intermediate opposite ends" to only require that the interface cover the "middle" of the projectile, thus permitting it to extend and enclose a projectile end.  While an open-transition term can permit additional elements, it cannot render the term "intermediate" meaningless.  As a result, the trial court's construction erroneously encompasses the reverse jackets of the A1 projectiles, which enclose the projectile's tail and cover more than two-thirds of the projectile's length, as well as all projectile jackets that merely cover the "middle" of the projectile in some fashion.

Independent claim 1 requires an interface defining a "reduced area of contact" with the barrel, which the court construed to require a contact area less than a "traditional jacketed lead bullet."  While that construction of this term of degree was fine as far as it went, the court's construction provided no criteria for

measuring a "reduced area" with reasonable certainty.  Applying an indefinite

construction, the court found infringement simply because *some* heavier, larger

comparator projectiles had greater contact areas than the A1 projectiles.

The patent only provides one example of a traditional lead bullet, the M855,

and gives no other guidance.  For the construction to be definite, the M855 must

serve as the standard of comparison for the successor M855A1.  In turn, the

comparable NATO-standard 7.62 mm bullet, the M80, must be the standard of

comparison for the M80A1.

Under this construction, the A1 projectiles clearly do not infringe.  In

designing the A1 projectiles, the Army deliberately (and significantly) increased

the contact area of the predecessor rounds, the M855 and M80.  This design

improved some performance attributes, but increased barrel friction and wear (the

very items the patent seeks to reduce).

The court also construed the "controlled rupturing" limitation (in all asserted

claims) too broadly.  The patent describes the "present invention" as directed to a

yaw-dependent projectile, which penetrates a target, tumbles, and then breaks apart

due to interface rupturing.  During prosecution, the Applicant similarly

distinguished his invention from prior-art fragmenting jackets.  But the court

incorrectly construed "controlled rupturing" as permitting interface "rupture" by

any mechanism.  Under a proper construction, the A1 projectiles do not infringe as

their reverse jackets are designed to fracture independent of yaw and do not require tumbling to initiate that reaction.

The trial court also made numerous errors in finding the asserted claims nonobvious. First, the court ignored unmistakable prior-art disclosures of jacketed projectiles "structured to provide controlled rupturing" and also applied a narrower construction than it had in finding infringement. Second, it applied an improper legal analysis by, *inter alia*: (i) applying the rigid teaching-suggestion-motivation test and ignoring specific evidence of motivations to combine; (ii) requiring more than a "reasonable expectation of success" for cited combinations; and (iii) evaluating obviousness only from the perspective of the inventor. As a result, the trial court refused to consider *any* cited combinations of prior art, despite specific expert testimony on motivations to combine.

Finally, the trial court exceeded its jurisdiction by granting a running royalty for future procurement of the A1 projectiles. Under section 1498, the government is only liable for past infringing activities under an eminent-domain theory of damages. Thus, there has been no waiver of sovereign immunity that would permit such an unprecedented award.

# ARGUMENT

## I.    STANDARDS OF REVIEW

Though claim constructions may involve mixed questions of law and fact, thus requiring deference to the trial court, this Court reviews constructions *de novo* when the trial court "reviews only evidence intrinsic to the patent." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 834 (2015).  Here, though both parties submitted extrinsic evidence, the trial court found that "[n]o extrinsic evidence is necessary for resolution of claim construction for the '325 patent."  A63.  All of the government's appellate arguments are also based on intrinsic evidence.  Thus, the challenged constructions are subject to *de novo* review.  *See In re Papst Licensing Digital Camera Patent Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015).

Obviousness under 35 U.S.C. § 103 is a "question of law, reviewed *de novo*, based upon underlying factual questions which are reviewed for clear error following a bench trial."  *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006).  The ultimate obviousness determination is reviewed *de novo*, as this Court must "ensure that the law has been correctly applied to the facts." *Agriza, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1343 (Fed. Cir. 2008).  In turn, inquiries regarding the content of the prior art and the presence (or absence) of motivations to combine prior-art references are factual issues reviewed for clear

error. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18 (1966); *Alcon Res., Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1365 (Fed. Cir. 2012).

Finally, whether the trial court had subject matter jurisdiction to award prospective relief is also subject to *de novo* review. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1078 (Fed. Cir. 2001).

## II.    THE TRIAL COURT IMPROPERLY FOUND THAT THE A1 PROJECTILES INFRINGE DUE TO OVERLY BROAD CONSTRUCTIONS OF THE "INTERMEDIATE OPPOSITE ENDS," "REDUCED AREA OF CONDUCT," AND "CONTROLLED RUPTURING" LIMITATIONS.

To establish infringement under section 1498, Liberty must prove by a preponderance of the evidence that *every limitation* set forth in a patent claim is found in the accused product or process exactly or by a substantial equivalent.[15] *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) (citations omitted). Failure to meet a single limitation negates infringement of the claim. *Id.*

A patent infringement analysis is a two-step process: a threshold determination of claim interpretation followed by a determination of whether the properly construed claims encompass the accused process or products. *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1247-48 (Fed. Cir. 1998). To

---

[15]    The infringement analysis under 35 U.S.C. § 271(a) parallels the analysis to determine unauthorized use or manufacture under 28 U.S.C. § 1498. *Casler v. United States*, 15 Cl. Ct. 717, 731 (1988), *aff'd mem.*, 883 F.2d 1026 (Fed. Cir. 1989).

determine the meaning of claim language, this Court must first consider (1) the language of the claims, (2) the specification, and (3) the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted). Only when this evidence is insufficient may a court then consider extrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc).

At trial, Liberty asserted infringement of independent claim 1 and claims 2-3, 7-11, 18-20, 22, 25, 28-31 (which depend from claim 1) as well as independent claim 32 and claims 38-41 (which depend from claim 32). A20. The trial court found that all 22 asserted claims were literally infringed entirely because of improper claim constructions. Under proper constructions, two limitations from each independent claim (and thus each asserted claim) are not met by the A1 projectiles, either literally or under the doctrine of equivalents. Thus, the trial court legally erred in expanding (or eliminating) certain limitations to encompass the A1 projectiles.

## A. "Intermediate Opposite Ends" and "Reduced Area of Contact"

As discussed, each of the independent claims recites a limitation directed to an interface that defines a reduced area of contact with the rifling of the firearm. Claim 1 requires a "reduced area of contact," while claim 32 requires an interface "disposed intermediate opposite ends." The trial court construed these terms too

broadly, by ignoring intrinsic evidence (provided by the claims and specification) as well as the public-notice function of claims.

### 1.    Claim 32 and its Dependents Are Not Infringed Under Proper Construction of "Intermediate Opposite Ends."

Independent claim 32 specifically recites an "interface portion disposed intermediate opposite ends" of the projectile body.  A17136 (10:2-3).  This language should be construed to mean that "the interface is positioned between the front end and the rear end of the projectile body (such that the interface does not extend all of the way to the front or to the end of the projectile)."  A61.  This construction is supported by repeated specification passages and the plain meaning of the claim language.

The specification discloses one interface embodiment, described as being disposed at "intermediate opposite ends."  A17125 (Abstract), A17132 (2:53-58).  Discussing the patent figures, the specification states that "the projectile body **12** includes an interface **18**, shown in detail in FIGS. 4 and 7, *disposed intermediate the opposite ends* of the projectile body **12** in interconnecting relation to the head portion **14** and the tail potion **16** as demonstrated in FIG. 1."  A17133 (4:24-29) (emphasis added).  Indeed, Figures 1, 4 and 7 display an interface **18** consistent with the government's construction–a banded-type structure that does not reach either end of the projectile.  A17126-31 (Figs. 1-7).



**Figure 1 of '325 patent.  A17126.**

The government's construction also corresponds with the ordinary meaning

of the claim language.  *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,* 334 F.3d

1294, 1298 (Fed. Cir. 2003).  "Intermediate opposite ends," by itself, strongly

suggests that the interface is not disposed at either end, but rather at an

intermediate position between the ends.

The trial court rejected the government's construction as "unwarranted"

insofar as it prohibited the interface from extending to a projectile end.  A61.

Instead, the court construed the term to mean that "the interface is positioned

*between or in the middle of* the opposite ends of the forward end of the nose

portion and the trailing end of the tail portion."  A62 (emphasis added).  The court

further explained that "'intermediate opposite ends' indicates by its plain meaning

an embodiment where the interface is positioned between the tail and nose, though

*not necessarily enclosing* the tail or nose." A61 (emphasis added). In distinguishing the recited "interface" of claim 1, the court similarly noted that claim 32 and its dependent claims did not "describe" an embodiment "in which the interface encloses at least one of the nose and tail [portions]." A52. Thus, the construction was vague as to whether an interface could enclose a projectile end.

Even with this vague construction, the government's expert, Dr. Clarence W. Kitchens, Jr., testified that the court's construction should not cover the A1 projectiles, where the unitary jacket encloses a projectile end and extends over two-thirds of the projectile length. A12231-34 (Kitchens). Such embodiments are not "intermediate" in any way. A15163-64 (¶¶75-78). The interface simply cannot be disposed "intermediate opposite ends" if it extends to one of them.

The trial court disagreed, ruling that an "interface disposed intermediate opposite ends" can encompass jackets that enclose one or both projectile ends, like the reverse jackets of the A1 projectiles. A20-21. In the court's view, the term requires the interface (jacket) to cover the middle portion of the projectile, but is not limited to just covering the middle portion. A21. Adopting Liberty's arguments, the court reasoned that the limitation is preceded by "including," an open transition term, and thus permits additional elements, namely additional length to the interface. *Id.* (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008)).

This Court, however, has expressly rejected this rationale. An open transition term allows for additional elements, but does not "reach in" to recited claim elements and make them open-ended. *Promega Corp. v. Life Techs. Corp.*, 773 F.3d 1338, 1350 (Fed. Cir. 2014); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007); *see also Spectrum Int'l, Inc. v. Sterlite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998) ("Comprising is not a weasel word with which to abrogate claim limitations."). In other words, a court cannot use an open transition term to completely read a limitation out of a claim. *See, e.g.*, *Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993). Here, the trial court did that by not requiring the "interface" to be in an "intermediate" position.

The court's construction is also contrary to the public-notice function of claims. The claim language forms "the metes and bounds of the right which the patent confers on the patentee." *Corning Glass Works v. Sumitomo Elec. USA, Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). This gives notice to others and permits them to avoid infringement. *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (citation omitted). Here, the public should be able to rely on the claim's express words that limit the interface to those embodiments disposed "intermediate opposite ends" of the projectile body. Such reliance is reasonable in light of the express claim language and the patent's description of the

disclosed projectiles as not being "jacketed as in conventional copper-jacketed projectiles," A17134 (6:63-67).

Properly construed, an interface "disposed intermediate opposite ends" cannot stretch to either end of the projectile, which excludes the reverse-jacketed A1 projectiles. Accordingly, neither A1 projectile meets this limitation literally, as alleged by Liberty.[16] As the limitation is an embodiment of an interface that defines a "reduced area of contact," the limitation is not met by equivalents for the same reasons as the "reduced area" limitation. A12233-34 (Kitchens); A15165 (¶79); *see infra* II.A.2. Thus, as the disposition and length of the A1 jackets are not disputed, this Court should reverse the trial court's finding that asserted claims 32 and 38-41 are infringed by the A1 projectiles.

### 2.    Claim 1 and its Dependents Are Not Infringed Under Proper Construction of "Reduced Area of Contact"

Claim 1 requires an "interface portion disposed and dimensioned to define a reduced area of contact of said [projectile] body with the rifling of the firearm." A17135 (7:65-67). The specification explains that "the design and structuring of a proposed projectile would result in a contact area thereon which would be significantly less than a traditional jacketed lead bullet," A17132 (2:4-6), and

---

[16]    Liberty's expert only asserted that the limitation was literally met, and Liberty did not assert infringement by equivalents. A10667-69 (German); A17395-96 (¶¶227-31).

consistently references the "reduced area" in this manner. *Id.* (1:63-66); A17135 (7:3-9). The patent explains that "by reducing the contact area of the projectile, barrel friction would be significantly reduced." A17132 (2:6-8). As a result, the projectile can improve barrel performance and barrel life. *Id.* (2:9-13, 45-49).

Nevertheless, the specification provides no general criteria for determining what constitutes a traditional projectile. The only example given is the M855, the predecessor to the M855A1. A17132 (1:36-43). Specifically, the patent references the M855 as a "conventional jacketed lead projectile" and discusses the need for a heavier, lead-free alternative that provides greater terminal energy. *Id.*

The prosecution history gives no further guidance to one of ordinary skill. While the Applicant argued that the Cooke and Strandli references did not teach a "reduced area," those references do not provide information on specific projectile dimensions and calibers, which are needed to evaluate whether an accused projectile comparatively has a "reduced area." A180-86 (Cooke); A173-79 (Strandli).

The term "reduced" is a term of degree, and thus, raises issues of definiteness. Under 35 U.S.C. § 112, second paragraph,[17] a claim is invalid for

---

[17]    Section 112 amendments implemented by the 2011 Leahy-Smith America Invents Act, Pub. L. 112-29, 125 Stat. 284, are inapplicable to this case, as the relevant patent application was filed before September 16, 2012, and proceedings began prior to September 16, 2011.

indefiniteness when the intrinsic evidence "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

While terms of degree may not be precise, this does not necessarily render the claim language hopelessly indefinite. *Biosig Instruments, Inc. v. Nautilus, Inc.*, No. 2012-1289, 2015 WL 1883265, at *3 (Fed. Cir. Apr. 27, 2015); *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). When a term of degree is used, the court should determine whether the specification provides some standard for measuring that degree. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1367 (Fed. Cir. 2010); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010).

The claim language is definite if the specification provides examples that can be used to measure the degree, even if no precise numerical standard is provided. *See Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1381 (Fed. Cir. 2001). Here, the M855 must be explicitly designated as a traditional 5.56 mm projectile in construing the limitation. Accordingly, the government proposed the construction: "the area of contact between the projectile and the rifling of the firearm is less than that of a traditional jacketed projectile, which includes the M855." A55. The government further asserted that "because the M855A1 is the same caliber ammunition (5.56 mm) as the M855, the M855 is a

*proper standard for comparison* in the present case."[18]  A140, n.12 (emphasis added).

The trial court disagreed, construing the limitation to mean:  "the area of contact between the interface and the rifling of the firearm is less than that of a traditional jacketed lead bullet of calibers .17 through .50 BMG."[19]  A56.  In rejecting the M855 as an objective standard, the court explained that its construction was "more precise" in that it was "limited to those projectiles comparable to the ones enabled by the '325 patent," namely all calibers between .17 through .50 BMG.  *Id.*; *see also* A23 (rejecting M855 and M80 as sole comparators).

The application of the court's construction to the A1 projectiles, however, highlights its indefiniteness.  Lacking any stated criteria, both experts compared the A1 projectiles to numerous bullets (most commercially sold by Sierra and Berger) in the 5.56 mm and 7.62 mm calibers identified as "traditional projectiles." A15149-51 (¶46), A15157 (¶58); A17371-75 (¶¶49-64).  In total, the experts evaluated 26 (5.56 mm) bullets and 15 (7.62 mm) bullets as comparators.  A15151 (Table 1), A15157 (Table 2).

---

[18]     The M80A1 design was finalized in mid-2014, and thus was not an accused product during *Markman* proceedings in 2013.

[19]     The trial court also added the requirement that "traditional projectiles" must be leaded.

The parties' experts used similar methods to calculate contact area defined by the jackets of the A1 projectiles,[20] and only compared projectiles of the same caliber.  A23, n.34; A15147 (¶40); A17372-74 (¶¶55-63).  Thus, their differing conclusions turned on what each chose as comparator projectiles.  All comparators identified by Liberty's expert, Dr. Randall M. German, were heavier than the A1 projectile they were compared to and all had greater contact areas.[21]  A10701-10 (German) (discussing in part A17438-40); A17371-75 (¶¶49-64).  In turn, Liberty asserted that both A1 projectiles had a smaller contact area than *a number* of traditional bullets and thereby met the limitation.  A17372 (¶56), A17374 (¶62).

Under the court's construction, Dr. Kitchens asserted that the M855 and M80 were the best comparators (among numerous candidates) for the M855A1 and M80A1.  A12192-93 (Kitchens); A15146-47 (¶39).  Apart from the patent's citation of the M855, both projectiles were also NATO (and Army) standard rounds in the same caliber, as well as predecessors to the A1 projectiles.  A15145-

---

[20]    The claim requires the "interface" to define the contact area, which would have to be the A1 projectiles' jackets.  Dr. Kitchens acknowledged that their reverse jackets defined the entire contact area, so each jacket's contact area is synonymous with the projectile's contact area.  A15148 (¶43), A15154-55 (¶53).

[21]    In one instance, Dr. German relied on a 7.62 mm comparator that was lead-free.  A10708-09 (German) (discussing A17418-25).  For certain comparators, he made calculations from unscaled photographs subsequently evaluated by Dr. Kitchens.  A10698-700 (German); A12204-06 (Kitchens).

47 (¶¶34-39).  Both were also leaded, jacketed rounds that had been used for decades.

Lacking annular grooves and similar features, both A1 projectiles were designed to have significantly greater contact areas than their predecessors.  Dr. Kitchens calculated, based on engineering drawings, that the M855A1 had a 12.3% greater contact area than the M855.  12193-98 (Kitchens); A15148-49 (¶¶43-45) (citing A13563, A13951).  And, he further calculated that the contact area of the M80A1 was 24.8% and 10.3% greater, respectively, than the contract areas of the two M80 variants fielded by the Army.[22]  A12221-25 (Kitchens); A15154-57 (¶¶54-57) (citing A14400, A16001-02).

Given the court's vague construction, Dr. Kitchens also addressed a number of additional projectiles.  A15151, A15157.  Unlike Dr. German, he found that a proper comparator's weight should be similar to the subject A1 projectile.  A15147 (¶41); A12191-93 (Kitchens).  As the '325 patent acknowledges, if one significantly increases the weight of a "conventional jacketed lead projectile" an increase in length "would have to be assumed," A17132 (1:41-46).  This generally correlates to a larger contact area.  A22192 (Kitchens).

---

[22]    The M80 is constructed according to two slightly different designs (termed "variants" by Dr. Kitchens), reflected in separate drawings.  A16001-02; A11977-79 (Middleton).  The M80 variants weigh slightly more than the M80A1. A15155-56 (¶55).

The trial court, however, wholly rejected Dr. Kitchens' analysis based on a construction that does not provide "reasonable certainty" regarding its boundaries. Finding that the M855 and M80 bullets weren't the "sole comparators," the court adopted Liberty's arguments that the A1 projectiles have less contact area than "a number" of traditional lead projectiles. A24. The court rejected projectile weight as a criterion, finding that, by changing the "material of construction," a bullet can become heavier and not longer.[23] A22, n.33 (citing A10691 (German)). Instead, the court asserted that Dr. Kitchens' comparators were improper in that they that were "shorts," non-military rounds, and/or were "partially jacketed," all criteria previously omitted from the earlier construction. A24.

This construction violates the public-notice function of claims. *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996); *see also Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2004). Under the trial court's view, the patentee merely has to identify some heavier bullets of the same caliber, which tend to have greater bearing surfaces, in order to prove infringement. This creates a "zone of uncertainty" as to where the limitation's boundaries lay, a hallmark of indefiniteness. *Nautilus*, 134 S. Ct at 2130 (citation omitted). Regarding the M855A1, this is particularly true. The Army deliberately increased the contact area from the jacketed M855, the only

---

[23]     The court's construction, however, requires leaded comparators.

traditional projectile referenced in the patent, but the M855A1 was somehow adjudged to have a reduced contact area. Illogically, this also means that the M855 itself must have a reduced area of contact.

Under a proper construction, using the M855 as an objective standard, the A1 projectiles do not meet the limitation literally. Being the same caliber, M855 would be the standard of comparison for the M855A1, which has a significantly greater contact area. The M80, as the standard NATO (and Army) 7.62 mm caliber bullet for decades, should be the standard comparator for the M80A1, which has a significantly greater contact area than both M80 variants.

This evidence is undisputed, as Liberty's expert declined to address the M855 and M80. Nevertheless, Dr. German agreed that there was "no reason" for the M855 *not* to be a comparator bullet under the court's construction. A10689-91 (German). And while the M80 was addressed in his expert report, he admitted to mistakenly overestimating its bearing surface. A10706-07 (German). Dr. German did not recalculate it for trial because he was told it was "not important," as expert reports had already been submitted. A24, n.36 (citing A10706-07).

The undisputed evidence also shows that the A1 projectiles do not meet this limitation by equivalents. Under the function-way-result test, the "reduced area" limitation functions to reduce barrel friction by reducing the bearing surface (through some design feature), thereby resulting in reduced barrel erosion. Unlike

the patented projectiles, the increased contact area of the A1 projectiles increases barrel friction, resulting in greater barrel erosion than the predecessor M855 and M80. A15159-62 (¶¶63-72); A12228-30 (Kitchens).

This analysis is also undisputed, as Dr. German analyzed equivalence based on Liberty's rejected claim construction, not the court's construction. A55-56. Rejecting a comparison to traditional projectiles, Dr. German asserted that A1 projectiles met the limitation by equivalents because they have areas of "reduced diameter" or circumference, including a pointed nose and tapered rear, which do not contact the barrel. A10608-09 (German); A17373 (¶58), A17135 (¶65). This view of the limitation was properly rejected by the trial court as "self-referential" in that the contact area has not been reduced "from anything." A55; A10688-89 (German). Indeed, Dr. German relied on the fact that the A1 projectiles are "smaller in some places than others" to find equivalence. A55.

## B.    "Structured to provide controlled rupturing"

The trial court also erred by construing the term "controlled rupturing" to mean "the interface portion is structured to rupture (*i.e.*, break apart) upon striking a target or object, separating two or more of the components of the projectile." A55. This construction is improperly broad, by not requiring an interface that is structured to "rupture" due to "tumbling," *e.g.* in a yaw-dependent manner. A53-55.

The patented "interface" interconnects the nose and tail portions, allowing them to separate upon striking a target. A17132 (2:54-67). The "Summary of the Invention" first describes this separation in terms of a "controlled fragmentation." *Id.* (2:62-67). Immediately following this passage, the patent states that "when the projectile body *of the present invention* penetrates a soft material target it begins to *'tumble' typically resulting in the interface rupturing*." A17133 (3:5-7) (emphases added).

Where the specification describes an aspect of a claim term as part of the "present invention," rather than simply "an embodiment," such statements are strong evidence to limit the claim scope. *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Honeywell v. I.T.T.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006); *SciMed v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001). In some instances, such "clear and unmistakable" statements can establish a "disavowal or disclaimer" of claim scope. *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1025-26 (Fed. Cir. 2015).

Here, the specification repeatedly describes "rupturing"[24] in terms of penetration and tumbling, and discloses no other mechanisms for creating "controlled fragmentation." The abstract plainly states that "[s]eparation of the nose and tail portions . . . is *caused by the tumbling* of the projectile and the

---

[24]   The term "controlled rupturing" is only found in the claims.

cooperative structuring of the interface to facilitate separation . . . ." A17125

(emphasis added).  Similarly, in describing the patent's figures, the specification

explains:

> More specifically, when the projectile body **12** penetrates a soft target
> (human, animal, etc.) it begins to "tumble".  Due at least in part to the
> forces exerted on the projectile body **12** and the structural features of
> the interface **18** during such tumbling, the interface **18** will separate or
> rupture.

A17134 (5:17-21).  It then states that "the nose and tail portions 14 and 16 separate

from one another by the fact that the interface 18 *ruptures upon striking the target*

*and/or during the tumbling procedure*." *Id.* (5:24-26) (emphasis added).  Only one

terminal mechanism, however, is described here.  As Dr. Kitchens' explained, if

the projectile enters at a very large yaw angle, it may rupture "very shortly after

entering the target" and thus "rupture upon striking the target." A196 (¶17).  At a

low yaw angle, the bullet penetrates further before tumbling and rupturing.  *Id.*

Liberty's expert agreed that a "bending" force can lead to interface rupturing by

tumbling after penetration or alternatively "a hit at an angle to a target." A571.

Thus, this disclosure is consistent with the government's construction.

The prosecution history further supports this position.  To obtain allowance,

the Applicant distinguished the pending claims from the Cooke reference as not

describing "controlled rupturing responsive to impact." A17318-19.  Cooke

describes a "fragmenting projectile," where the exterior casing 14 (the cited

interface, A17245) is formed by two or more adjacent threaded sleeves, which

surround explosive material.  A182-83 (Figs. 1, 6).  The threaded sleeves remain

intact on launch and target penetration, but fragment in a controlled manner (into

consistently sized pieces) after detonation of the explosive material.  A184 (1:58-

61), A185 (3:36-43).  But Cooke does not disclose an "interface" that breaks apart

due to tumbling.

Thus, Liberty's statements indicate that "controlled rupturing" does not

encompass interfaces structured to "rupture" without tumbling.  *MBO Labs., Inc. v.

Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007).  This subject

matter cannot be reclaimed to prove infringement.  *Southwall Techs., Inc. v.

Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

Aligned with this intrinsic evidence, the government construed the limitation

to mean that "the "interface is structured (or constructed) so that as the claimed

projectile penetrates a predetermined target, such as a soft material target, the

projectile begins to tumble and this tumbling leads to the interface rupturing . . . ."

A53.  Citing the patent's discussion of "controlled fragmentation," however, the

trial court broadly construed "controlled rupturing" to only require an interface

"structured to rupture (*i.e.*, break apart) upon striking a target or object," thereby

leading to separation of projectile components.  A55.  Without addressing the

prosecution history, the court explained that "controlled rupturing" is not limited to

"soft targets," A53,  and in turn, "the component parts of a '325 projectile may be ruptured or broken through bursting, rupturing, dislocating, or other action, even in the absence of a tumbling motion."  A54.

Under this construction, the A1 projectiles meet the limitation despite differing greatly from the patent's teachings.  A15165-66 (¶¶82-84). Fragmentation induced by tumbling is a yaw-dependent mechanism whereby the yaw angle upon target entry affects how quickly it tumbles and ruptures. Conversely, the A1 projectile jackets are structured to provide yaw-independent behavior by fracturing without tumbling.  Under a proper construction, this Court should reverse its ruling that the A1 projectiles meet the "controlled rupturing" limitation.

## III.    THE COURT COMMITTED NUMEROUS LEGAL ERRORS IN HOLDING THAT THE ASSERTED CLAIMS WERE NOT OBVIOUS, IF INFRINGED.

The trial court also committed a number of reversible errors in finding the asserted claims nonobvious.  First, in finding that the government's primary prior art did not teach the "controlled rupturing" limitation, the court clearly erred in evaluating (i) the content of the prior art and (ii) how it differed from the limitation as construed.  Second, the court legally erred in applying the prescribed test for obviousness, principally by failing to properly consider stated motivations to

combine references and by not evaluating issues from the perspective of one of ordinary skill.

A patent claim is invalid when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art . . . ." 35 U.S.C. § 103(a). "[O]bviousness . . . is a legal conclusion based on underlying facts." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1290 (Fed. Cir. 2013). Those facts include: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) evidence of secondary considerations. *Id.* at 1291; *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

Generally speaking, the asserted claims "require little more than a three-piece projectile that, based on its structure, is capable of staying intact and in synchronized rotation until reaching a target and breaking apart on impact." A15066 (¶5). These types of projectiles (often designed for soft targets) "were known and being built . . . decades before the filing of the '325 patent in 2005." *Id.*; *see also* A12236-38 (Kitchens).

In support of its invalidity arguments, the government cited three primary prior art references as teaching one of ordinary skill most (if not all) limitations in the asserted claims: the Leussler '416 patent, A15576-78; (ii) the M855/M855

LFS projectiles, shown in the McElroy '879 patent, and (iii) the Nosler '420 patent, A15563-65. A15066 (¶7). To the extent that none anticipated a claim,[25] the government's expert testified that they (in combination with other cited references) rendered each asserted claim obvious. *See generally* A15060-129; A15173-90. As detailed by Dr. Kitchens for each claim, A15071-128, "[t]he general motivation to combine these references emanates from the desire for three known and desirable performance characteristics: stable and accurate bullet flight; reduced barrel friction and wear; and proper lethality characteristics on impact." A15067 (¶7).

## A.    Inconsistent Application of "Controlled Rupturing" Construction

The trial court distinguished the three principal references on the sole ground that none discloses a projectile that is "structured to provide controlled rupturing." A25-27. In doing so, the trial court erred in the application of its construction of "controlled rupturing." For each reference, the court either misinterpreted clearly disclosed embodiments and/or added unjustified requirements to the "controlled rupturing" limitation not applied in determining infringement.

---

[25] While the government is not appealing the trial court's ruling that no asserted claim is anticipated under 35 U.S.C. § 102, anticipation is nonetheless the "epitome of obviousness." *In re McDaniel*, 293 F.3d 1379, 1385 (Fed. Cir. 2002).

### 1.    Leussler '416 patent

Issued in 1934, the Leussler '416 patent discloses a jacketed three-piece projectile with an exposed nose portion (point core **4**), where the jacket may or may not enclose the tail portion (heel core **2**).  A15576, A15577 (lines 94-108).  Upon striking a target, "the velocity of the projectile point is abruptly and greatly reduced, but due to its momentum the heavy heel section tends to maintain its velocity, with the result that the point is flattened or spread, and its jacket torn apart."  A15578 (lines 6-11).  Based on these passages, the trial court concluded that the front portion of the Leussler bullet only mushrooms, but does not separate into pieces.  A25-26.



*Fig. 5*

**Figure 5 of the Leussler '416 patent.  A15576.**

But this ignores disclosed embodiments where the front portion (the point core) separates from other components on impact due to the inwardly projecting fold (labeled 3') in the Leussler jacket.  A15578 (lines 21-26); A12250, A12303-04 (Kitchens).  The Leussler specification specifically discloses that "[i]n actual

practice the point core [nose] is often completely dispersed, and the point jacket is frequently completely sheared off at the angle where it joins the fold 3', the heel section of the projectile with the fold 3' remaining intact." A15578 (lines 22-27). Only when the velocity is lower and the target is flesh (and not bone) "*may* [the point section] be merely flattened or mushroomed . . . ." *Id*. (lines 27-30) (emphasis added); *see* A12815-17 (German). Accordingly, the patent claims a projectile "whereby the sections are separated on impact . . . against a target." *Id.* (claim 6); *see also id.* (claims 5, 8).

The trial court dismissed the "perfunctory" disclosure of the Leussler claims to a bullet that separates on impact and ignored the related specification disclosures relating to these embodiments. A25. This is legally flawed. Prior-art patents are "relevant for all they contain," including the disclosure of alternative embodiments. *In re Heck*, 699 F.2d 1331, 1332-33 (Fed. Cir. 1983); *see also Upsher-Smith Labs. v. Pamlab, LLC,* 412 F.3d 1319, 1323 (Fed. Cir. 2005). Likewise, "the claims of a prior art patent are part of its disclosure." *Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1289, 1295 (Fed. Cir. 2010) (citations omitted).

### 2.    M855/M855 LFS Projectiles, As Disclosed in the McElroy Patent

As three-piece general-purpose bullets, Dr. Kitchens also asserted that the M855 and the M855 LFS, the lead-free-slug (tungsten-based) projectiles created in

the early Green Ammunition Program, were also known in 2005 to be "structured to provide controlled rupturing," as construed by the court.  A15078-79 (¶39); A15186-87 (¶36); A12251-76 (Kitchens).



**Fig 1**

**Prior Art M855 Projectile**

**Figure 1 of the McElroy '879 patent.  A15778.**

In support, the government's expert (1) submitted his own testing of M855/M855 LFS bullets manufactured in 2003, which demonstrated its yaw-dependent behavior, A15920-30, and (2) also cited the McElroy '879 patent, filed in 2003 and prior art under 35 U.S.C. § 102(e), A15777-84.  The McElroy patent discusses the terminal performance of both the M855 and M855 LFS, stating:

> [D]ue to the multicomponent structure the [M855] projectile *will generally break up upon striking either hard or soft targets due to the intrinsic weakness of the gilding metal jacket* surrounding both the penetrator and soft rear core, usually constructed of either lead antimony alloy or as of late a tungsten-tin or tungsten-nylon composite . . . .

A15770 (1:44-51) (emphasis added).

In its cursory analysis, the trial court found that the M855 was not structured (and was not known) to provide "controlled rupturing," citing only reported instances of "through and through" hits in combat use and alleged deficiencies in Dr. Kitchens' test results.[26]  A27.  The trial court, however, ignored the '879 patent's clear teaching that the M855/M855 LFS bullets would generally break up upon striking targets at shorter ranges (due to jacket structure).  This disclosure clearly meets the court's construction, A53-55, which only requires the bullet to be *structured* to break up in some fashion, not to necessarily break up in all instances and under all conditions (something both experts agree no projectile would do).  A12300-03 (Kitchens); A12824 (German).

Indeed, the court legally erred by adding requirements to the "controlled rupturing" construction not applied in analyzing infringement.[27]  The law does not

---

[26]    The cited deficiencies were based on the conclusory testimony of Dr. German, a material scientist who admittedly has no expertise in terminal ballistics. A10566-71 (German).  Dr. Kitchens, on the other hand, has extensive experience in terminal ballistics, including as chief of the Terminal Ballistics Division at BRL, the predecessor to ARL.  A11240-52 (Kitchens); A14885-92.

[27]    The court similarly erred in finding that the Frey '016 patent did not teach the "reduced area of contact" limitation because the disclosed "annular flanges" for reducing contact area (A15767 (1:36-38), A15769 (6:65-66)) are "not employed by the '325 patent."  A29-30, n.42 (citation omitted).  Nothing in the court's construction excludes any structural features that reduce contact area.

permit a narrower construction in evaluating validity.  *W.L. Gore & Assoc. Inc. v. Garlock Inc.*, 842 F.2d 1275, 1279 (Fed. Cir. 1988).

### 3. Nosler '420 patent

Issued in 1961, the Nosler patent discloses a projectile that is structured to be discharged from a firearm, featuring a nose portion (front lead slug **15**) and a tail portion (rear lead slug **16**), surrounded by a copper jacket.  It also features a relief band **17**, which reduces the contact area between the projectile and a rifle barrel.  A15563 (Fig. 1), A15564 (2:56-67).



**Figures 1 and 4 of the Nosler '420 patent.  A15563.**

As shown in Figure 4, the Nosler projectile is designed to deform upon impact, completely releasing the front slug from the fractured jacket.  The patent explains that the "front lead," on impact, "will disintegrate and produce the desired shocking effect."  A15564 (1:55-57).  Specifically, the Nosler jacket **10a** employs a progressive thickening from a "soft" front to a "harder metal" at the partition (in

the projectile's middle) in order to "make the [jacket] wall **12a** *split* under impact

in a *controlled manner*." *Id.* (2:24-28) (emphases added).  The patent further

explains that "the 'mushrooming' or folding back of the soft front portion of the

jacket 10a upon impact is controlled to produce the maximum shocking effect."

*Id.* (2:24-28).

     Nevertheless, the trial court found that the Nosler patent was directed to a

*mushrooming* bullet with a *non-fragmenting* jacket, and thus did not teach a

projectile structured to provide "controlled rupturing."  A26.  Both features,

however, are not precluded by the court's construction, which only requires the

interface to "rupture (i.e, break), separating two or more components of the

projectile." A55.  Nothing in the construction precludes deformation or

disintegration of the nose portion.  While an expanding or mushrooming bullet is

prohibited for military uses, A29, n.42, no claims are limited to military uses.

A17135-36 (7:57 to 10:54).

     Likewise, the court's construction does not require the jacket (interface) to

fragment into separate pieces.  The separation of bullet components is caused "by a

combination of bending and buckling forces," which may include a "splitting"

action.  A54.  Again, the court erroneously applied a narrower construction in

evaluating validity.  *W.L. Gore*, 842 F.2d at 1279.

### B.    Improper Legal Framework for Evaluating Obviousness

Moreover, by applying an improper legal framework, the trial court further

erred by also refusing to combine *any* prior-art references cited by the government.

In addition to the government's three primary references, Dr. Kitchens provided

detailed testimony for combinations of those references with other prior art,

including:  the Katzmann '172 patent, A15579-83; the Frey '016 patent, A15765-

70; the Kruse '508 patent, A15771-76; and the Frost publication, A15589,

A15703-32.  *See generally* A15071-128 (¶¶24-157).

A claimed invention is invalid for obviousness when *a person of ordinary*

*skill in the art* would have been *motivated to combine* the teachings of prior-art

references to achieve the same result with a reasonable expectation of success in

doing so.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1349, 1359-61 (Fed. Cir.

2007).  This law requires the court to evaluate the issue of obviousness from the

perspective of one of ordinary skill, and further, to evaluate whether a legally

sufficient motivation to combine references existed.  The court, however, failed to

properly apply these legal principles, thereby ignoring the bulk of the

government's evidence of obviousness.

### 1.    The Trial Court Improperly Applied Teaching-Suggestion-Motivation Test.

First, the trial court rigidly applied the teaching-suggestion-motivation test

for establishing a motivation to combine prior-art teachings, citing case law

overturned in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). Specifically, the trial court found that Dr. Kitchens' asserted motivations to combine were insufficient because they only "establish . . . a motivation to increase performance in small-arms ammunition" rather than a motivation to combine particular references. A28-29. As a result, the court concluded that Dr. Kitchens had merely performed an impermissible limitation-by-limitation hindsight analysis. A29.

In support, the trial court cited pre-*KSR* law, setting forth the rigid teaching-suggestion-motivation test. A28. Specifically, in setting forth the "test of obviousness," *id.*, it partially quotes the statement of *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) that: "[T]he 'motivation-suggestion-teaching' test asks not merely what the references disclose, but whether a person of ordinary skill in the art, possessed with the understandings and knowledge reflected in the prior art, and motivated by the general problem facing the inventor, would have been led to make the [claimed] combination . . . ."[28] A28.

This stricter test, however, was jettisoned by *KSR*. In its place, the Supreme Court ruled that a motivation to combine may be shown by the "interrelated

---

[28] The court similarly cites *Princeton Biochemicals v. Beckman Coulter*, 411 F.3d 1332, 1337 (Fed. Cir. 2005), which also sets forth the pre-*KSR* requirement of "some *suggestion or motivation in the prior art* to make the new combination." *Id.* at 1338 (citation omitted) (emphasis added). While the trial court also cited post-*KSR* cases, its reasoning suggests an improper use of a rigid teaching-suggestion-motivation test.

teachings of multiple patents; the effects of demands known to the design

community or present in the marketplace; and the background knowledge

possessed by a person having ordinary skill in the art." 550 U.S. at 418. The

Court emphasized that "[r]igid preventative rules that deny factfinders recourse to

common sense, however, are neither necessary under our case law nor consistent

with it." *Id.* at 421. Accordingly, "[t]he combination of familiar elements

according to known methods is likely to be obvious when it does no more than

yield predictable results." *Id.* at 416. The government's expert applied these

standards in the present case. A15069-70 (¶¶16-21).

In its overly rigid analysis, the trial court further erred by adopting Liberty's

position that "[u]nless *one knew* that combining separate elements from ten

disparate references would yield improved lethality, consistency, accuracy, and be

environmentally friendly, there would be no reason to combine the prior art to

arrive at the claimed device." A28 (quoting Liberty post-trial briefing) (emphasis

added). This adds unstated claim limitations (*e.g.*, "environmentally friendly") and

conflicts with well-settled law that the person of ordinary skill must only have had

"reasonable expectation" of making the claimed combination, not the guarantee

required by the trial court. *Pfizer*, 480 F.3d at 1364.

The trial further erred by citing factually distinguishable, post-*KSR* cases

such as *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008),

where the defendant's expert failed to identify *any* evidence of a motivation to

combine under the *KSR* standard.[29]  A28.  While citing to Dr. Kitchens' summary

statements regarding motivations to combine, A28, the court never even

acknowledges the specific motivations he set forth for each and every asserted

claim.  A12286-88, A12311, A12314, A12316-17, A12318-20, A12322-23,

A12329, A12332, A12336, A12353, A12356, A12359 (Kitchens).

### 2. The Trial Court Used Perspective of the Inventor, Not a Person of Ordinary Skill.

The trial court also legally erred in not evaluating obviousness from the

perspective of one ordinary skill in the art, but instead from that of the inventor.

Specifically, the court dismissed many of the combinations asserted by the

government because "[i]t would be non-obvious for a person of ordinary skill in

the art seeking to develop military ammunition to combine elements from

projectiles that breach the laws of war with features of the M855, M855 LFS, and

other references that are compliant with such international laws."  A29-30, n. 42.

While Mr. Marx, the named inventor of the '325 patent, was seeking to make

military ammunition, the claims are not limited to military-standard ammunition,

and such a narrow viewpoint is improper.

---

[29]    Similarly, the trial court cites this Court's decision in *ActiveVideo
Network, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012).
A28.  In that case, the expert's stated motivation was "because you wanted to build
something better."  *Id.*  The evidence here is far more substantial and specific.

The obviousness analysis is not made from the viewpoint of the inventor, but from the viewpoint of a hypothetical person of ordinary skill in the field of the invention. *KSR*, 550 U.S. at 419-20; *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1574 (Fed. Cir. 1986). This assures that the decision-maker has the appropriate perspective and focuses on conditions as they existed when the invention was made. *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 956 (Fed. Cir. 1997). Accordingly, the perspective of the inventor is "irrelevant" to patentability. *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000); *see also KSR,* 550 U.S. at 419.

This fundamental error is evidenced by the trial court's refusal to properly consider references like the Leussler and Nosler patents because they disclose hunting bullets that are prohibited for use by the military, A29-30, n. 42. By drawing this distinction, the court refused to consider combinations with other cited art that disclosed non-mushrooming bullets, such as the Katzmann '172 patent. *Id*. Katzmann discloses a "hollow fragmentation jacket" that is structured to "fragment after the penetration of the projectile into the target and will fragment or disintegrate into individually effective fragments or splinters or the like." A15582 (3:39-42). Dr. Kitchens, in turn, testified that one of ordinary skill in 2005 would know how to apply this jacket to two-piece cores and would be motivated to

use such projectiles in order to increase "lethality to the target you are attacking." A12244-46, A12250-51, A12286-87 (Kitchens); A15080 (¶41), A15088 (¶60).

### 3. Liberty's Evidence of Secondary Considerations Lacks a Nexus with the Claimed Invention.

The trial court also improperly considered evidence of secondary considerations. While such evidence can be probative, the patentee must establish a nexus with the *claimed* invention and the secondary consideration. *In re GPAC Inc.*, 75 F.3d 1573, 1580 (Fed. Cir. 1995). As the trial court acknowledges, the government argued that all such evidence related to nonclaimed features of the M855A1: (1) its use of nonlead materials and (2) its yaw-independent performance. A32. But the court found that Liberty did not have to establish a nexus as it violates the presumption of validity. *Id.* This is not the law.

For all of these reasons, this Court should reverse the trial court's judgment of validity and find the asserted claims obvious.

## IV. THE TRIAL COURT EXCEEDED ITS JURISDICTION BY AWARDING A RUNNING ROYALTY.

The trial court awarded a running royalty of "$0.014 per round" for the government's future procurement of the A1 projectiles "until the '325 patent expires on October 20, 2027." A37. The government must also make annual royalty reports to coincide with annual future royalty payments. A43. Notably, the trial court did not cite any authority for this relief, nor did either party's

damages expert address patent damages for future procurement of A1 projectiles. A32-38. Indeed, we are aware of no section 1498 action in which future royalty payments have been ordered.

The court lacked jurisdiction for this prospective relief, which is akin to an injunction. Section 1498 states that when a patented invention "is used or manufactured" by the government, the patentee's remedy is by action for "reasonable and entire compensation." 28 U.S.C. § 1498. This section effectively grants the government a compulsory patent license for its past infringing activities. *Crozier v. Krupp*, 224 U.S. 290, 307 (1912); *Penda Corp. v. United States*, 29 Fed. Cl. 533, 573 (1993). As a taking, the patentee's only remedy is "compensation" when his patented invention "is used or manufactured" by the government. Accordingly, section 1498 does not permit injunctive relief. *Leesona Corp. v. United States*, 599 F.2d 958, 966-67 (Ct. Cl. 1979).

The award of a running royalty for future manufacture is similarly barred. The the government's ongoing manufacture of A1 projectiles is not a single continuing taking that begins upon the manufacture of the first device, but rather a series of separate takings. *See Pitcairn v. United States*, 547 F.2d 1106, 1115 (Ct. Cl. 1976); *Irving Air Chute Co. v. United States*, 93 F. Supp. 633 (Ct. Cl. 1950).

Under takings law, that the value of just compensation is determined retrospectively as of the time of the taking. *First English Evangelical Lutheran*

*Church v. Los Angeles Cty.*, 482 U.S. 304, 320 (1987).  Thus, it is improper for the trial court to attempt to set the "reasonable and entire compensation" before future procurement has occurred.  This Court has similarly refused to award future damages for partial breaches of spent-nuclear-fuel contracts.  *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1376-78 (Fed. Cir. 2005).  In such cases, the claimant, as under section 1498, must file a new action for damages incurred in the future, absent a settlement.

Accordingly, this Court should vacate the trial court's award of prospective relief for lack of jurisdiction.

## CONCLUSION

For the above reasons, the Court should reverse the trial court's judgment of patent infringement and validity and vacate its award of prospective relief.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOHN J. FARGO
Director

Of Counsel:
CONRAD J. DeWITTE, JR.
Department of Justice

  /s/Walter W. Brown
WALTER W. BROWN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530

May 26, 2015

Telephone:   (202) 307-0341
Facsimile:   (202) 307-0345

**ADDENDUM**

# In the United States Court of Federal Claims

### No. 11-84C

(Filed Under Seal: December 19, 2014)
(Reissued: December 31, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **LIBERTY AMMUNITION, INC.,** | ) Post-trial decision in patent case; U.S. |
| | ) Patent No. 7,748,325 entitled "Firearms |
| | ) Projectile;" patent validity; 35 U.S.C. |
| **Plaintiff,** | ) § 103 (2006); infringement by M855A1 |
| | ) and M80A1 ammunition; "reasonable and |
| **v.** | ) entire compensation" for the compulsory, |
| | ) non-exclusive patent license; 28 U.S.C. |
| **UNITED STATES,** | ) § 1498(a) |
| | ) |
| **Defendant.** | ) |
| | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Stephen B. Judlowe, McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, New York, for plaintiff. With him on the briefs and at trial were Joseph P. LaSala, Michael Rato, and Riadh Quadir, McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, New York, and Lawrence E. Bathgate, II and Daniel F. Corrigan, Bathgate, Wegener & Wolf, P.C., Lakewood, New Jersey.

Walter W. Brown, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs and at trial was Conrad J. DeWitte, Jr., Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. With them on the briefs were Joyce R. Branda, Acting Assistant Attorney General, Civil Division, and John Fargo, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

### OPINION AND ORDER[1]

LETTOW, Judge.

This post-trial decision addresses plaintiff's claims for damages for patent infringement and for breach of non-disclosure agreements relating to the intellectual property rights to a firearms projectile. Plaintiff, Liberty Ammunition, LLC ("Liberty"), alleges that the United

---

[1]Because this order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this order and to provide proposed redactions of any confidential or proprietary information. No redactions were requested.

States ("the government") through the Department of Defense ("DOD"), has infringed upon its patent, United States Patent No. 7,748,325 ("'325 patent"), entitled "Firearms Projectile."

Since the mid-1990s, the DOD has been seeking a lethal, lead-free bullet to take the place of the former 5.56 x 45mm (.223 caliber) standard-issue NATO round, the M855. In 2010, the United States Department of the Army ("the Army") began replacing the M855 with a new lead-free bullet, the M855A1 Enhanced Performing Round ("EPR"). The Army is seeking to also replace another bullet, the M80, with a similar lead-free design, designated as the M80A1 EPR.[2] During the development of this ammunition, an individual now associated with Liberty, PJ Marx, the inventor of the projectile covered by the '325 patent, contacted individuals at the DOD to share his design for a new, lead-free projectile. Liberty further alleges that through these conversations with Mr. Marx, the Army copied its design and violated the terms of three non-disclosure agreements ("NDAs") by disclosing confidential information within the Army to unauthorized recipients, including some who worked with vendors of ammunition to the Army. The government denies both of Liberty's claims and asserts that the '325 patent is invalid. An eleven-day trial was held in Washington, DC, commencing on June 23, 2014, and ending on July 8, 2014. Following post-trial briefing, a closing argument was held on October 24, 2014. The case is now ready for disposition.

## FACTS[3]

### A. Army's Standard Ammunition

During the Vietnam War, the Army discontinued its use of its earlier standard projectile in favor of a .22 caliber bullet, the M855.[4] *See* Pl.'s Pretrial Mem. at 1, ECF No. 56; *see also* Tr. 443:19-20 (Test. of George Joseph Phillips, Liberty's CEO).[5] The M855 was developed by

---

[2]The M80 is a 7.62 x 51mm rifle cartridge that previously served as the standard small-arms round among North Atlantic Treaty Organization ("NATO") countries. It remains standard for light machine guns. The round is roughly equivalent to a .308 caliber or the original 30-06 cartridge.

[3]This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims. Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

[4]A round, also known as a loaded cartridge, constitutes one unit of ammunition containing: (1) a bullet, which is a solid projectile propelled from the ammunition upon firing; (2) a propellant, which is explosive gun powder; (3) a primer, which ignites the propellant; (4) a case, which holds the pieces of ammunition together; and (5) sometimes, a rim, found at the tail end of the ammunition and which holds the round in the barrel of the firearm. Caliber denotes the diameter of a bullet.

[5]Citations to the trial transcript are to "Tr. __." Citations to plaintiff's exhibits are identified as "PX __," defendant's exhibits are denoted as "DX __," and joint exhibits are referred to as "JX __." Plaintiff's demonstrative exhibits are cited as "PDX __."

Belgium, Tr. 1554:23, 1557:9 (Test. of Dr. James Frederick Newill, Weapons and Materials Research Directorate's Force Application Capability Research Area Manager), and incorporates a hardened steel penetrator; a lead slug; and a forward-drawn copper jacket, JX 11 at 1 (M855 Design), JX 83 at 4 (M855 Technical Drawing).[6]  The M855 features a 5.56mm (.223 in) cartridge, JX 83 at 1, 4, and has a weight of 62 grains, JX 11 at 1.  In 1983, the M855 became the standard NATO ammunition in its caliber and has been used in infantry deployments overseas.  *See* Pl.'s Pre-Trial Mem. at 1; *see also* Tr. 306:7-8 (Test. of PJ Marx, '325 Patent Inventor).  A similar, but larger and heavier lead projectile, the M80, is also used by the Army.  *See supra*, at 2 n.2.  The M80 weighs 147.5 grains, Tr. 2223:12 (Test. of Clarence Wesley Kitchens, Jr., defendant's technical expert) and is the standard NATO 7.62 mm (.30 in) cartridge, *see* Tr. 1699:20-21 (Newill).

        In the 1990's, post-combat reports and surveys revealed discrepancies surrounding the lethality of the standard ammunition.  Tr. 1523:23 to 1524:6 (Newill); *see also* JX 25 at 3 ("M855 Enhanced Performance Round (EPR) Media Day" (May 4, 2011)).  Some soldiers were reporting instances of through-and-through hits on enemy combatants who would return fire despite being struck by the standard ammunition, while other infantry units were experiencing no issues with the projectiles' performance.  Tr. 183:21 to 184:6 (Test. of Tyler Ehlers, a Mechanical Engineer with the Army Research Laboratories ("ARL")); *see also* JX 20 at 6 ("Improved Performance 5.56mm Desired Characteristics") ("We had a[n] enemy that had been hit 14 times in the fatal zone and was still returning fire on us. . . . [A]fterwards when we checked his body most of the shots went clean through him with minimal damage.").  These inconsistencies were a result of the M855 and M80 being yaw-dependent.  Tr. 53:4-5 (Test. of Lt. Col. Glenn A. Dean, III, U.S. Army); *see also* Tr. 181:5-13 (Test. of Lee Smith Magness, Jr., ARL).[7]  At a high angle of yaw, the projectile typically strikes a soft target without exiting the body.  In doing so, the bullet transfers all of its energy within that target, which increases the severity of tissue damage and therefore, the likelihood of incapacitation.  Conversely, at a low angle of yaw, the bullet may pass through a soft target.  If it does not puncture a vital area, such as an organ, the through-and-through hit will only cause minimal damage because the projectile traverses the body without expending significant energy.  Tr. 99:8-10 (Lt. Col. Dean); *see* Tr. 183:21 to 184:19 (Ehlers); *see also* Tr. 181:5-10 (Magness).  Therefore, proficient marksmanship

---

        [6]In the M855, the penetrator is at the front of the bullet, the slug consisting of a lead core is at the tail, and the jacket completely encompasses the penetrator and slug.  *See* JX 11 at 1.  The jacket of the M855 is forward-drawn, *i.e.*, the jacket "is formed, point first, the steel penetrator is inserted into the jacket, with the lead core behind, and then the projectile is crimped shut."  JX 15 at 6 ("In Search of Lethality: Green Ammo and the Development of the M855A1 Enhanced Performance Round" (May 9, 2011)).

        [7]Yaw is the rotation of a bullet along its longitudinal axis while in flight and yaw angle is the degree to which the bullet deviates from its line of flight.  *See* Tr. 233:2-13 (Test. of Dr. Dipak Kamdar, Engineering Fellow with Alliant Techsystems ("ATK")).  The amount of yaw depends on the environment; both the distance to the target and velocity of the projectile affect yaw.  *See* Tr. 99:1-18 (Lt. Col. Dean).  In a yaw-dependent bullet, such as the M855 and M80, tumbling, *i.e.*, high yaw, will affect lethality.  *See id.*; *see also* Tr. 232:23 to 233:1 (Kamdar).

3

becomes a necessary factor for engendering incapacitation and preventing an enemy combatant from returning fire. *See* Tr. 51:11-15 (Lt. Col. Dean) ("The issue is . . . unless that through-and-through passes through a critical organ like the brain, you don't incapacitate the target."); *see also* Tr. 181:11-13 (Magness).

### B. President Clinton's Executive Order

In addition to the soft-target lethality issues in the standard ammunition, there were mounting concerns that lead from lead slugs at small-caliber firing ranges was penetrating soil and polluting ground water. *See* JX 32 at 1 ("Green Ammunition Phase II Program" (Apr. 7, 2005)); *see also* JX 125 at 3 (Small Business Innovative Research ("SBIR") Program Proposal (Jan. 13, 2006)) ("The lead can leach through the soil and contaminate ground water, leading to exposure of the surrounding population."). Given this concern, President Clinton signed Executive Order 12856 in 1993 which "mandated the elimination of 50 percent of the hazardous materials [in projectiles] by [1999]." Tr. 1952:15-18 (Test. of John R. Middleton, an Engineer with the U.S. Army Armament Research, Development, and Engineering Center); *see also* Tr. 2428:11-21 (Kitchens).

Recognizing the need to mitigate the negative environmental externalities associated with lead slugs and to enhance performance of its standard ammunition, the army initiated the Green Ammunition Program ("the Program") in 1995. *See* JX 32 at 1. Participating in the Program were various Army departments and small-arms developers, including Project-Manager - Maneuver Ammunition Systems ("PM-MAS"), ARL, the United States Army Infantry Center ("USAIC"), and ATK. *See* JX 21 at 1 ("Green Ammunition Phase II Kick-off" (July 26, 2005)); *see also* JX 15 at 1. The Program's goal was to develop a non-lead and yaw-independent bullet as an alternative to the Army's standard .22 cartridge, the M855. Tr. 2424:11 to 2425:19 (Kitchens); JX 31 at 4, 11 (Briefing to Congressman Sherwood (Mar. 7, 2005)).

In the late 1990's, the Army produced the M855 Lead-Free Slug ("M855 LFS"), which contained tungsten bound with tin or nylon in place of the lead core used in the M855. Tr. 1954:3-6 (Middleton); JX 83 at 9. The Army selected a tungsten core as a substitute for lead because the two metals have approximately the same density. Tr. 1954:18-22, 1960:2-5 (Middleton); *see also* JX 83 at 4. By 2003, the Army's Lake City Army Ammunition Plant ("LCAAP") was producing significant quantities of the M855 LFS. *See* Tr. 2002:8-9 (Test. of Frank Joseph Hanzl, U.S. Army Maneuver Ammunitions Systems Office's Project Manager); *see also* Tr. 1956:4-5 (Middleton) ("[W]e had produced 88 million rounds [of the M855 LFS]."). However, the scale-up in production resulted in irregularities in the slugs. Specifically, anomalies created erratic and unstable flight trajectories. Tr. 1835:11-25 (Test. of Daniel J. Mansfield, ATK's Design Engineer) ("There were failure rates [in the 855 LFS] that were approaching 50 percent, depending on the circumstances."); *see also* Tr. 1516:14-19 (Newill) ("[The M855 LFS bullets] were getting keyholes, which means the round goes and hits the target sideways . . . indicating . . . at least sporadic performance problems with the [tungsten].").

Consequently, in 2003, the Army initiated Phase I of the Green Ammunition Program to identify the manufacturing problem that was causing erratic flight in the M855 LFS and to find alternative slug materials that could replace the tungsten core. Tr. 1957:6-10 (Middleton); Tr.

4

230:23-25 (Kamdar). At the commencement of Phase I, PM-MAS directed scientists at ARL to begin searching for new slug materials and drafting other projectile designs. Tr. 1511:2-13, 1518:7-14 (Newill). Additionally, ATK, the contract operator for the LCAAP, began investigating potential causes of the erratic flight paths. Tr. 1833:25 to 1834:16 (Middleton). By summer 2004, ATK had determined that an error in the manufacturing process at LCAAP was creating unstable flight trajectories,[8] and had found various tungsten-based materials that were acceptable replacements for the M855 LFS slugs. Tr. 1839:1 to 1840:6 (Mansfield). By this time, Dr. Newill and other scientists at ARL had also developed four redesigns of the projectile with slugs comprised of tungsten-derived materials. On July 27, 2004, ARL presented its conceptual designs to the Army. Tr. 1533:7-11 (Newill); JX 79 at 5-15 ("New Concepts for M855 5.56mm Ball Ammunition" (July 27, 2004)).

Despite identifying the source of erratic flight in the M855 and designing slug replacements, the Army was unsuccessful in its efforts to develop a non-lead and yaw-independent bullet during Phase I. Tungsten as a substitute for lead was no longer a viable solution for the Army because prices for the metal had rapidly increased, JX 32 at 1, *see also* JX 31 at 4 (finding that production of the M855 LFS was 50 percent more costly than that of a leaded bullet), and alternative slug materials proposed by ammunition developers proved equally ineffective because they were also derived from tungsten, JX 32 at 1. Furthermore, tungsten alloys presented environmental concerns. JX 33 at 6 ("5.56mm Green Ammo Program Strategy" (Apr. 14, 2005)).

### C. Marx's Experimental Work

Mr. Marx, a business owner living in Florida, was aware of the Army's unsuccessful endeavors to develop a replacement projectile for the standard ammunition. *See* Tr. 288:2 to 293:10 (Marx).[9] Despite having little experience in ammunition design, Mr. Marx set out to

---

[8]The consolidation process, in which the slug became consolidated in the jacket, was imperfect, leaving a small gap between these two components. During flight, this gap prevented the M855 LFS from "spinning fast enough to be gyroscopically stable." Tr. 1519:16 to 1520:18 (Newill). The consolidation steps needed to be adjusted to account for the stiffness of tungsten powder when inserted into the jacket. Tr. 1839:22 to 1840:2 (Mansfield).

[9]Mr. Marx at the age of thirteen and with funds provided to him from his father became a minority partner in a retail music store. Tr. 280:10-16 (Marx). In this capacity he attended trade shows involving the music industry. *See* Tr. 281:8 to 282:23 (Marx). After finishing high school, Mr. Marx formed and became president of Lady Amplification USA ("Lady"), a music distribution company. Tr. 283:1-6 (Marx). While president of Lady, Mr. Marx created a product line of vacuum tube amplifiers and electromagnetic transducers for the domestic market. Tr. 283:3 to 284:19 (Marx). He later formed PJ Marx Pickups and Electronics, which focused on transducers and guitar assembly work. *See* Tr. 286:5 to 287:3 (Marx). Mr. Marx received two United States patents for his guitar assembly designs. Tr. 285:12-15 (Marx). He currently is the inventor of ten United States patents. The majority of these patents involve Mr. Marx's music-related endeavors. Tr. 285:7-15 (Marx). In the late 1990's Mr. Marx moved from Nashville,

5

design a lethal, lead-free 5.56mm NATO round.  Tr. 360:20 (Marx).  His interest stemmed from
the 9/11 attacks.  Specifically, Mr. Marx felt obligated to "to try to make a contribution to the
war effort."  Tr. 289:7-12 (Marx).  After the 9/11 tragedy, Mr. Marx sold his business, and in
2003 he began meeting with members of the firearms industry to explore solutions to the M855.
Tr. 289:7-12, 290:2 to 293:6 (Marx).  During summer 2004, parallel in time to the Army's Phase
I presentations, *see supra*, at 5, Mr. Marx conceived of the Enhanced Performance Incapacitative
Composite ("EPIC") round, JX 122 at Attach. (EPIC Brochure).  Comparable to the M855, the
EPIC ammunition featured a 5.56mm bullet, but had a greater mass (approximately 100 grains)
and fragmented upon striking a soft target.  Tr. 297:17 to 300:25 (Marx); JX 122 at Attach.[10]
According to Mr. Marx, the EPIC prototype projectile displayed "a much higher ballistic
coefficient,[11] better penetration[,] and excellent terminal effects against soft targets," JX 122 at
Attach., which could improve "the performance of [the Army] personnel's existing weapons,"
JX 4 (Letter from Marx to Lt. Col. Dean (Nov. 16, 2004)).

In the fall of 2004, Mr. Marx contacted Lt. Col. Dean, then Chief of Small Arms for the
U.S. Army Infantry Directorate of Combat Development at Ft. Benning, to discuss the possibility
of commercializing his invention with the Army.  JX 4; Tr. 47:22 to 48:1 (Lt. Col. Dean).
"[L]ooking at multiple opportunities to bring forth technology to the Army," Tr. 350:15-16
(Marx), Mr. Marx also spoke with Paul Riggs, then Director of the Green Ammunition Program,
to arrange a meeting, which took place at Picatinny Arsenal on February 16, 2005, *see* Tr. 352:9-
19 (Marx).  At this meeting, Mr. Marx presented a 5.56mm EPIC prototype, but did not leave
any rounds with Mr. Riggs or engage in technical discussions.  Tr. 351:6-20 (Marx); Tr. 2100:23
to 2101:6 (Test. of Paul Riggs, Office of PM-MAS).[12]

The next day, on February 17, 2005, Mr. Marx met with Lt. Col. Dean and his civilian
aide, John Amick, at Ft. Benning.  Tr. 321:7-12 (Marx).  To protect the proprietary projectile
design, Mr. Marx had previously requested that Lt. Col. Dean and Mr. Amick sign a NDA on
behalf of the government, which provided that the countersigning party would keep secret all
confidential information disclosed by Mr. Marx.  JX 3 (the "Dean NDA"); Tr. 319:9 to 320:10

---

where he had been touring with musical groups and playing guitar, to Florida.  Tr. 287:14 to
288:5 (Marx).

[10]Once a bullet fragments, or breaks apart, the detached pieces traverse the body in
distinct "wound channels," which compound the degree of injury.  Tr. 381:5-7, 418:16 (Marx);
Tr. 575:4-7 (Test. of Randall Michael German, plaintiff's Technical Expert).

[11]The higher the ballistic coefficient, the longer a projectile will travel. Tr. 963:16-17
(Test. of Thomas "Tucker" Campion, a contractor with United States Special Operations
Command ("SOCOM")).

[12]Mr. Marx testified that at the February meeting, Mr. Riggs "refused to sign [a NDA],
claiming that he didn't have the authority."  Tr. 351:1-3 (Marx).  Mr. Riggs did not recall any
such conversation with Mr. Marx.  Tr. 2100:11-20 (Riggs).

6

(Marx).[13]  Upon executing the Dean NDA, Mr. Marx supplied Lt. Col. Dean and Mr. Amick with fifty rounds of the 5.56mm EPIC ammunition along with performance test results.  Tr. 361:8-14 (Marx); Tr. 491:12 to 492:18 (Amick).  Following the meeting, and without going "into too many details" so as to "respect [Mr. Marx's] concerns about confidentiality," Lt. Col. Dean contacted various small-arms developers at the Army and at SOCOM to highlight the projectile's "very promising technology that line[d] up well with [the Army's] lethality improvement efforts" and to illustrate the potential uses and alternative applications surrounding the design.  JX 8 (E-mail from Lt. Col. Dean to Vernon Shisler, *et al.* (Feb. 17, 2005)).  Lt. Col. Dean also suggested that the EPIC round be considered "as an alternative" ammunition within the Green Ammunition Program, recognizing the need for further evaluations by the Army.  *Id.*  Subsequently, in March 2005, Mr. Amick sent Mr. Riggs and the United States Army Marksmanship Unit a subset of the fifty EPIC rounds for testing.  *See* JX 37 (E-mail from Amick to Marx (Mar. 15, 2005)).

*D. Transitional Events*

On May 11, 2005, Mr. Marx attended an Industry Day conference, co-hosted by Mr. Riggs, to further his connections in the small arms community and to learn more about the Green Ammunition Program.  Tr. 367:23 to 368:2 (Marx); JX 36 at 3 ("Welcome to Green Ammo Industry Day" (May 11, 2005)).  Program participants expected to hear about "the status of the [P]rogram, and [who] would be potential suppliers of a concept in Phase II," and were disappointed when they discovered that Phase II of the Program would primarily be a "joint government/ATK [re]design effort" and that the Army would no longer be considering slug replacement designs from the industry.  Tr. 2110:9 to 2113:22, 2118:17 to 2119:1 (Riggs); JX 36 at 18-19.  Consequently, Mr. Riggs suggested to Mr. Marx that he might pursue commercializing the EPIC technology with a boutique customer, such as SOCOM.  Tr. 2112:21 to 2113:12 (Riggs).

On June 23, 2005, Mr. Marx met with Thomas Campion, a contractor at SOCOM, to discuss the EPIC round.  Tr. 961:6-12 (Campion).  Mr. Campion was interested in submitting a SBIR proposal[14] involving ammunition with enhanced ballistics and was aware that Mr. Marx had designed a heavier projectile with a large ballistic coefficient.  *See* Tr. 963:11 to 965:16 (Campion).  After signing a second NDA (the "Campion NDA"), Mr. Marx provided Mr. Campion samples of the 5.56mm EPIC round and disclosed information about the proprietary design.  JX 124 (Campion NDA); JX 48 (E-mail from Campion to Shawn Spickert-Fulton (Aug. 5, 2005)).  Mr. Campion subsequently e-mailed technical and performance data, such as "gel shots" and a descriptive brochure about EPIC, to members of the Army, with the disclaimer that

---

[13]The Dean NDA "imposes an affirmative duty to hold [disclosed] information in confidence and protect it from dissemination to and use by an unauthorized person.  In the absence of the Disclosing Party's prior written consent, the Receiving Party shall not reproduce nor disclose the Confidential Information to any third party."  JX 3 § 2.1 (Dean NDA).

[14]The SBIR program awards research and development grants to eligible small businesses looking to commercialize a product.  *See* Tr. 964:15-19 (Campion).

7

they "[t]reat th[e] [information] as proprietary." JX 122 (E-mail from Campion to Charles Marsh, *et al.* (Aug. 18, 2005)).[15]

By this time, Phase II of the Green Ammunition Program had commenced with a redirected purpose to design a cost effective lead-free 5.56mm projectile that would also be more lethal than its predecessor, the M855. JX 21 at 4. Several prototypes were designed and tested. *See* JX 11 at 3-25. ATK had previously submitted ammunition redesigns to the Army, DX 584 at 10 ("Preliminary Program Review" (Feb. 22-24, 2005)), Tr. 1849:6 to 1850:1 (Mansfield), and it provided the initial two concepts. Concept A comprised a modified M855 projectile with a full metal jacket and a copper slug. JX 11 at 3. Concept B, later designated as B1, featured a three-component projectile having a reverse jacket,[16] exposed penetrator, and copper slug. *See* DX 214 at Attach. (E-mail from Mansfield to Kamdar & Dr. Joseph South (Aug. 19, 2005)); *see also* DX 122 at 1, 5 (South Lab Notebook (Aug. 2, 2005)).[17] During July and August 2005, ATK made final design modifications for Concept B and carried out computer-based simulations to determine its lethality and large-scale manufacturing capability. *See* Tr. 1649:23 to 1653:13 (Newill); *see also* JX 11 at 4-6. The tests were completed in October 2005 with mixed results; although Concept B was yaw-independent, it received low performance ratings. Tr. 1677:5-23 (Newill).

*E. Marx's Patent Application*

On October 21, 2005, Mr. Marx filed a patent application for the EPIC projectile, which in due course led to issuance of the '325 patent on July 6, 2010. PX 1 at 2 (the '325 patent). After applying for the patent, Mr. Marx assigned the rights to his invention to Liberty, a business he formed in 2005. JX 132 (Assignment of Rights in Patent Application (Apr. 5, 2010)); Tr. 416:19 to 417:3 (Marx).[18] The patent describes a three-component projectile, one embodiment

---

[15]"Gel shots" are either photographs or videos of projectiles fired into translucent blocks of gelatin, or the actual gelatin blocks after being hit by the fired projectiles. *See, e.g.*, Tr. 221:10-16 (Magness).

[16]In a bullet having a reverse-jacketed design, the jacket is drawn last. Specifically, "the slug is first inserted [into a cup,] and then the penetrator is inserted, and then the jacket [cup] is deformed around the rear portion of the penetrator." Tr. 218:9-12 (Ehlers); Tr. 1815:12-13 (Newill). This "method of construction . . . results in a [uniform tapered base] and more consistent dispersion performance." JX 15 at 6.

[17]Concept A and Concept B originated as Concept 1 and Concept 2, respectively. Tr. 1602:23 to 1604:5 (Newill).

[18]Mr. Marx is "an Officer and Chief of Research and Development of Liberty." Mem. of Law of Pl. in Opp'n to Def.'s 12(b)(1) Mot. to Dismiss Counts II and III of the First Amended Complaint for Lack of Subject Matter Jurisdiction, Ex. 2, at ¶ 2 (Aff. of PJ Marx (Aug. 27, 2011)), ECF No. 14. After starting Liberty as a sole proprietorship, the business became "Liberty Ammunition Inc., a Florida corporation, Liberty Ammunition LLC, a Delaware Limited Liability Company – [and ultimately took] its current form[,] Liberty Ammunition Inc., a

8

of which has an exposed steel nose (penetrator), an exposed copper tail (slug), and a copper interface (in place of a jacket) interconnecting the head and tail portions together during discharge and flight. *See generally* '325 patent.  The interface portion is engineered to create a reduced area of contact between the projectile and the rifle barrel, thereby decreasing barrel friction and increasing the life of the gun barrel.  '325 patent, col. 2, lines 39-49.  These components of this embodiment are represented in Figure 1 of the patent:



*Id.* at 3.

This tripartite lead-free design "overcome[s] the disadvantages and problems associated with conventional firearm projectiles."  '325 patent, col. 2, lines 35-37.  The bullet of the invention is capable of penetrating a hard target, but engages in controlled fragmentation upon hitting a soft target, *id.*, col. 2, line 62 to col. 3, line 11.  Controlled fragmentation is "facilitated by one of both of the nose and tail portions being removably attached or connected to the interface."  *Id.*, col. 2, lines 62-67.  An additional benefit of the patented invention is that it "may be produced on a mass scale using materials and manufacturing equipment currently available and known in the projectile production industry."  *Id.*, col. 3, lines 36-38.

The '325 patent contains two independent claims (Claims 1 and 32) and forty dependent claims. Claim 1 reads as follows:

A projectile structured to be discharged from a firearm, said projectile comprising:

a body including a nose portion and a tail portion,

said body further including an interface portion disposed in interconnecting relation to said nose and tail portions, said interface portion structured to provide controlled rupturing of said interface portion responsive to said projectile striking a predetermined target,

---

Delaware corporation by conversion of the LLC pursuant to § 265 of the Delaware Corporation Law."  *Id.* ¶ 10.

> said interface portion disposed and dimensioned to define a
> reduced area of contact of said body with the rifling of the firearm,
>
> said interface portion maintaining the nose portion and tail portion
> in synchronized rotation while being fixedly secured to one
> another by said interface portion whereby upon said projectile
> striking said predetermined target said interface portion ruptures
> thereby separating said nose and tail portions of said projectile.

'325 patent, col. 7, line 57 to col. 8, line 5.

Claim 32 recites:

A projectile structured to be discharged from a firearm, said projectile comprising:

> a body including a nose portion and tail portion,
>
> said body further including an interface portion disposed
> intermediate opposite ends of said body in interconnecting relation
> to said nose and tail portions, said interface portion structured to
> provide controlled rupturing of said interface portion responsive to
> said projectile striking a predetermined target, said interface
> portion maintaining said nose portion and tail portion in
> synchronized rotation while being fixedly secured to one another
> by said interface portion whereby upon said projectile striking said
> predetermined target said interface portion ruptures thereby
> separating said nose and tail portions of the projectile; and
>
> said exterior surface of said interface portion disposed and
> structured to define a primary area of contact of said body with an
> interior barrel surface of said firearm.

*Id.*, col. 9, line 55 to col. 10, line 16.

Additionally, a series of claims dependent upon Claim 1 describe embodiments in which the interface encloses at least one of the nose or tail. These dependent claims derive either directly or indirectly from Claim 8, which provides:

> A projectile as recited in claim 1 wherein said interface comprises
> an at least partially hollow interior dimensional and configured to
> receive at least one of said nose or tail positions therein.

'325 patent, col. 8, lines 27-30. As a result, either a forward-drawn or reverse-jacketed design is contemplated by Claim 1 and Claim 8.

10

**A-10**

### F.  Marx's SBIRs with SOCOM

At the time the patent application was filed, the Army Marksmanship Unit was evaluating the performance of the EPIC rounds previously provided by Mr. Marx.  On November 1, 2005, the Army Marksmanship Unit tested ten out of the fifty rounds and found weaknesses in the bullet's muzzle velocity, precision, and target penetration capability.  *See* Tr. 539:17 to 545:18 (Amick); *see also* DX 212 (E-mail from Troy Lawton to Amick (Nov. 1, 2005)).[19]  Mr. Marx was "surprised by th[ose] data," because  they were "inconsistent" with his own test results, Tr. 374:7-10 (Marx), and he was also "uncomfortable with the fact that [his ammunition] was tested in a weapon . . . that didn't appear to be a part of the weapons that were being utilized by the U.S. Army," Tr. 375:17-25 (Marx).  Mr. Marx subsequently requested that the Army return the remaining EPIC rounds to him.  Tr. 376:1-4 (Marx); *see also* DX 63 (E-mail from Marx to Amick (Jan. 3, 2006)).[20]

Mr. Marx then focused his efforts on a SBIR contract with SOCOM, collaborating with Mr. Campion to complete a Phase I SBIR proposal.  *See* Tr. 375:24-25 (Marx) ("I felt that . . . my time was better spent working with SOCOM").  Shortly thereafter, on January 1, 2006, Mr. Marx entered into a third NDA with Charles Marsh (the "Marsh NDA"), a Navy employee at the Crane Naval Surface Warfare Center.  JX 131 (Marsh NDA).[21]  Mr. Campion had requested that Mr. Marx execute a NDA with Mr. Marsh because Mr. Marsh worked closely with SOCOM and had experience with SOCOM weapon systems.  Tr. 340:7-19 (Marx).[22]

The SBIR Phase I proposal, with an objective to evaluate the performance of the EPIC ammunition and to make necessary modifications, was submitted on January 13, 2006.  JX 125 at 1, 13.  It recited that "Liberty . . . ha[d] developed green 5.56mm projectiles with range from 98-126 grains," plus a "62 grain, green copper alloy 5.56mm projectile."  JX 125 at 3-4, 9-11; *see also* Tr. 379:4-24 (Marx).  The proposal featured a three-component projectile capable of controlled fragmentation and comprising the same interface with exposed copper slug and steel penetrator as found in an embodiment of the application that resulted in the '325 patent.  JX 125 at 7, 9-11.  Dr. Newill and two additional evaluators reviewed Liberty's SBIR proposal for its

---

[19]"The lower the velocity . . . the more time that mother nature has the ability to move the round or affect the round as it [is] going down range.  Also, the lower the velocity, the lower the . . . [hard and soft] target [penetration] potential associated with ammunition."  Tr. 541:24 to 542:6 (Amick).

[20]Although ten out of the fifty rounds were tested, Mr. Marx testified that the Army only returned "26 or so samples" of the EPIC ammunition.  Tr. 377:7-17 (Marx).

[21]Except for the name of the countersigning party, the Marsh NDA is identical to the Campion NDA.  *Compare* JX 124 (Campion NDA), *with* JX 131 (Marsh NDA).

[22]Mr. Campion testified that he was "pretty sure" that Marx sent a subset of the 5.56 EPIC ammunition to Mr. Marsh.  Tr. 985:2-4 (Campion); *see also* JX 48 at 2 (E-mail from Campion to Mark Minisi (Aug. 4, 2008)).  According to Mr. Marx, he did not provide Mr. Marsh with any EPIC rounds, Tr. 659:9-12 (Marx), and there is no evidence in the record showing that Mr. Marsh received samples of the EPIC ammunition.

11

technical merit and documented their findings in a written report. Tr. 1749:10-22 (Newill). Although Dr. Newill did not retain a copy of this report, Tr. 1750:3-5 (Newill), computer records from SOCOM reveal that he accessed the proposal on July 31, 2006. JX 89 at 1 (SOCOM Computer Records).[23]

### G. Army's Completion of Development

Given the problematic results for Concept B, *see supra*, at 8, ATK revisited an earlier prototype that it had developed, Concept L, in October 2006. JX 24 at 25 ("Green Ammo Status" (Oct. 10, 2006)). Concept L was similar in structure to Concept B; both featured a reverse jacket, copper slug, and steel penetrator. *See* Tr. 1677:12-23 (Newill); *compare* JX 24 at 16 (Concept B design), *with* JX 14 at 25 (Concept L design). In spring 2007, two versions of Concept L, L2 and L3, were designed to replace the M855. While both had an optimal weight of approximately 64 grains,[24] displayed fragmentation behavior when striking a soft target, and featured a reverse jacket and steel penetrator, Concept L2 employed a bismuth-tin slug, while Concept L3 used a copper slug. Tr. 1686:13 to 1687:4 (Newill); JX 11 at 24-25. The Army first produced the L2 concept in May 2007, *see* Tr. 1687:16 to 1688:1 (Newill), but later replaced the bismuth-tin slug with a copper slug, featured in L3, after qualification testing revealed that bismuth-tin slugs lost their shape under high temperatures, Tr. 1695:9-14 (Newill).

At the time of the L3 production by the Army and ATK, Liberty was awarded a SBIR Phase I contract for $90,000. Liberty and SOCOM completed the ballistics tests outlined in the SBIR Phase I proposal and presented the results in a Phase I report on August 30, 2007. Tr. 387:4-13 (Marx); JX 126 (Liberty SBIR Phase I Report). In 2010, for the SBIR Phase II contract, SOCOM requested that Liberty "scale down [its] lead-free exposed-tip, [three]-piece 5.56mm Enhanced Performance Round, [which] had demonstrated both superior penetration of hard targets and terminal effects in soft issue in [the] Phase I SBIR." DX 270 at 9 (Liberty SBIR Phase II Report). Specifically, Liberty was asked to create a 4.6mm prototype projectile that would "exhibit enhanced internal, external[,] and terminal ballistics performance, as well as defeat intermediate barriers such as auto glass and doors, when fired." *Id.* at 9. In March 2013, Liberty submitted a Phase II test report summarizing its progress. *See id.*

The projectile design found in L3 became what is now designated as the M855A1 Enhanced Performance Round and achieves several enhancements not found in M855.[25] These

---

[23]Although all of the information contained in the SBIR proposal was considered confidential under SBIR regulations, *see* Tr. 1766:10 to 1767:5 (Newill); *see also* JX 125, the EPIC projectile disclosed in the '325 patent became public knowledge after the patent application was published on April 26, 2007. *See* '325 patent at 1.

[24]ARL had previously determined that the weight of the original M855, 62 grains, was optimal for a 5.56mm projectile. DX 156 at 13-14 ("Projectile Mass Study").

[25]"On May 7, 2010, the Army submitted Patent Application No. 61332631 for its bullet, but this application apparently has been abandoned." *Liberty Ammunition, LLC v. United States* ("*Liberty Ammunition II*"), 111 Fed. Cl. 365, 370 n.6 (2013).

include superior hard target performance, greater soft target lethality, higher velocity, and reduced muzzle flash. *See* JX 15 at 5-9.[26]  The design of the M855A1, reproduced below, exhibits a tripartite construct comprising: a steel nose ogive with an exposed tip,[27] a tail portion containing a copper slug, and a surrounding thin jacket that connects the nose and tail. Moreover, the jacket of the M855A1 is designed to rupture upon soft target impact, regardless of the yaw angle. *See* Tr. 2366:16-21 (Kitchens); *see also* JX 25 at 5-7.  These enhancements are also achieved by Liberty's EPIC projectile and are highlighted in the '325 patent. *See supra*, at 9-10.  Indeed, after examining the exterior surfaces of the EPIC and M855A1 EPR projectiles, a senior contractor for the SOCOM "thought there was a fairly direct similarity between [the two designs]."  Tr. 778:25 to 779:6 (Test. of John D. Bennett, SOCOM's Acquisition Logistician).



JX 54 at 2 (M855A1 Technical Drawing).

### H. Army's Adoption and Fielding of the M855A1

The M855A1 EPR was fielded in Afghanistan in 2010 and has since replaced the M855 round. *See* Tr. 1694:17-25 (Newill); *see also* JX 15 at 11.  The developers of the M855A1 have been awarded DOD's highest acquisition award for their exemplary contribution to small arms ammunition.  JX 80 ("PEO Ammunition Team wins DOD's highest award" (Oct. 5, 2012)) ("The result is the most effective and technically advanced small caliber cartridge ever developed, designed to equip our troops with improved ammunition quickly, while also supporting the Army's requirement for an environmentally friendly projectile'" (quoting Col. Paul Hill, PM-MAS)).  As of 2013, LCAAP had produced over one billion rounds of the M855A1, *see* Tr. 892:4 (Test. of Kimberly Mary McCleerey, PM-MAS Acquisition Manager), *see also* Tr. 2041:8-9 (Hanzl), which is now the Army's. 22 caliber standard issue ammunition, Tr. 306:9-10 (Marx).

### I. Adoption of the M80A1

"As soon as [the Army] knew [they] were very likely to be successful with the M855A1," Tr. 1698:15-16 (Newill), they began exploring how to "integrate to the M80 projectile the same types of performance gains achieved in the M855A1 while removing the lead from the projectile

---

[26]Muzzle flash refers to the flare of light created by the combustion of propellant in the cartridge upon firing. *See* JX 15 at 8.

[27]In architectural terms, an ogive is a curved, pointed arch, often represented in Gothic windows or fan vaulting.  *See Merriam-Webster Online Dictionary*, ogive, *available at* www. merriam-webster.com/dictionary/ogive.  For projectiles, an ogive can appear as a streamlined, elliptical, rounded nose.

13

due to environmental reasons." DX 175 at 7 (Defendant's Responses to Plaintiff's Third Set of Interrogatories); Tr.189:12-18 (Ehlers). The 7.62mm M80A1, reproduced below, is the Army's most recent prototype round. Similar to the M855A1, the projectile of the M80A1 EPR employs a steel penetrator, copper slug, and reverse copper jacket that ruptures upon striking a soft target. However, the M80A1 features different dimensions and detailed features from those of the M855A1. DX 175 at 7-9; *see* Tr. 1443:24 to 1445:6 (Middleton). As of the date of the trial, qualification and performance evaluations were still being performed on the M80A1. *See* Tr. 1699:10-11 (Newill).



JX 144 at 2 (M80A1 Technical Drawing)

## PROCEDURAL HISTORY

Liberty filed suit in this court on February 8, 2011 alleging that the Army's "Green Bullet" technology found in the M855A1 and the M80A1 infringed upon its '325 patent, and that Army breached its contractual obligations set forth in three NDAs by disclosing confidential information to potential vendors. *See* Compl. at 2-3. After the government moved to dismiss the breach-of-contract count, Liberty amended its complaint and included a pendent claim for unfair competition under the Lanham Act and state law. *See* First Am. Compl., ECF 9. At that point, the parties stipulated to a denial of the government's motion to dismiss, *see* Joint Stipulation Regarding Pl.'s First Am. Compl. (July 18, 2011), ECF No. 11, and the government filed its second motion to dismiss on July 28, 2011 seeking to dismiss Liberty's breach-of-contract and unfair competition claims, *see* Def.'s Mot. to Dismiss Counts II & III of the First Am. Compl., ECF No. 13. Following briefing and a hearing, the court held that the Anti-Assignment Act did not bar its subject matter jurisdiction over Liberty's breach-of-contract claim, but dismissed Liberty's pendent Lanham Act and unfair-competition claim for lack of jurisdiction. *Liberty Ammunition, Inc. v. United States* ("*Liberty Ammunition I*"), 101 Fed. Cl. 581, 586-92 (2011).

The parties then proceeded to submit briefs on claim construction and to present oral arguments at a *Markman* hearing held on March 22, 2013. The court issued an order on June 13, 2013, construing fifteen terms of the patent. *Liberty Ammunition II*, 111 Fed. Cl. at 368-81.[28]

---

[28]Most importantly for this post-trial decision, the court adopted a construction of "'reduced area of contact,' as meaning that the area of contact between the interface and the rifling of the firearm is less than that of a traditional jacketed lead bullet of calibers .17 through .50 BMG," and held that "'intermediate opposite ends' means that the interface is positioned between or in the middle of the opposite ends of the forward end of the nose portion and the trailing end of the tail portion." *Liberty Ammunition II*, 111 Fed. Cl. at 375, 380. For the additional thirteen claims construed by the court, see *id*. at 371-80.

14

After the parties completed discovery, an eleven-day trial began on June 23, 2014.  In aid of trial, the parties filed pre-trial briefs addressing the issues of patent infringement, breach-of-contract, and damages.  Following post-trial briefing and closing argument, the case is ready for disposition.

## STANDARDS FOR DECISION

### A. Patent Infringement

Section 1498(a) of Title 28 serves as a congressional waiver of the United States's sovereign immunity and vests in the United States Court of Federal Claims the exclusive authority to adjudicate patent infringement claims against the federal government "[w]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same."  28 U.S.C. § 1498(a); *see Martin v. United States*, 99 Fed. Cl. 627, 632-33 (2011) (recognizing that Section 1498, rather than the Tucker Act, 28 U.S.C. § 1491(a), grants the court jurisdiction over a claim for patent infringement).  The statute further states, in pertinent part, that "the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."  28 U.S.C. § 1498(a).

### 1. Taking of a non-exclusive and compulsory license.

Pursuant to 28 U.S.C. § 1498, the government is authorized to "take" a non-exclusive and compulsory license to any United States patent based on the theory of eminent domain.  *See Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed. Cir. 1984) (recognizing that the taking of a license equates to an eminent domain taking of property under the Fifth Amendment of the United States Constitution).  "The [g]overnment takes a license to use or to manufacture a patented invention as of the instant the invention is first used or manufactured by the [g]overnment."  *Decca Ltd. v. United State*s, 640 F.2d 1156, 1166 (Ct. Cl. 1980).  Because the government has consented to being sued only for the compulsory taking of a non-exclusive

patent license, the basis for recovery against the government under 28 U.S.C. § 1498 diverges from that in patent litigation between private parties under 35 U.S.C. § 271:

> Expressed differently, section 1498 is a waiver of sovereign immunity only with respect to a *direct governmental infringement* of a patent.  Activities of the Government which fall short of direct infringement do not give rise to governmental liability because the Government has not waived its sovereign immunity with respect to such activities.  Hence, the Government is not liable for its inducing infringement by others, for its conduct contributory to infringement of others, or for what, but for section 1498, would be contributory (rather than direct) infringement of its suppliers.

15

**A-15**

> Although these activities have a tortious ring, the Government has
> not agreed to assume liability for them.

*Decca*, 640 F.2d at 1167 (emphasis added); *see, e.g., Martin*, 99 Fed. Cl. at 632 (recognizing that injunctive relief is not available under 28 U.S.C. § 1498).

As it pertains to an action under Section 1498, direct infringement of a patent occurs when the government directly uses or manufactures the patented invention without a license, *Decca*, 640 F.2d at 1167 n.15, or when, through a procurement contract or otherwise, the government consents to the use or the manufacture of the patented invention for its benefit without first obtaining a license, *id.* at 1166-67; *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 897 (Ct. Cl. 1976); *Parker Beach Restoration, Inc. v. United States*, 58 Fed. Cl. 126, 131 (2003). The court determines whether the government has engaged in direct infringement using a two-step process that parallels the analysis for infringement litigation between private parties. *See Lemelson v. United States*, 752 F.2d 1538, 1548 (Fed. Cir. 1985); *see also Casler v. United States*, 15 Cl. Ct. 717, 731 (1988), *aff'd*, 883 F.2d 1026 (Fed. Cir. 1989). The court initially construes the claims of the patent and then compares the construed claims to that of the accused infringing product or process. *See JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1329 (Fed. Cir. 2005). When comparing the claims to the accused device or process, "'the plaintiff must show the presence of every element [for literal infringement] or its substantial equivalent [for infringement under the doctrine of equivalents] in the accused device.'" *Boeing Co. v. United States*, 69 Fed. Cl. 397, 426 (2006) (alteration in original) (quoting *Lemelson*, 752 F.2d at 1551); *see also Pratt & Whitney Canada, Inc. v. United States*, 17 Cl. Ct. 777, 781-84 (1989), *aff'd*, 897 F.2d 539 (Fed. Cir. 1990). The first step in this analysis, *i.e.*, claim construction, is a question of law to be determined by the court; the second step, *i.e.*, infringement, either literal or under the doctrine of equivalents, involves questions of fact. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-90 (1996). The plaintiff has the burden of proving direct infringement, whether by literal infringement or under doctrine of equivalents, by a preponderance of the evidence. *Lemelson*, 752 F.2d at 1547; *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed. Cir. 1983).

*2. Relief available under 28 U.S.C. § 1498(a).*

The relief provided by 28 U.S.C. § 1498(a) for direct infringement is the "reasonable and entire compensation" for the compulsory non-exclusive patent license. 28 U.S.C. § 1498(a); *see Decca*, 640 F.2d at 1167; *see also Honeywell Int'l Inc. v. United States*, 107 Fed. Cl. 659, 679 (2012) ("Because [S]ection 1498(a) entails an eminent domain remedy, the Government must pay 'just compensation[.]'" (citations omitted)). "Generally, the preferred manner [for computing reasonable and entire compensation] is to require the government to pay a reasonable royalty for its license as well as damages for its delay in paying the royalty." *Standard Mfg. Co. v. United States*, 42 Fed. Cl. 748, 758 (1999), *abrogated in other respects by Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011); *see also Wright v. United States*, 53 Fed. Cl. 466, 469 (2002). When determining the amount of royalty required to adequately compensate the plaintiff, the court must consider the "supposed result of hypothetical negotiations between the plaintiff and defendant." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995) (en banc) (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983)).

16

"The hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began," *id.*, which is the date of first use or manufacture, *Brunswick Corp. v. United States*, 36 Fed. Cl. 204, 210 (1996), *aff'd*, 152 F.3d 946 (Fed. Cir. 1998). To aid in its calculation of a reasonable royalty arising from a hypothetical negotiation, the court may rely on a comprehensive list of factors elucidated in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971). *See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109-10 (Fed. Cir. 1996). The factors recognized by the court in *Georgia-Pacific* are:

> (1) current, established royalty rates under the patent at issue; (2) royalty rates for comparable technology; (3) scope, exclusivity, and restrictiveness of a retroactive license; (4) the patent holder's established licensing and marketing practices; (5) commercial/competitive relationship of licensor and licensee; (6) derivative/convoyed sales of unpatented, accompanying materials by patentee and competitors; (7) duration of patent and license terms; (8) profitability and commercial success of invention; (9) utility and advantages of invention over prior art; (10) nature, character, and benefits of use; (11) extent and value of infringing use; (12) allocation of a portion of profits or sales for use of invention; (13) portion of realizable profits creditable to the invention alone; (14) expert testimony on royalty rates; and (15) the totality of other intangibles impacting a hypothetical negotiation between a willing licensor and licensee.

*Georgia-Pacific Corp.*, 318 F. Supp. at 1120. Nonetheless, the court "is neither constrained by [the factors] nor required to consider each one where they are inapposite or inconclusive." *Brunswick*, 36 Fed. Cl. at 211-12. The determination of a reasonable royalty "requires a highly case-specific and fact-specific analysis, relying upon mixed considerations of logic, common sense, justice, policy and precedent." *Boeing Co. v. United States*, 86 Fed. Cl. 303, 311 (2009) (internal citations omitted) (quotation marks omitted).

### 3. Available defenses.

Under Section 1498(a), "'[i]n the absence of a statutory restriction, *any defense* available to a private party is equally available to the United States.'" *Motorola*, 729 F.2d at 769 (alterations in original) (quoting 28 U.S.C. § 1498 Revisor's Notes). Accordingly, the government may avail itself of the invalidity defenses set forth in 35 U.S.C. § 282(b). *See, e.g.*, *Messerschmidt v. United States*, 29 Fed. Cl. 1, 18-40, *aff'd*, 14 F.3d 613 (Fed. Cir. 1993) (holding that patent was invalid for lack of novelty and for obviousness, addressing an infringement claim brought under Section 1498(a)). The government has the burden of proving invalidity by clear and convincing evidence, as opposed to merely the preponderance of the evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, __ U.S. __, __, 131 S.Ct. 2238, 2242 (2011)); *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1291 (Fed. Cir. 2013); *Twin Disc, Inc. v. United States*, 10 Cl. Ct. 713, 727 (1986) (quoting *SSIH Equipment, S.A. v. International Trade Comm'n*, 718 F.2d 365, 375 (Fed. Cir. 1983)). This burden of persuasion remains on the party asserting invalidity throughout the pendency of the action. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983); *see also In re Cyclobenzaprine Hydrochloride Extended-*

17

*Release Capsule Patent Litig.*, 676 F.3d 1063, 1080 (Fed. Cir. 2012) (holding that the trial court must "consider[] the objective evidence in its entirety before making an obviousness finding, and consider[] that evidence in light of the actual burden imposed on a patentee and a patent challengee").

To invalidate a patent for lack of novelty pursuant to Section 102(a) of Title 35, the asserted claim in the patent-in-suit must be anticipated. *See* 35 U.S.C. § 102(a) (2006) ("A person shall be entitled to a patent unless . . . the invention was . . . patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent."). [29]    Although validity is a legal issue, anticipation is a question of fact. *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 995 (Fed. Cir. 2006). "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987). If there is not strict equivalence between the prior art reference and each and every element set forth in the claim, "the proper inquiry is obviousness, not [anticipation]." *Messerschmidt*, 29 Fed. Cl. at 21; *see Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 726 (Fed. Cir. 2002) ("Indeed the obviousness inquiry weighs the differences between the claimed invention and non-anticipating prior art references to determine whether one of skill in the art would have considered the invention obvious at the time of invention."); *see also Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("A prior art disclosure that 'almost' meets th[e anticipation] standard may render the claim invalid under § 103; it does not 'anticipate.'").

A patent is invalid for obviousness when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (2006). [30]    "The determination of obviousness under 35 U.S.C. § 103 is a legal conclusion based on underlying facts." *Allergan*, 726 F.3d at 1290. These factual underpinnings include: (1) the scope of content of the prior art; (2) the difference between the prior art and asserted claims; (3) the level of ordinary skill in the relevant art; and (4) the objective evidence of non-obviousness. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399-01 (2007). "A party asserting that a patent is obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the

---

[29]Section 102 was amended by Section 3 of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, and AIA Paragraph 3(n)(1) makes that change applicable to any patent application filed 18 months after September 16, 2011, *i.e.*, on March 16, 2013. Because the application for the '325 patent was filed well before that date, the court will reply on the pre-AIA version of § 102. *See SD3, LLC v. Dudas*, 952 F. Supp. 2d 97, 103 nn.4-5 (D.D.C. 2013).

[30]Section 103 also was amended by Section 3 of the AIA. For reasons stated *supra*, at n.29, the pre-AIA version of § 103 applies in this case. *See Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1183 n.1 (Fed. Cir. 2014); *see also I.E.E. Int'l Electronics & Eng'g, S.A. v. TK Holdings Inc.*, No. 10-13487, 2014 WL 5371038, at *40 n.4 (E.D. Mich. Oct. 23, 2014).

prior art reference to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *PAR Pharm., Inc. v. TWI Pharms., Inc.*, __ F.3d __, __, 2014 WL 6782649 (Fed. Cir. Dec. 3, 2014) (internal quotation marks omitted) (quoting *In re Cyclobenzaprine Hydrochloride*, 676 F.3d at 1068-69 (in turn quoting *Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009))).

## B.  Breach of Contract

The Tucker Act grants the Court of Federal Claims subject matter jurisdiction to hear claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  Although the Tucker Act waives sovereign immunity, it does not create a substantive right to relief against the United States.  *United States v. Testan*, 424 U.S. 392, 398, (1976); *Martinez v. United States*, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (en banc).  Rather, the "substantive right must be found in some other source of law" that mandates payment from the United States for the injury suffered.  *United States v. Mitchell*, 463 U.S. 206, 216 (1983).  A damages claim arising from a breach-of-contract with the United States fits squarely within the ambit of this requirement.  *Speed v. United States*, 97 Fed. Cl. 58, 64 (2011), *aff'd*, 550 Fed. Appx. 885 (Fed. Cir. 2014) ("Allegations of a contract with the government and breach of that contract can suffice for this purpose, so long as monetary relief is sought." (citing *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract."))).

To prevail on a breach-of-contract claim, the plaintiff bears the burden of proving: (1) the existence of a valid contract between the parties; (2) a duty arising from the contract; (3) a breach in duty; and (4) damages caused by the breach.  *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  A valid contract with the United States may be express, *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997), or may be implied-in-fact, "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding," *Baltimore & O.R. Co. v. United States*, 261 U.S. 592, 597 (1923).  For either type of contract, *see Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) ("[T]he requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs."), the plaintiff must demonstrate: (1) mutuality of intent; (2) consideration; (3) an unambiguous offer and acceptance; and (4) the existence of actual authority, express or implied, on part of the government signatory to bind the government to the contract.  *Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999); *see also H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (recognizing that "implied actual authority, like expressed actual authority, will suffice" for the fourth requirement).  The remedy for breach-of-contract is to award "damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed."  *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).  The injured party, however, may only recover if: (1) the damages were reasonably

foreseeable; (2) there is a causal connection between damages and the breach; and (3) the amount of recovery is not speculative.  *Id.*

## ANALYSIS

## I. PATENT INFRINGEMENT

Liberty filed suit against the government under 28 U.S.C. 1498(a), alleging that the M855A1 and the M80A1 ("A1 projectiles") directly infringe, by literal infringement and under the doctrine of equivalents, the '325 patent.  Specifically, Liberty charges the government with infringement of independent Claims 1 and 32, as well as dependent Claims 2-3, 7-11, 18-20, 22, 25, 28-32, and 38-41.  Pl.'s Post-Trial Br. at 5-6, ECF No. 99.  The government maintains that the A1 projectiles do not directly infringe independent Claims 1 or 32 or their dependent claims, Def.'s Post-Trial Br. at 40-46, ECF No. 103, and contests the validity of "each and every claim of the '325 patent," *id.* at 47.  Before addressing the government's invalidity contentions, the court will make a factual determination regarding whether the A1 projectiles directly infringe the foregoing claims in the '325 patent.

### A. Literal Infringement

#### 1. Claim 32.

Liberty avers that the A1 projectiles literally infringe independent Claim 32, as well as the associated  dependent Claims 38-41.  To prove literal infringement, Liberty has the burden of demonstrating that the A1 projectiles embody each and every element in Claim 32.  *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1578 (Fed. Cir. 1988); *Judin v. United States*, 27 Fed. Cl. 759, 784 (1993).  If the language set forth in Claim 32 reads directly on the A1 projectiles, "the court may disregard additional components or elements of the [A1 projectiles] if those additions do not produce a radically different result."  *Judin*, 27 Fed. Cl. at 784; *see also Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 797 (Fed. Cir. 1990).

The government concedes that the A1 projectiles infringe each and every element of Claim 32 in the '325 patent except the claim limitation "intermediate opposite ends."  *See supra*, at 10, 15 n.28; Tr. 2375:16 to 2376:9 (Kitchens); Def.'s Post-Trial Br. at 45-46.  In its claim construction order, the court construed "intermediate opposite ends" to mean "that the interface is positioned between or in the middle of the opposite ends of the forward end of the nose portion and the trailing end of the tail portion."  *Liberty Ammunition II*, 111 Fed. Cl. at 379-80.  The court further acknowledged that  "'intermediate opposite ends' indicates by its plain meaning an embodiment where the interface is positioned between the tail and nose, though *not necessarily enclosing the tail or nose*."  *Id.* at 379 (emphasis added).

The government now interprets that construction as precluding the interface from "enclos[ing] an end of the projectile."  Def.'s Post-Trial Br. at 46; Tr. 2343:24 to 2344:9 (Kitchens).  The government's attempt to interpose this limitation into Claim 32 restates an unsuccessful argument that it previously raised during claim construction.  Then, the government urged the court to adopt an additional limitation, "that the interface cannot extend to the front or

20

to the end of the projectile," because no figures found in the '325 patent depict an interface that extends to the nose or tail portions. *Liberty Ammunition II*, 111 Fed. Cl. at 379. Given that "the sampling of embodiments provided by the figures does not comprise the entirety of all embodiments enabled by the patent," the court declined to adopt the government's proffered limitation. *Id.* at 379-80 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[W]e have repeatedly warned against confining the claims to those embodiments . . . [and] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.")).

The government further argues that an embodiment in which the interface encloses an end portion contradicts the meaning of "intermediate opposite ends" because that interface no longer is "positioned between or in the middle of the opposite ends [of the projectile]." *See* DX 203 at 34 (Dr. Kitchens's Responsive Expert Report Regarding Infringement); *see also* Def.'s Post-Trial Br. at 46. This supposition mischaracterizes the claim language. The claim term "intermediate opposite ends" is preceded by the open transition term "including." It is axiomatic in patent law that the terms "including" and "comprising" have the same meaning, "namely that the listed elements . . . are essential but other elements may be added." *Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008). Therefore, as Liberty correctly has recognized, "intermediate opposite ends" means that the interface must "cover[] at least the 'middle' portion of the round, but *is not limited* to covering only that middle portion." Pl.'s Post-Trial Br. at 9 (alteration in original); *see* Tr. 668:7-24 (German) (testifying that the court's construction of "intermediate opposite ends" permits, but does not require, the interface to extend to the front or to the end of the projectile).[31] The government's attempt to limit this claim term falls short.

Under the proper reading of "intermediate opposite ends," the A1 projectiles literally infringe Claim 32. A trial, Liberty demonstrated by a preponderance of evidence that the reverse-drawn jackets of the M855A1 and M80A1 are disposed at "intermediate opposite ends" because the jackets cover at least the middle portion of the round. *See* PDX 66-67 ("Disposed Intermediate Opposite Ends" of the A1 Projectiles); *see also* Tr. 669:10-19 (German). Moreover, the government's expert, Dr. Kitchens, conceded that under the court's construction, the A1 projectiles are indeed "disposed at intermediate opposite ends." Tr. 2344:20-22, 2395:24 to 2396:10 (Kitchens). Given that the jackets of the A1 projectiles fall within the scope of "intermediate opposite ends," each and every element in Claim 32 reads on the A1 projectiles.

Based on the foregoing, the M855A1 and the M80A1 literally infringe independent Claim 32. It is self-evident that dependent Claims 38-41, which incorporate by reference all of the limitations of Claim 32, are also infringed by the A1 projectiles. *See Wahpeton Canvas Co.*

---

[31]The government's expert, Dr. Clarence W. Kitchens, in his report had suggested that Liberty's interpretation of the claim term "is essentially identical to the limitation provided by the language in [C]laim 32 that the interface be 'dis[posed . . . in interconnecting relation to said nose and tail and portion.'" DX 203 at 34. This juxtapositioning of claim terms is not warranted. The terms "intermediate opposite ends" and dis[posed] . . . in interconnecting relation to" serve different purposes in delineating the claim.

21

**A-21**

*v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989); *see also* Tr. 2376:6-9 (Kitchens).

   *2. Claim 1.*

   Liberty further contends that the A1 projectiles literally infringe, or alternatively infringe under the doctrine of the equivalents, independent Claim 1 and the associated dependent Claims 1-3, 7-11, 18-20, 22, 25, and 28-31.  Pl.'s Post-Trial Br. at 5.  Unlike Claim 32, Claim 1 describes a projectile having a "reduced area of contact" with the "interior barrel surface of said firearm."  *See supra*, at 9-10.  There are "no clues within [Claim 1] itself as to what the area of contact has been reduced *from*," *Liberty Ammunition II*, 111 Fed. Cl. at 375 (alteration in original), but the specification recites "a reduced contact area as compared to conventional projectiles," '325 patent, col. 1, lines 65-66.  During claim construction, Liberty argued that the claimed reduction was "self-referential, defined by a comparison between the interface and part of the interface."  *Liberty Ammunition II*, 111 Fed. Cl. at 375.  In contrast, the government maintained that an accurate comparator was that of a "traditional jacketed projectile, which includes the M855."  *Id.*  The court found that neither referent adequately addressed the missing antecedent and looked to the entire patent to select the following appropriate referent: the area of contact is reduced to that of a "traditional jacketed lead bullet of calibers .17 through .50 BMG."[32]  *Id.* (recognizing that "'conventional projectiles' referred to in the specification must logically be limited to those projectiles comparable to the ones enabled by the '325 patent, which is to say 'all calibers generally ranging from .17 through [.]50 BMG.'") (citing '325 patent, col. 2, line 28)).  Accordingly, the court construed "reduced area of contact" to mean "the area of contact between the interface and the rifling of the firearm is less than that of a traditional jacketed lead bullet of calibers .17 through .50 BMG."  *Id.*

   Similar to Claim 32, the government only contests the infringement of one element found in Claim 1: the "reduced area of contact" limitation.  Tr. 2375:16 to 2376:8 (Kitchens).  The crux of the contention centers on the parties' diverging selection of referent projectiles in accordance with the court's claim construction order.  For each A1 projectile, Liberty and the government selected jacketed lead comparators with the same caliber, but Dr. Kitchens further limited the government's comparison to projectiles with approximately the same mass.  Dr. Kitchens testified that the referent must have a similar weight as the accused projectile because a bullet's mass is positively correlated to its length and its area of contact.  *See* Tr. 2192:2 to 2193:4 (Kitchens).  According to Dr. Kitchens, "if heavier and larger bullets are considered proper comparative projectiles, then every bullet could conceivably have a reduced area of contact, as long as a heavier bullet was used as a comparator."  DX 203 at 17.[33]

---

   [32]"'BMG" specifically refers to the Browning Machine Gun and thus ".50 BMG" refers to the cartridge developed for that machine gun (used for some time with the military-standard M2 heavy machine gun)."  *Liberty Ammunition II*, 111 Fed. Cl. at 375 n.8.

   [33]According to Liberty's expert, Dr. Randall M. German, a bullet does not necessarily become longer as it becomes heavier.  By "chang[ing] the material of construction," the bullet's mass can increase without a corresponding expansion in length.  Tr. 691:16-23 (German).

Dr. Kitchens determined that the M80 and the M855 "are the best comparators" because they are "the same weight as [their successors], and they are both general-purpose Army rounds that will be used in the same weapon."  Def.'s Post-Trial Br. at 42; *see* DX 203 at 15-16.  Recognizing that the specific predecessor rounds may be "excluded as a standard of comparison," *see* DX 203 at 17, Dr. Kitchens selected additional .22 caliber bullets with weights between 40 and 70 grains as comparators for the M855A1, *id.* at 21.  He also picked the M80 and other .30 caliber projectiles with weights of 110 to 168 grains as referents for the M80A1.  *Id.* at 27.  Based on these comparators, Dr. Kitchens concluded that the "M855A1 has a larger area of contact[34] than the M855 it has replaced, as well as a larger area of contact than twenty other representative 5.56mm (0.22 cal[iber]) traditional lead bullets," *id.* at 22-23, and that "the M80A1 has a larger area of contact than the M80 . . . , as well as a larger area of contact than nine other 7.62mm (.30 cal[iber]) traditional jacketed lead bullets," *id.* at 28.  He then concluded that neither the M855A1 nor the M80A1 "literally meet (or infringe) the 'reduced are of contact limitation.'"  *Id.* at 24, 29.

The court finds that the M855 and M80 are not the sole comparators for the claim term because the '325 patent is silent as to this additional limitation.  The specification simply recites that the area of contact is reduced as compared to "conventional projectiles," '325 patent, col. 1, lines 65 to 66, which are projectiles of "all calibers generally ranging from .17 through [.]50 BMG," *id.* at col. 2, line 28.  *See Liberty Ammunition II*, 111 Fed. Cl. at 375 (declining to adopt the M855 as a referent when construing the claim term "reduced area of contact").  Comparing the accused rounds by weight is equally problematic for three reasons.  First, the standard of comparison enunciated by the court is that of "traditional jacketed lead bullet of calibers .17 through .50 BMG."  *Id.*  Notably absent from the court's construction is any limitation on the weight of the referent.  *See* Tr. 604:22-24 (German).  Accordingly, selecting referent rounds by weight impermissibly limits the "reduced area of contact" claim term.  Second, many of the referents cited by Dr. Kitchens are not traditional jacketed lead bullets.  Rather, a number of those comparators are either partially- or non-jacketed bullets, non-military standard ammunition, or civilian .22 caliber ammunition designated as .22 "shorts" or "longs" that are not comparable in any meaningful way to ammunition used by the military.  *See* DX 203 at 21, 27; *see also* Pl.'s Post-Trial Br. at 10 n.5 ("While Dr. Kitchens purports to list a number of rounds

---

[34]Dr. Kitchens's methodology for calculating the contacting area was similar to that employed by Dr. German.  *Compare* DX 203 at 14 ("[Area of Contact] = $\pi$DL, where D is the nominal outer diameter of the non-tapered cylindrical portion of the bullet, L is the bullet bearing surface length."), *with* PX 12 at 16 (Dr. German's Expert Report Regarding Infringement) ("[Surface Area] = $2\pi$rh, where r is the radius of the largest diameter non-tapered outer section of the jacket and h is the length of that non-tapered outer section.").  The only difference between the two approaches is that Dr. Kitchens included the "length of any knurled cannelure" for the value of L in bullets that featured a cannelure.  *See* Tr. 2186:14-16 (Kitchens); *see also* DX 203 at 14.  Accordingly, Dr. Kitchens calculated the contacting area of the M855A1 and M80A1 to be .2648 square inches and to be .3653 square inches, respectively.  DX 203 at 23, 25.  In contrast, Dr. German's calculations were .2365 square inches for the M855A1 and .3260 square inches for the M80A1.  PX 12 at 17, 19.  The difference in area value for projectiles counting the cannelure is not dispositive.  Both proffered values for the A1 projectiles are less than a number of "traditional jacketed lead bullet of calibers .17 through .50 BMG."  *See infra*, at 24-25.

23

**A-23**

with a lesser contacting surface area than the M855A1, many of these rounds are .22 'shorts[,]' a rimfire munition that may or may not be characterized as a 'traditional' jacketed lead round."). Third, traditional jacketed lead bullets are intentionally manufactured to be different weights to account for their intended shooting application, *e.g.*, target practice versus hunting versus combat. Tr. 604:11-21 (German) (recognizing that "the ammunition has a variety of applications, and a variety of masses" because the bullets are "used in many different applications"). In sum, Dr. Kitchen's identification regarding comparable projectiles is fatally flawed.[35]

The court accepts the findings of Liberty's expert, Dr. German, because he assessed the surface area values of the M855A1 and the M80A1 with those of traditional jacketed lead rounds of the same caliber. Specifically, Dr. German compared the contacting surface area of the M855A1 to the area values of traditional jacketed .22 caliber bullets. PX 12 at 17-18 (comparing the M855A1 EPR to the "MK262 Sierra," the "Sierra Black Hills 100," the "Berger .22 caliber 77grain OTM Tactical," the "Berger .22 caliber 80 grain VLD," the "Berger .22 caliber 82 grain Long Range," the "Berger .22 caliber 90 grain VLD," and the "ATK 86 Grain"). Likewise, he examined the contacting surface areas of the M80 and traditional jacketed .308 caliber projectiles. PDX 3 (comparing the M80 to the "Berger .30 caliber 155 grain VLD hunting," the "Sierra Pro Hunter," and the "Barnes TSX").[36] Dr. German determined that the contacting surface area for the M855A1 is "less than the contacting surface area of a number of traditional jacketed .22 caliber projectiles (and, obviously, all 7.62 and .50 cal[iber] projectiles)," PX 12 at 18, and that the contacting surface area of the M80A1 is also "less than the contacting surface area of a number of traditional jacketed [.308] caliber projectiles," *id.* at 20.

Given that the M855A1 and the M80A1 have reduced areas of contact compared to traditional jacketed lead bullets, the court finds that Liberty has proven by a preponderance of the evidence that the A1 projectiles accused in this suit contain the "reduced area of contact" limitation found in Claim 1, and therefore, the M855A1 and the M80A1 literally infringe independent Claim 1. As such, claims 1-3, 7-11, 18-20, 22, 25, 28-31, which depend from

---

[35]Dr. Kitchen testified that he did not know how many of the chosen comparators were .22 shorts or .22 longs, partially- or non-jacketed projectiles, or other non-military ammunition. *See* Tr. 2201:23 to 2202:7 (Kitchens). Upon examining the referents chosen by Dr. Kitchens, it appears that at least the first eight of his referent projectiles for the M855A1 are .22 shorts, *see, e.g.*, the "Sierra .22 caliber (.224) 40 grain Hornet." DX 203 at 21. The remainder referents for both A1 projectiles feature partially-jacketed bullets, *see, e.g.*, the "Sierra .30 caliber/7.62mm (.308) 110 grain Round Nose," *id.* at 27, or are advertised as non-military standard ammunition, *see, e.g.*, the "Sierra .22 caliber (.224) High Velocity 55 grain FMJBT" and the "Berger .22 cal. 52 gr. Match FB Varmint," *id.*

[36]Dr. German's export report included the M80 as a referent. He testified that he "made a mathematical error in [his] calculation for [the M80]," but did not recalculate the contacting surface area value for trial because he was told it was not important since the expert report had been filed. Tr. 706:15 to 707:8 (German). Consequently, Dr. German's testimony at trial excluded the M80 as a comparator. *See* PDX 3.

independent Claim 1, are also directly infringed by the A1 projectiles. *See* Tr. 2376:2-5 (Kitchens); *see also Wahpeton Canvas*, 870 F.2d at 1553.[37]

### B. Anticipation

The government claims invalidity of the '325 patent based on a lack of novelty. *See* 35 U.S.C. § 102(a)(1) (2006). For the court to invalidate the '325 patent for lack of novelty, a single prior art reference must anticipate each and every limitation of the claimed invention. *See Verdegaal Bros.*, 814 F.2d at 631. A prior art reference may anticipate without expressly disclosing a limitation of the claimed invention if the absent limitation is inherent, or necessarily present, in the prior art reference. *See id.* To prove anticipation, the government points to three prior art references: the Leussler '416 patent (U.S. Patent No. 1,967,416), the Nosler '420 patent (U.S. Patent No. 3,003,420), and the M855/M855 LFS rounds. The government maintains that Claim 32 and the claims that depend from Claim 32 are anticipated by both above-mentioned patents and that Claim 1 and those claims that depend on Claim 1 are anticipated by the Nosler '420 patent and are inherently anticipated by the M855/M855 LFS. Liberty argues that these prior art references are not anticipatory of any claim in the '325 patent because the references lack the element of "controlled rupturing," found in both independent Claim 32 and independent Claim 1. *See* Pl.'s Post-Trial Reply Br. at 15-16, 19, ECF No. 106.

### 1. Leussler '416 patent.

The Leussler '416 patent describes a projectile with an exposed nose ogive and an interface portion that encloses the tail end of the projectile. DX 281 at 1 (Leussler '416 patent). Liberty avers that the Leussler '416 projectile is not anticipatory because the interface portion expands, or mushrooms,[38] upon impact, and therefore, is not "structured to provide controlled rupturing." Pl.'s Post-Trial Reply Br. at 15-16.[39] Liberty points to disclosures in the prior art to show that "[t]he Leussler '416 round mushrooms on contact to increase its lethality, but not to the point of separating the component parts." *See id.* at 15. Indeed, the Leussler '416 patent highlights a "projectile having *one part* . . . which is *readily deformed*, [or] flattened . . . , but continues to *advance as a unit*, thereby insuring deep and effective penetration." Leussler '416 patent, col. 1, lines 30-35 (emphasis added). The government sets forth the perfunctory argument that the Leussler patent nonetheless discloses a fragmenting projectile because a limitation found in Claim 6 of the '416 patent recites that "the sections are separated on impact of said projectile against a target." Leussler '416 patent, col. 4, lines 114-15; *see* Def.'s Post-

---

[37]Because Claim 1 is literally infringed under 28 U.S.C. 1498(a), it is not necessary for the court to determine infringement under the alternative test, *i.e.*, the doctrine of equivalents.

[38]A mushrooming projectile "fold[s] back on a thickened base at target impact[,] increasing its lateral cross-section." Pl.'s Post-Trial Reply Br. at 12.

[39]In its claim construction order, the court construed "structured to provide controlled rupturing" to mean "that the interface portion is structured to rupture (*i.e.*, break) upon striking a target or object, separating two or more of the components of the projectile." *Liberty Ammunition II*, 111 Fed. Cl. at 374.

Trial Br. at 51. The court finds this argument unpersuasive. A mushrooming bullet "[is] a very different style of lethal mechanism . . . compared to [a fragmenting bullet]," Tr. 1475:1-16 (Newill), and the Leussler patent unambiguously discloses a projectile with a deformable point section (nose portion) "that mushrooms upon impact." Leussler '416 patent, col. 3, lines 38-45. The objective of the Leussler '416 projectile is not to rupture upon impact, and accordingly, it does not anticipate each and every element of Claim 32 or its dependent claims.

*2. Nosler '420 patent.*

The Nosler '420 patent describes a projectile with an exposed nose portion, a tail portion, a jacket, and a relief band in the middle portion of the projectile, which serves to reduce friction between the projectile and a rifle barrel. *See* DX 279 (Nosler '420 patent), col. 2, lines 4-71. Similar to the Leussler '416 bullet, the Nosler '420 projectile mushrooms upon impact. *Id.*, col. 1, lines 57-79 (reciting that the forward portion of the jacket in the Nosler '420 projectile will split and fold back in petal-like fashion to increase the shocking power of the bullets."); *see also id.* at Fig. 4. Again, Liberty makes the argument that the "controlled rupturing" limitation in the '325 patent is not anticipated by this prior art reference, as the Nosler projectile is not structured to fragment. The government agrees that "Nosler ['420] projectile is designed to deform upon impact," but insists that the jacket and head portion nonetheless fragment upon striking a soft target. Def.'s Post-Trial Br. at 49. For reasons similar to those stated regarding the Leussler '416 patent, this argument related to the Nosler '420 patent falls short. As Liberty correctly recognizes, "the lethality mechanism that the Nosler '420 [projectile] is designed to use is an expanding/mushrooming [nose portion,] reinforced and enhanced by an intact expanding jacket," and modifying the Nosler '420 projectile to induce fragmentation would "alter [its] express operating principle . . . – the creation of larger wound channels (and shocking power) through the mechanism of an expanding projectile diameter upon impact." Pl.'s Post-Trial Reply Br. at 14 (referring to the Nosler '420 patent); *see* Nosler '420 patent, col. 1, lines 33-58, col. 3, lines 3-27. Given that the lethality mechanism provided for in the Nosler '420 patent is that of deformation and expansion, rather than fragmentation, it does not anticipate each and every element of Claim 32, Claim 1, or the attendant dependent claims.

*3. M855/M855 LFS.*

The M855 and the M855 LFS rounds feature a three-component projectile. *See supra*, at 3 n.6, 5. In arguing inherent anticipation of Claim 1, the government avers that the M855 and M855 LFS rounds are inherently structured to rupture upon soft target contact, causing fragmentation. Def.'s Post-Trial Br. at 51-52. The government maintains that controlled rupturing is inherent, or "necessarily present," in the predecessor rounds because ballistics tests conducted by Dr. Kitchens confirm that the rounds fragment shortly after impacting a soft target. *Id.*; *see* DX 290-92 (Dr. Kitchens's Test Report and Results).[40] The record does not support this

---

[40]The government places substantial reliance on these test results, but their probative value is limited. Contrary to the 10 percent gelatin standard for Army tests, Dr. Kitchens ran ballistics tests with a 20 percent gel block. Tr. 2782:1-20 (German). Dr. Kitchens also modified the propellant without documenting the modification, which prevents replicating the experiment. Tr. 2889:3-7 (German). Finally, "[t]he results [of his tests] demonstrated a highly unlikely

26

factual postulate. To the contrary, "the through[-]and[-]through rounds complained of by U.S. warfighters [were] [from] a M855 projectile that did not rupture/break upon hitting the enemy combatant." *See supra*, at 3, *see also* Tr. 2425:11-21 (Kitchens) (testifying that there were instances of through-and-through hits). Moreover, the Army acknowledged this lethality issue, *see supra*, at 3, *see also* Pl.'s Post-Trial Reply Br. at 19 ("The M855's inconsistency and ineffectiveness in combat was one of the principal shortcomings to be addressed by the Defendant's Green Ammo [and] Lethality program."), and the lethality mechanism of fragmentation featured in the M855A1 was the chosen solution to this problem, *see supra*, at 13, *see also* JX 25 at 4-6 (recognizing that the M855A1 is designed to rupture upon soft target impact, irrespective of the yaw angle). This evidence establishes that the claim element of "controlled rupturing" is neither present nor inherent in the M855 or the M855 LFS. These predecessor rounds do not anticipate each and every element of Claim 1 or its dependent claims.

The '325 patent is not invalid for lack of novelty, as it was not anticipated by any of the three prior art references cited by the government.

### C. Obviousness

The government's second asserted ground for patent invalidity is that a combination of prior art references renders the '325 patent obvious under 35 U.S.C. § 103. In particular, to invalidate the '325 patent based on obviousness, the government must show that "a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention." *PAR Pharm.*, __ F.3d at __, __, 2014 WL 6782649, at *5 (quoting *In re Cyclobenzaprine Hydrochloride*, 676 F.3d at 1068 (in turn quoting *Procter & Gamble*, 566 F.3d at 994)); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). When undertaking such an inquiry into obviousness, the court "must step backward in time and into the shoes worn by [the skilled artisan] when the invention was unknown and just before it was made . . . [and] then determine whether the patent challenger has convincingly established . . . that the claimed invention as a whole would have been obvious at *that* time to *that* person." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566 (Fed. Cir. 1987) (alteration in original) (citations omitted); *see also Graham*, 383 U.S. at 3. Hindsight may not be considered when making this determination. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008) (recognizing that courts must "be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention."). The court must also consider secondary evidence of non-obviousness, such as "commercial success, long[-]felt but unsolved needs, [and] failure of others," before concluding that a patent is invalid as obvious. *Graham*, 383 U.S. at 17-18.

### 1. Motivation to combine.

To demonstrate obviousness, the government points to ten prior art references: (1) the Leussler '416 patent; (2) the Nosler '420 patent; (3) the M855; (4) the M855 LFS; (5) the

---

statistical discrepancy between tested round velocity and round lot referenced velocities." Pl.'s Post-Trial Reply Br. at 18; *see* Tr. 2786:12 to 2787:2 (German).

Katzmann '172 patent (U.S. Patent No. 4,753,172); (6) the Frey '016 patent (U.S. Patent No. 3,154,016); (7) the Kruze '508 patent (U.S. Patent No. 4,884,508); (8) DX 284, George E. Frost, *Ammunition Making* (1990) ("*Frost on Ammunition*"); (9) the McElroy '879 patent (U.S. Patent No. 6,973,879); and (10) the Auxier '287 patent (U.S. Patent No. 2,958,287). DX 202 at 12, 57 (Dr. Kitchens's Expert Report Regarding Validity). Liberty avers that Dr. Kitchens failed to explain the motivation that would have led a skilled artisan to combine those references at the time the invention was made and that he used impermissible hindsight to conclude that the claimed invention in the '325 patent is obvious. Pl.'s Post-Trial Br. at 15-19. The opinion by Dr. Kitchens regarding the motivation to combine the ten prior art references states:

> [The] asserted claims of the '325 patent require little more than a three-piece projectile that, based on its structure, is capable of staying intact and in synchronized rotation until reaching a target and breaking apart on impact. Given the long history of small-arms ammunition, the asserted claims represent general types of projectile (often designed for soft targets) that were known and being built by those of ordinary skill in the art decades before the filing of the '325 patent in 2005. . . . The *general motivation to combine these references emanates from the desire for three known and desirable performance characteristics*: stable and accurate bullet flight; reduced barrel friction and wear; and proper lethality characteristics on impact.

DX 202 at 7-8 (emphasis added).

This reasoning "fails to explain why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does.*" *ActiveVideo Networks*, 694 F.3d at 1328 (emphasis in original) (citing *KSR*, 550 U.S. at 418 ("[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does . . . because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.")); *see also PAR Pharm.*, __ F.3d at __, __, 2014 WL 6782649, at *5-8. The government has only established that there was a motivation to increase performance in small-arms ammunition, which is "entirely different from [a] motivation to combine particular references." *Innogenetics*, 512 F.3d at 1373 ("[K]nowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references."); *see also In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[The test for obviousness] asks . . . whether a person of ordinary skill in the art, possessed with the understandings and knowledge reflected in the prior art, and motivated by the general problem facing the inventor, *would have been led to make the combination recited in the claims.*" (emphasis added)). As Liberty correctly notes, "[u]nless one knew that combining separate elements from ten disparate references would yield improved lethality, consistency, accuracy, and be environmentally friendly, there would be no reason to combine the prior art to arrive at the claimed device." Pl.'s Post-Trial Br. at 19.

2. *Impermissible hindsight.*

Additionally, Dr. Kitchen's testimony at trial illustrates the use of improper hindsight in the selection of the prior art references. Dr. Kitchens acknowledged that he divided the '325 patent into claim elements and then searched for a prior art reference that would correspond to each element. *See* Tr. 2422:1-15, 2423:6-20 (Kitchens). For example, for the "reduced area of contact" limitation, *see* DX 202 at 12, Dr. Kitchens surveyed the prior art and found a carrier for a cluster munition, which carrier featured annular grooves in two driving bands around the shell, *id.* at 23, *see also* DX 286 (Kruse '508 patent), col. 3, lines 6-65. That patent is entitled "Spin Stabilized Carrier Projectile Equipped with a Driving Band." Kruse '508 patent, col. 1, lines 1-2. The cluster shell was fired from a gun, the barrel of which was rifled to induce stabilizing spin during flight.[41] Dr. Kitchens argued that the driving bands in the claimed invention corresponded to an interface and that the grooves equated to a reduction in the area of contact between the interface and firearm. DX 202 at 23. By this mode of reasoning, Dr. Kitchens was ignoring the "as a whole" requirement of 35 U.S.C. § 103 and was engaging in a part-by-part analysis that relied on hindsight. As the Federal Circuit explained in *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (Fed. Cir. 2005):

> In making the assessment of differences between the prior art and the claimed subject matter, [S]ection 103 specifically requires consideration of the claimed invention "as a whole." Inventions typically are new combinations of existing principles or features. The *"as a whole" instruction in title 35 prevents evaluation of the invention part by part. Without this important requirement, an obviousness assessment might successfully break an invention into its component parts, then find a prior art reference corresponding to each component.* This line of reasoning would import hindsight into the obviousness determination by using the invention as a roadmap to find its prior art components.

*Id.* (internal citations omitted) (emphasis added); *see also Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1998) ("Defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness.").[42]

---

[41]The driving bands had a diameter that was sufficiently large to engage the rifling, sealing the gas generated by firing the propellant, as well as imparting spin. Kruse '508 patent, col. 1, lines 11-16.

[42]The Nosler '420 and Leussler '416 patents teach mushrooming bullets that provide through-and-through hits, intended for use in hunting large game animals. *See* DX 284 ("*Frost on Ammunition*") 115 (referring to a bullet with "desirable expansion characteristics"). The Auxier '287 patent teaches a mushrooming bullet for "use in game hunting rifles which will offer correct penetration and expanding characteristics." DX 283 (Auxier '287 `patent), col. 2, lines 10-13. Mushrooming bullets are prohibited for military use by international treaties on the laws of war. Pl.'s Post-Trial Reply Br. at 13 n.9. It would be non-obvious for a person of ordinary skill in the art seeking to develop military ammunition to combine elements from projectiles that breach the laws of war with features of the M855, M855 LFS, and other references that are

The government's argument for obviousness fails to provide a motivation to combine the ten prior art references and is predicated on an improper, part-by-part, retrospective reconstruction of the claimed invention.

### 3.  Secondary considerations.

Secondary considerations, "'can be the most probative evidence of non-obviousness in the record, and enable[] the . . . court to avert the trap of hindsight." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310 (Fed. Cir. 2010) (alteration in original) (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986)).  Secondary considerations are deserving of significant weight in this case.  As Judge Learned Hand aptly said in *Safety Car Heating & Lighting Co. v. General Elec. Co.*, 155 F.2d 937, 939 (2d Cir. 1946),

> In appraising an inventor's contribution to the art, as we have often said, the most reliable test is to look at the situation before and after it appears.  Substantially all inventions are for the combination of old elements . . . [courts] had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention.  Among these will figure the length of time the art, though needing the invention, went without it: the number of those who sought to meet the need, and the period over which their efforts were spread: how many, if any, came upon it at about the same time, whether before or after:

---

compliant with such international laws.  *See* PX 24 at 72 (German's Reply Expert Report on Validity).

Additionally, a skilled artisan would not have been motivated to combine the Katzmann '172 patent, DX 282 (Katzmann '172 patent), and the Kruse '508 patent, DX 286 (Kruse '508 patent), with a mushrooming projectile.  The lethality mechanisms of the Katzmann '172 patent (a sabot projectile) and the Kruse '508 patent (a carrier projectile) are diametrically opposed to the mushrooming mechanism taught by the Nosler '420 patent, the Leussler '416 patent, the Auxier '287 patent, and *Frost on Ammunition*.  *See* Katzmann '172 patent, col. 1, lines 23-26, col. 2, lines 24-26, 45-56 (teaching a large caliber munition intended to combat airborne targets by fragmenting on a time delay after entering the target); *see also* Kruse '508 patent, col. 2, lines 56-65, col. 4, lines 4-17 (teaching a carrier projectile capable of exploding while in flight).  Correspondingly, it would have been unexpected to combine the McElroy '879 patent, DX 287 (McElroy '879 patent), with the Katzmann '172 and Kruse '508 patents, promoting fragmentation because the McElroy '879 patent teaches a uniform projectile that remains intact when striking a soft target.  McElroy '879 patent, col. 7, lines 31-34; *see also Frost on Ammunition* at 115 (teaching away from a fragmentation mechanism by noting that a preferred projectile is one where the "core and jacket . . . stay together"); *see also* Auxier '287 patent, col. 1, lines 63-65 (teaching against fragmentation and promoting a projectile construction that will not "permit a separation of the jacket and core upon impact").  Finally, the Frey '016 patent, DX 285 (Frey '016 patent), teaches a method of using annular flanges to reduce contact area, which is not employed in the '325 patent.  Frey '016 patent, col 1, line 35 to col. 2, line 39.

30

**A-30**

> and—perhaps most important of all—the extent to which it
> superseded what had gone before.  We have repeatedly declared
> that in our judgment this approach is more reliable th[a]n prior
> conclusions drawn from vaporous, and almost inevitably self-
> dependent, general propositions.

*Id.*

Liberty has presented evidence of secondary considerations of non-obviousness, including: (1) a long-felt need since 1993 for a lethal, lead-free replacement projectile for the standard ammunition, (2) the combat-proven success of the M855A1, and (3) the acclaim and recognition for the development of the A1 technology.[43]  The government does not challenge the existence of this evidence, but opines that there is not a "*nexus* with the *claimed* invention and the secondary consideration[s]."  Def.'s Post-Trial Br. at 54 (emphasis added).

"The term 'nexus' is often used, in this context, to designate a legally and factually sufficient connection between the proven success [or other secondary considerations] and the patented invention, such that the objective evidence should be considered in the determination of non[-]obviousness."  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988); *see also Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).  The plaintiff has the burden of presenting evidence sufficient to establish a *prima facie* case of nexus.  *Demaco*, 851 F.2d at 1392 (citing *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus. Inc. v. Karavan Trailors, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999)).  "However, if the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus."  *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006).

In this instance, a nexus is presumed because the A1 projectiles are coextensive with and embody the features claimed in the '325 patent.  *See J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) ("When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention.") (citations omitted)).  Accordingly, the government must adduce evidence to negate the connection between the evidence of secondary considerations and the patented invention.  *Brown & Williamson Tobacco*, 229 F.3d at 1130.  The government agrees with Liberty that the M855A1 was a successful solution to the long-felt need for an

---

[43]The court also takes account of the fact that copying is "strong evidence" of non-obviousness.  *Pandirect Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1099 (Fed. Cir. 1985); *see also Diamond Rubber Co. of N.Y. v. Consolidated Rubber Tire Co.*, 220 U.S. 428 (1911).  Just before the '325 patent issued in July 2010, the Army submitted Patent Application No. 61332631, filed May 7, 2010, for a projectile that was similar in all pertinent respects to that covered by the '325 patent.  *See supra*, at 12 n.25.  The Army's application was abandoned, *id.*, but it does show the correspondence between the Army's projectile and that of the '325 patent.

environmentally-sound and lethal projectile.  Def.'s Post-Trial Br. at 54; PX 24 at 10
(Dr. German's Reply Expert Report Regarding Validity).  However, the government maintains
that "both concerns have no nexus to the claimed invention(s) of the '325 patent [because] none
of the patent claims require the use of non-lead materials . . . or projectiles with the yaw-
independent (and in turn more lethal) behavior of the M855A1."  Def.'s Post-Trial Br. at 54.
This reasoning is deficient because it forces Liberty to disprove a negative in its *prima facie*
case, thus contravening the basic tenet of the presumption.  *See Demaco*, 851 F.2d at 1394 ("A
requirement for proof of the negative of all imaginable contributing factors would be unfairly
burdensome, and contrary to the ordinary rules of evidence.").  Placing the burden on Liberty to
prove that commercial success was *not* due primarily to the lead-free and yaw-independent
design amounts to the tail wagging the dog.  Further, "it is not necessary . . . that the patented
invention be *solely* responsible for the commercial success, in order for this [secondary
consideration] to be given weight."  *Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264,
1273 (Fed. Cir. 1991) (emphasis added).  Finally, while the technology in the patent does not
require a lead-free slug and a yaw-independent projectile, the claim language expressly covers
these elements.[44]  The government's conjecture is inadequate to rebut the presumed nexus.

The government has failed to provide clear and convincing evidence that the ten prior art
references would enable a skilled artisan to achieve the claimed invention.  The '325 patent is
not invalid for obviousness.

### D. Damages

The government's infringement of the '325 patent entitles Liberty to recover "reasonable
and entire compensation" for the compulsory non-exclusive patent license.  28 U.S.C. § 1498(a).
The proper measure of damages is the reasonable royalty, *see Standard Mfg.*, 42 Fed. Cl. at 758,
that would have resulted from a hypothetical negotiation, *see Rite-Hite*, 56 F.3d at 1554.[45]
Reasonable royalty is "calculated by determining a reasonable royalty rate and multiplying it by
a reasonable compensation base."  *Brunswick*, 36 Fed. Cl. at 209.

---

[44]Notably, the claimed invention in the '325 patent contemplates the use of a non-lead
materials, *see, e.g.*, '325 patent, col. 4, lines 53-55, col. 7, line 44.  The claimed projectile in the
'325 patent is also yaw-independent based in part on its "hardened steel exposed tip arrowhead
penetrator [and] thin copper alloy interface secured opposite the penetrator skirt."  Pl.'s Post-
Trial Reply Br. at 20 n.12, which produces "controlled rupturing of said interface portion
responsive to said projectile striking a predetermined target."  '325 patent, col. 7, lines 62-64.

[45]Both parties agree that the date of the hypothetical negotiation would have taken place
on July 2010, the date of issuance for the '325 patent.  Def.'s Post-Trial Br. at 56 n.53; Pl.'s
Post-Trial Br. at 40; *see also Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356,
1361 (Fed. Cir. 2006) ("We have held that a reasonable royalty determination for purposes of
making a damages evaluation must relate to the time infringement occurred.").

### 1. *Reasonable compensation base.*

Liberty and the government agree that the reasonable compensation base includes the amount of infringing rounds ordered by the government. *See* Tr. 2569:7-8, 2570:1-3 (Test. of Christopher J. Bokhart, defendant's damages expert); *see also* Pl.'s Post-Trial Br. at 40. More specifically, the reasonable compensation base is the number of M855A1 and M80A1 rounds ordered from July 6, 2010, the issuance date of the '325 patent, through October 20, 2027, the expiration date of the '325 patent.[46] Thus, for the period of July 6, 2010 through April 30, 2013, the reasonable compensation base is 1,115,538,120 rounds. *See* PX 21 at 32.[47]

### 2. *Baseline royalty rate.*

The parties acknowledge that there is no established reasonable royalty rate, *i.e.* royalty per round, in these circumstances. Def.'s Post-Trial Br. at 56. They recommend substantially different rates, drawing upon the *Georgia-Pacific* factors, quoted *supra*, at 17.[48] Liberty's expert, Creighton G. Hoffman, opined that to properly determine a reasonable royalty rate, it was necessary to calculate a starting royalty based on the government's total cost savings per round. PX 21 at 13-19; *see also* DX 527 at 25 (Mr. Bokhart's Expert Report Regarding Damages) ("As a prudent licensee, the [g]overnment would have been aware of the alternative technologies available to it, and would take the costs associated with them into consideration when negotiating a license to the patent-in-suit at the hypothetical negotiation."). According to Mr. Hoffman, the advantages of the '325 patented technology (*Georgia-Pacific* factor 9) and its benefits to users (*Georgia-Pacific* factor 10), *i.e.*, the environmentally-sound design and

---

[46]Pursuant to 35 U.S.C. § 154(b), the patent term was extended by 729 days. *See* '325 patent at 1.

[47]The number of infringing rounds for each fiscal year is as follows:

|  | Fiscal Year 2010 [1] | Fiscal Year 2011 | Fiscal Year 2012 | Fiscal Year 2013 [2] | Total |
|---|---|---|---|---|---|
| M855A1 Rounds Ordered | 294,137,160 | 383,337,440 | 279,425,680 | 158,637,840 | 1,115,538,120 |

Notes:
[1] Assumes all units ordered in 2010 were made or used after the issuance of the '325 patent.
[2] Includes the period through April 30, 2013.

PX 21 at 32 (Mr. Hoffman's Expert Report Regarding Damages); *see also* DTX 528, tab 5, at 1, (Mr. Bokhart's calculation of rounds ordered).

[48]*Georgia-Pacific* factors 1 through 6 and factor 12 are neutral and do not affect the determination of a reasonable royalty rate in this case. *See* PX 21 at 11-20; *see also* DX 527 at 30-35 (Mr. Bokhart's Expert Report Regarding Damages).

33

**A-33**

increased lethality, saved the government $0.28 per round and $0.23 per round, respectively.  PX 21 at 19.  Mr. Hoffman explained the basis for these values as follows:

> The [costs savings] to the [g]overnment can be measured against the best available alternatives . . .

> To achieve environmental greenness, the best alternative to the M855A1 is to incur the cost of lead remediation at firing range sites . . . .  [T]he remediation effort undertaken at Fort Dix in 1999 cost approximately $0.28 per round. . . .

> To achieve comparable lethality, the best alternative to the M855A1 is the leaded [Special Operations Science and Technology ("SOST")] round . . . In fiscal year 2012, the U.S. Navy purchased 700,000 SOST rounds at $0.50 per round.  This reflects a cost premium of approximately $0.23 over the M855A1 average cost of $0.265 per round in fiscal year 2013.

> Thus, the total cost savings to the [g]overnment from the use of the patented technology amounts to approximately $0.51 per round ($0.28 + $0.23)

*Id.*[49]

---

[49]The government's expert on damages, Christopher J. Bokhart, did not calculate a baseline royalty per round, but posited that the existence of two alternative scenarios, by that fact itself, reduces the amount of royalty:

> [T]he government would have simply continued the Green Amm[unition] Project, using the leaded M855 until an alternative lead-free round could be developed that would meet the project's cost and performance criteria. . . . The total cost of this alternative would be $40.1 million to $45.8 million, or $0.012 to $0.017 per round over the life of the '325 patent.

> [Alternatively, the government would have] convert[ed] to the SOCOM SOST round. . . . [T]he cost of the SOST round would have been the same as, if not slightly less than, the current M855A1 cost . . . [so] there would be little, if any, risk of incurring incremental remediation costs if the government continued to use leaded rounds.  Thus, the costs associated with this alternative would be less than $0.11 per round, if any at all.

DX 527 at 25-30.

34

Mr. Hoffman's approach in arriving at a baseline royalty of $0.51 per round is deficient because it overstates the remediation costs that the parties would have anticipated during a hypothetical negotiation. The Fort Dix study upon which Mr. Hoffman relied involved the use of phytoremediation, a remediation treatment using hypo-accumulating plant species to uptake toxic metals, *see* DX 495 at 59 ("Treatment and Management of Closed or Inactive Small Arms Firing Ranges" (June 2007)), *see also* DX 527 at 41, that has since "fallen out of favor as a method [of lead remediation] because . . . it depends upon the time and the amount of soil, and also . . . [is] expensive," Tr. 2605:12-21 (Bokhart). "Had the [g]overnment anticipated potential remediation at the 2010 hypothetical negotiation, it would not likely have envisioned using phytoremediation as there were other techniques that had been found to be more economical and or/more effective for lead remediation at [small arms firing ranges] by that point in time." DX 527 at 41; *see also* Tr. 2605:7 to 2607:7 (Bokhart). For example, physical separation techniques were readily available at the time of the hypothetical negotiation, which the government's expert, Mr. Bokhart, calculated to be less than $0.02 per round. DX 527 at 41; *see also* Tr. 2592:22 to 2593:16 (Bokhart). Equally problematic is the fact that the Fort Dix data relied upon by Mr. Hoffman would not have been current at the time of the hypothetical negotiation. DX 527 at 39. This is significant because the effectiveness of lead remediation technologies has improved over time, thus decreasing remediation costs. *Id.*; *see also* Tr. 2592:4 to 2593:16 (Bokhart).

The starting royalty per round proposed by Mr. Hoffman is further flawed because it inflates the costs associated with a SOST round. It is axiomatic that manufacturing costs decrease over time as the production process becomes more efficient, yet Mr. Hoffman "compares the cost of the [g]overnment's *first* orders for the SOST round with the cost of the M855A1 EPR in [its *third* year of production]." DX 527 at 38 (emphasis added). Moreover, the SOST and the M855A1 have inherently incommensurate costs because the former is purchased in small quantities, while the latter is ordered in bulk. Given that the government receives a discount for purchasing the M855A1 in large quantities, "the unit price associated with the purchase of a relatively small quantity of the SOST round is not comparable to the unit price associated with high volume purchases of the M855A1." *Id.* at 37.

In light of the foregoing, a baseline royalty of $0.51 per round is exorbitant and untethered from the facts in existence at the time of the hypothetical negotiation. The court finds that a proper baseline under the circumstances is $0.05 per round.

*3. Final royalty rate.*

Mr. Hoffman ultimately arrived at a royalty rate of $0.20 per round by adjusting the baseline figure of $0.51 downward to account for production costs incurred at LCAAP (*Georgia-Pacific* factor 13). PX 21 at 19 ("In addition to the cash paid for each round, the government provides its contractor, ATK, with the facilities and the equipment necessary to make the rounds.").[50] Mr. Bokhart responded by contending that the parties to a hypothetical negotiation

---

[50]The government contends that a figure of 20 cents per round equates to a reasonable royalty rate of approximately 74% because the government's cost per round is roughly $0.27. Def.'s Post-Trial Br. at 56. Liberty argues that because the government produces its own rounds, it is "entitled to a reasonable royalty on the full selling price for the infringing [round,]" which is

would have agreed to a lower royalty rate of $0.01 per round.  DX 527 at 34-35.  In arriving at a reasonable royalty of $0.01 per round, Mr. Bokhart balanced the relevant *Georgia-Pacific* factors, *see id.* at 30-35 (finding that factor 8 indicates a higher royalty, while factor 5 suggests a lower royalty), but notably left unanswered how and from what starting royalty the increment or decrement for each factor was calculated, *see* Pl.'s Post-Trial Reply Br. at 22.

Neither proffered value is justified because both experts failed to account for the state of development and commercialization (*Georgia-Pacific* factor 8) of the round covered by the '325 patent.  *Georgia-Pacific*, 318 F. Supp. at 1120 (reciting factor 8: "The established profitability of the product made under the patent; its commercial success; and its current popularity."); *see also* 7 Donald S. Chisum, *Chisum on Patents* ("*Chisum*") § 20.07[2][h] 20-1380 (2014) ("The state of development and commercialization affects both the estimated amount of economic benefit to the prospective licensee and the level of uncertainty as to its future realization.").  "The theory is that a willing licensee in a hypothetical negotiation at the time infringement began would have been more disposed to agree to a high royalty if the product or process was fully developed." *Chisum* § 20.07[2][h] 20-1380 to 81; *see also Georgia-Pacific*, 318 F. Supp. at 1120 (reciting factor 15: "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement.").  Correspondingly, the licensee would have been less inclined to pay a high royalty where features disclosed in the patent were "unaccompanied by technology or practical know-how necessary to design and incorporate the invention into [a commercial product]." *Hughes Aircraft Co. v. United States*, 31 Fed. Cl. 481, 489 (1994), *aff'd*, 86 F.3d 1566 (Fed. Cir. 1996), *cert. granted, judgment vacated*, 520 U.S. 1183 (1997), and *aff'd*, 140 F.3d 1470 (Fed. Cir. 1998); *see also Chisum* § 20.07[2][h] 20-1381.

In *Hughes Aircraft*, the court determined that a licensee during a hypothetical negotiation would have been willing to pay a royalty rate of only 1 percent to use an attitude control process covered by the patent because the licensor did not have a commercially proven product or the practical know-how to offer assistance to the government-licensee.  31 Fed. Cl. at 488-89.  Rather, the "non-exclusive license taken by the government was a mere 'naked' license . . . . The user of the license was left to expend the financial resources to develop [a commercial] design necessary for implementation of the attitude control system." *Id.* at 488.  The court considered that these circumstances "have the effect of lowering rather than enhancing the level of a reasonable royalty." *Id.*; *see also Ellipse Corp. v. Ford Motor Co.*, 461 F. Supp. 1354, 1370, 1376 (N.D. Ill. 1978), *aff'd*, 614 F.2d 775 (7th Cir. 1979) (finding a reasonable royalty of $0.01 per product where plaintiff "did not have a commercially proven product; nor did it have any manufacturing experience or other technical assistance to offer to [the licensee].").

In this case, the government would not have been disposed to a high royalty rate. At the time of the hypothetical negotiation, Liberty would have been offering only a bare, non-exclusive license because its patented projectile would have required substantial refinement and elaboration before a resulting projectile would have become suitable for use by the Army in combat.  Instructively, Liberty's own interactions with SOCOM in connection with the SBIR

---

$1.50.  Pl.'s Post-Trial Reply Br. at 23.  Under the methodology employed by Liberty, a royalty of $0.20 per round amounts to a royalty rate of 13%.  *Id.*

contracts reveal that the projectile disclosed in the '325 patent was still being refined at the time of the hypothetical negotiation. For example, in its Phase I SBIR report, Liberty recognized that "potential refinements of the projectile designs included in the SOCOM SBIR proposal" were needed in light of live fire test results. JX 126 at 1. Likewise, Liberty's Phase II SBIR proposal indicates that SOCOM operators relayed "[s]ignificant concerns about penetration of hard target and terminal effects on impact with the current ammunition," DX 270 at 9, and had asked Liberty to "scale down [its] lead-free exposed-tip, [three]-piece 5.56mm Enhanced Performance Round," *id.*, *see also* JX 82 at 1 (After Action Report). In these circumstances, the government would have had to spend significant time and financial resources modifying the '325 design for large-scale military use. *Cf.* Tr. 1686:13 to 1695:21 (Newill) (testifying that ATK had to make several design improvements before the final M855A1 projectile could be fielded as the standard ammunition). Given the extensive contribution required to refine and hone the '325 patented projectile, at the time of the hypothetical negotiation the government would have been able to negotiate a royalty several cents less than $0.05 per round.

Based on the record as a whole, a reasonable royalty rate in this instance is $0.014 per round. Applying the reasonable royalty rate of 1.4 cents per round to the reasonable compensation base of 1,115,538,120 rounds yields a reasonable royalty of $15,617,533.7 as of April 30, 2013. This value must be adjusted to account for the accrual of interest that Liberty is owed. In addition, the government is also responsible for making periodic royalty payments in the amount of $0.014 per round until the '325 patent expires on October 20, 2027.

    4. *Delay compensation.*

Reasonable and entire compensation necessarily includes the prejudgment interest for delayed compensation of royalty "to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983) (citing *Waite v. United States*, 282 U.S. 508, 509 (1931) (addressing a patent infringement suit against the United States)). "An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment." *Id.* "Generally, the interest rate should be fixed as of the date of infringement, with interest then being awarded from that date to the date [the judgment is actually paid.]" *Boeing*, 86 Fed. Cl. at 322.

Determining the proper rate of delay-based interest involves a factual inquiry left largely to the discretion of the court. *See Dynamics Corp. of America v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985); *see also Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed. Cir. 1989). Rates used in the past include, *inter alia*, the prime rate, the prime rate plus a percentage, a U.S. Treasury bill or note rate, the tax-overpayment rate based upon 26 U.S.C. § 6621, and the Contract Disputes Act rate based upon 41 U.S.C. § 611. *See Brunswick*, 36 Fed. Cl. at 219 n.4; *see also Chisum* § 20.03[4][a][v] 20-316 to 24. Correlatively, courts frequently compound the delay-based interest, *see, e.g.*, *Brunswick*, 36 Fed. Cl. at 219, *ITT Corp. v. United States*, 17 Cl. Ct. 199, 234-40 (1989), "reflecting, in this regard, not only the expectation of a prudent, commercially reasonable investor, but also the way that post-judgment interest is calculated

under 28 U.S.C. § 1961(c)(3)," *Boeing*, 86 Fed. Cl. at 323.  In making a determination regarding the frequency of compounding, *i.e.* annually, semi-annually, quarterly, etc., courts consider how often the licensee would have made payments in accordance with the hypothetical negotiation. *See id.* (citing *Datascope*, 879 F.2d at 829); *see also Chisum* § 20.03[4] [a][v] 20-327 to 28.

Based on the facts and circumstances in this case, the court is persuaded that the proper and most prudent method of apportioning interest is the 5-year Treasury note rate.[51]  This rate adequately compensates Liberty because a Treasury note reflects minimal risk, the 5-year term roughly approximates the length of time from the date of infringement to the date of judgment, and there is ample precedent favoring the use of rates on Treasury securities.  For infringement that occurred several years before judgment, as here where the infringement began over 4 years ago, the court would ordinarily compound the prejudgment interest.  Given that the interest on a Treasury note is paid semi-annually, compounding semi-annually is appropriate in this instance.

Based on the foregoing, the court sets the interest rate for delay compensation at the 5-year Treasury note rate prevailing as of July 6, 2010.  Interest on the royalties owed shall be calculated using the 5-year Treasury note rate for the period from July 6, 2010 until the date the judgment is actually paid, compounded semi-annually.

## II. BREACH OF CONTRACT

Liberty's breach-of-contract claim is predicated on the government's disclosure and use of the EPIC technology in violation of three NDAs, *see supra*, at 6-7, 11.  As an initial step, the court must address whether the NDAs constitute valid contracts between Mr. Marx and the government.  *Lublin Corp. v. United States*, 98 Fed. Cl. 53, 56 (2011) ("As in any claim for breach of contract, in order to recover, plaintiff must establish, *inter alia*, that a valid contract existed between it and the government.").  According to Liberty, Lt. Col. Dean, Mr. Amick, Mr. Campion, and Mr. Marsh entered into valid contracts binding on the government in which they agreed to "protect (and not misappropriate) Mr. Marx's proprietary technology disclosed to them."  Pl.'s Post-Trial Br. at 22.[52]  The government maintains that those NDAs do not meet the requirements for a valid contract because the government signatories lacked actual authority to

---

[51]Mr. Hoffman selected a 3.25% prime rate, compounded quarterly.  PX 21 at 31.  The court declines to adopt this rate because a prime rate is more appropriate where "the patentee is a large, established and credit-worthy corporation."  *Boeing*, 86 Fed. Cl. at 323.

[52]Liberty has also raised an attendant trade secret misappropriation claim.  *See* Pl.'s Post-Trial Br. at 32-39.  Because the misappropriation of a trade secret is a tort, *see ABB Turbo Sys. AG v. TurboUSA, Inc.*, ___ F.3d ___, ___, 2014 WL  7156709, at *1 (Fed. Cir. Dec. 17, 2014); *Radioptics, Inc. v. United States*, 621 F.2d 1113, 1130 (Ct. Cl. 1980), this court does not have jurisdiction under the Tucker Act to grant relief on such a claim, unless it is specifically derived from contractual duties; *see Demodulation, Inc. v. United States*, 103 Fed. Cl. 794, 813 (2012) (citing *Awad v. United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002)); *see also Wood v. United States*, 961 F.2d 195, 198 (Fed. Cir. 1992).  As discussed *infra*, a contractual relationship does not exist between Liberty and the government, which forecloses this court's jurisdiction over Liberty's misappropriation claim.  *See Radioptics*, 621 F.2d at 1130.

obligate the United States in contract and there is no evidence that any government superior with contracting authority ratified the NDAs.  Def.'s Post-Trial Br. at 31-33.

### A. Express Contracting Authority

When entering into a contract with the government, one assumes "the risk of having accurately ascertained that he who purports to act for the [g]overnment stays within the bounds of his authority," even if the "agent himself is unaware of the limitations upon his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947).  The Supreme Court has cautioned that "[t]he scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power.  And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." *Id.*; *see also Council for Tribal Employment Rights v. United States*, 112 Fed. Cl. 231, 243 (2013), *aff'd*, 556 Fed. Appx. 965 (Fed. Cir. 2014).  "Although apparent authority will not suffice to hold the government bound by the acts of its agents, implied actual authority, like expressed actual authority, will suffice." *See H. Landau*, 886 F.2d at 324 (internal citation omitted).

A government agent has express actual authority to obligate the government in a contract "only when the Constitution, a regulation, or a statute grants such authority in an unambiguous manner." *Roy v. United States*, 38 Fed. Cl. 184, 188 (1997); *see also Tracy v. United States*, 55 Fed. Cl. 679, 682 (2003).  Liberty has failed to identify any statute, regulation, or constitutional provision conferring express contracting authority to Lt. Col. Dean, Mr. Amick, Mr. Campion, or Mr. Marsh.  Thus, the government signatories lacked the requisite express actual authority to bind the government to the NDAs.

### B.  Implied Contracting Authority

Even where express actual authority is lacking, a government agent may have implied actual authority to contract "when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee." *H. Landau*, 886 F.2d at 324; *see also P & K Contracting, Inc. v. United States*, 108 Fed. Cl. 380, 391 (2012), *aff'd*, 534 Fed. Appx. 1000 (Fed. Cir. 2013) (quoting *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1346 (Fed. Cir. 2007)).  "Contracting authority is integral to a government employee's duties when the government employee could not perform his or her assigned tasks without such authority and the relevant agency regulation does not grant such authority to other agency employees." *Flexfab, LLC v. United States*, 62 Fed. Cl. 139, 148 (2004), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005); *compare Telenor Satellite Services, Inc. v. United States*, 71 Fed. Cl. 114, 123 (2006) (holding that the Deputy Assistant Secretary for Analysis and Information Management, Department of State, had implied authority to enter into a bailment contract binding the government because, as the primary person responsible for information management programs, he could not perform his assigned tasks if he had to "obtain approval from another person before borrowing the equipment necessary to implement those programs"), *and Brunner v. United States*, 70 Fed. Cl. 623, 643 (2006) (determining that a Drug Enforcement Administration agent had implied authority to contract for expenses and salaries on behalf of the agency based on the agent's power to spend money for such purposes), *with Leonardo v. United States*, 63 Fed. Cl. 552, 558 (2005), *aff'd*,

163 Fed. Appx. 880 (Fed. Cir. 2006) (finding that an assistant to the Cultural Affairs Officer, United States Information Services, in Brussels, Belgium, who was responsible for developing and implementing cultural programs, lacked implied contracting authority because, *inter alia*, "[n]othing in this position description implie[d] either that [he] led any [cultural] programs or that contracting authority was necessary for him to discharge his duties successfully").

Liberty contends that Lt. Col. Dean had implied authority to contractually bind the government because that authority was integral to his duties as the Chief of Small Arms for the U.S. Army Infantry Directorate of Combat Development. Pl.'s Post-Trial Br. at 24-27. Lt. Col. Dean testified that he was responsible for evaluating new technologies and for drafting requirements for ammunition. *See* Tr. 48:5 to 49:6 (Lt. Col. Dean); *see also* Tr. 488:19-20 (Amick). In this capacity he "interacted with [members of] industry to find out what the art of the possible might be, and [] used that to generate requirements that the material developers whose responsibility it was to design, develop and procure systems would use to conduct their duties," Tr. 48:16-20 (Lt. Col. Dean), and also signed "a few" NDAs, Tr. 65:24 to 66:3 (Lt. Col. Dean). Although Lt. Col. Dean interacted with small-arms ammunition representatives, he "was not a contracting officer during his two years as Small Arms Chief, did not have a contracting warrant, and did not interact with contracting officers insofar as his duties related to interacting with industry personnel like Mr. Marx." Def.'s Post-Trial Br. at 31; *see also* Tr. 131:8 to 132:1 (Lt. Col. Dean). The record is also devoid of any evidence that "Lt. Col. Dean . . . had the authority to make any financial arrangements with the industry representatives that would visit [his office]." Def.'s Post-Trial Br. at 32; *see* Tr. 488:19-22 (Amick) (testifying that the Lt. Col. Dean's office had no power to purchase ammunition); *cf. Brunner*, 70 Fed. Cl. at 643 (concluding that the "power to spend the [government's] money implicitly includes the power to contract for the same purposes."). Lt. Col. Dean's job required him to write requirements and to facilitate discussions with the industry, which does not imply that it was necessary for him to execute NDAs to discharge those duties successfully. *Cf.* Tr. 132:8-9 (Lt. Col. Dean) (acknowledging that the duties of his job did not explicitly involve signing NDAs); *Telenor Satellite Services*, 71 Fed. Cl. at 123 (concluding that the Deputy Assistant Secretary for Analysis and Information Management of the Department of State had authority to select and obtain equipment). In light of the nature of Lt. Col. Dean's position as Chief of Small Arms, the court concludes that he lacked implied actual authority to bind the government to a NDA.

Mr. Amick, Mr. Campion, and Mr. Marsh also did not possess the requisite implied actual authority to form an enforceable contract on behalf of the government. Liberty broadly avers that Mr. Amick had implied authority since he worked with Lt. Col. Dean as a civilian aid on new ammunition technologies, *see* Pl.'s Post-Trial Reply Br. at 4, and that Mr. Campion "had implied actual authority because his Project Manager responsibilities included researching, identifying, and promoting technologies for acquisition by SOCOM to satisfy its weapons needs," Pl.'s Post-Trial Br. at 29, *see also* Tr. 956:12 to 959:16 (Campion). No such authority exists, however, because both individuals were civilian contractors, rather than government employees, and absent very explicit express authority, contractors cannot bind the government. *See Peninsula Grp. Capital Corp. v. United States*, 93 Fed. Cl. 720, 731 (2010) (holding that a government contractor's acceptance of a proposal to the Army was not a valid acceptance

40

**A-40**

because, as "a non-government employee, [the contractor] could not bind the government to a contract.").

Mr. Amick testified that he was working "as a contractor supporting the Small Arms Branch" at the time he signed the NDA. Tr. 475:16-17 (Amick). Likewise, Mr. Campion acknowledged that he was brought in by SOCOM to work as a contractor, Tr. 958:1-2, 959:3-13 (Campion), and "had no contracting authority at all," Tr. 970:9-11 (Campion). While both signatories could have been given express authority to act on behalf of the government, no such authority was conferred. With regard to Mr. Marsh, Liberty makes the statement that Mr. Marsh had implied contractual authority because "integral, essential and appropriate to [his] duties to test ammunition for Mr. Campion – was the ability to execute the NDA with Mr. Marx." Pl.'s Post-Trial Br. at 30. The court agrees with the government that this argument in untenable because "there is no testimony from Mr. Marsh or others to determine exactly what [Mr. Marsh's] duties were (or are) or to know whether signing NDAs are integral to those duties." Def.'s Post-Trial Br. at 33. Accordingly, Mr. Amick, Mr. Campion, and Mr. Marsh lacked implied actuality authority to enter into a contract for the government ensuring confidentiality.

### C. Ratification

Because the signatories lacked actual authority to execute a NDA on behalf of the government, the resulting contracts will be found valid only if Liberty proves that they were ratified. "Individual ratification, in the government contracts context, is defined particularly as "the act of approving an unauthorized commitment by an official who has the authority to do so." *Gary v. United States*, 67 Fed. Cl. 202, 215 (2005) (quoting 48 C.F.R. § 1.602-3(a)); *see also Schism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002) (en banc) ("Ratification is 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" (quoting Restatement (Second) of Agency § 82 (1958)). The doctrine of individual ratification requires that "a superior must not only (1) have possessed authority to contract, but also (2) have fully known the material facts surrounding the unauthorized action of her subordinate, and (3) have knowingly confirmed, adopted, or acquiesced to the unauthorized action of her subordinate." *Leonardo*, 63 Fed. Cl. at 560 (citing *California Sand & Gravel, Inc. v. United States*, 22 Cl. Ct. 19, 27-28 (1990), *aff'd*, 937 F.2d 624 (Fed. Cir. 1991)).

Liberty has not adduced any evidence that meets the requisite conditions for individual ratification, but contends that the contracts were nonetheless institutionally ratified. *See* Pl.'s Post-Trial Br. at 30. To support this contention, Liberty points to *Philadelphia Suburban Corp.*, 217 Ct. Cl. 705, 707 (1978). In *Philadelphia Suburban*, a chief petty officer of the Coast Guard directed personnel to use a private company's flame-retardant foam to fight a ship fire, which suggested to the owners that the Coast Guard would pay for the foam. 217 Ct. Cl. at 706. The Court of Claims held that ratification exists "where the *[g]overnment has or takes the benefit* of another's property" and remanded the case for trial "to determine the authority of the Coast Guard personnel, present at the fire-site . . . and also to decide whether a contract-implied-in-fact arose in the circumstances." *Id.* at 707 (emphasis added). Since then, courts have found

41

institutional ratification "when the government seeks and receives the benefits from an otherwise unauthorized contract." *Digicon Corp. v. United States*, 56 Fed. Cl. 425, 426 (2003); *see also Janowsky v. United States*, 133 F.3d 888, 891-92 (Fed. Cir. 1998). According to Liberty, the Army "obtained the 'benefit' of receiving Marx/Liberty's proprietary information . . . which is more than sufficient to support a finding of ratification" for the NDA signed by Lt. Col. Dean and Mr. Amick. Pl.'s Post-Trial Br. at 30-31; *see also* Pl.'s Post-Trial Reply Br. at 5. Liberty further states that "SOCOM's acceptance and review of the propriety information contained in Liberty's SBIR proposal constituted an acceptance of benefits that ratified and rendered enforceable the NDAs [signed by Mr. Campion and Mr. Marsh]." Pl.'s Post-Trial Br. at 31; *see also* Pl.'s Post-Trial Reply Br. at 5.

This argument is unavailing because Liberty's concept of institutional ratification lacks any requirement of a ratifying authority. In addition to the government's acceptance of benefits, an *official with the power to ratify must also know of the unlawful promise*, for "such knowledge is a key element of an institutional ratification claim." *Gary*, 67 Fed. Cl. at 216 (2005); *see Doe v. United States*, 58 Fed. Cl. 479, 486 (2003), *aff'd*, 112 Fed. Appx. 54 (Fed. Cir. 2004) ("Knowledge is the key distinguishing factor in all cases discussing institutional ratification; that is, in the absence of some indication, beyond mere assertions, that officials with ratifying authority knew of the unlawful promise, institutional ratification has not been upheld."); *see also City of El Centro v. United States*, 922 F.2d 816, 821 (Fed. Cir. 1990) (finding no institutional ratification when there was "no express promise, by an official empowered to bind the Government to pay for the care rendered . . . [and no] individual with contracting authority exercised that authority to bind the United States in this matter"). Without such a constraint, millions of federal employees could contractually bind the United States under an institutional ratification theory by accepting benefits from a contract. *See City of El Centro*, 922 F.2d at 820. In this case, Liberty does not identify any Army or SOCOM official with ratifying authority that knew of the promises of confidentiality entered by Lt. Col Dean, Mr. Amick, Mr. Campion, and Mr. Marsh. *See* Def.'s Post-Trial Br. at 34-35. Without this evidence, Liberty has failed to show that either the Army or SOCOM ratified the NDAs.

Because the signatories lacked actual authority to bind the government to the NDAs and no government official with the power to ratify knew of these contracts, Liberty's contentions regarding a breach of contract are fatally flawed.[53]

## CONCLUSION

For the reasons stated, court finds that the claims in the '325 patent are valid and directly infringed by the M855A1 and the M80A1. The court awards Liberty $15,617,533.68 in damages, as of April 30, 2013. Liberty is entitled to interest for delayed compensation at the 5-year Treasury note rate from July 6, 2010, compounded semi-annually, until the date the

---

[53]In light of the court's holding, it is not necessary to reach a decision as to whether the NDAs are barred by the Anti-Assignment Act, 41 U.S.C. § 6305. *See* Def.'s Post-Trial Br. at 35-37.

judgment is actually paid.[54]

Within 90 days of the close of each of the government's fiscal years after April 30, 2013, the government shall provide a royalty report to Liberty accounting for the number of infringing rounds ordered and delivered, and 30 days thereafter shall make a royalty payment to Liberty for those rounds at a rate of $0.014 per round.[55]  This further obligation shall terminate when the patent expires on October 20, 2027.  Final judgment to this effect shall be issued under RCFC 54(b) because there is no just reason for delay.  The clerk shall enter final judgment as specified.

In due course, Liberty may apply for an award of attorneys' fees and expenses under 28 U.S.C. 1498(a).  Proceedings related to any such request for attorneys' fees and costs shall be deferred until after any appellate process has been concluded or, alternatively, after the time for taking an appeal has expired.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[54]The government prevails on Liberty's contractual claims.

[55]As an exception, the first report, *i.e.*, that for fiscal year 2014, shall be due March 20, 2015, and the attendant royalty payment shall be made April 20, 2015.  In addition, the report for the balance of fiscal year 2013 may be combined with the report for fiscal year 2014.

43

**A-43**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No. 11-84C

(Filed: January 23, 2015)

|  |  |
|---|---|
| LIBERTY AMMUNITION, LLC, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |
|  | ) |

<u>NOTICE OF ERRATUM</u>

The court hereby submits the following erratum concerning a parenthetical descriptive phrase following a citation in *Liberty Ammunition, Inc. v. United States*, No. 11-84C, 2014 WL 7465773, at *25 (Fed. Cl. Dec. 19, 2014).  As a result of a typographical error, the text recites that the court in *Ellipse Corp. v. Ford Motor Co.*, 461 F. Supp. 1354, 1370, 1376 (N.D. Ill. 1978), *aff'd*, 614 F.2d 775 (7th Cir. 1979) found a reasonable royalty of "$0.01."  *Liberty Ammunition*, 2014 WL 7465773, at *25.  The correct reasonable royalty determined by the court in *Ellipse* was "$0.10."

s/ Charles F. Lettow
Charles F. Lettow
Judge

# In the United States Court of Federal Claims

### No. 11-84 C

**LIBERTY AMMUNITION, INC.**

                                                     **JUDGMENT**

     **v.**

**THE UNITED STATES**

Pursuant to the court's Opinion and Order, filed December 19, 2014, finding that the claims in the '325 patent are valid and directly infringed by the M855A1 and the M80A1, and directing the entry of judgment pursuant to Rule 54(b), there being no just reason for delay,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff is awarded $15,617,533.68 in damages, as of April 30, 2013. Plaintiff is entitled to interest for delayed compensation at the 5-year Treasury note rate from July 6, 2010, compounded semi-annually, until the date the judgment is actually paid. Within 90 days of the close of each of the government's fiscal years after April 30, 2013, the government shall provide a royalty report to plaintiff accounting for the number of infringing rounds ordered and delivered, and 30 days thereafter shall make a royalty payment to plaintiff for those rounds at a rate of $0.014 per round. This further obligation shall terminate when the patent expires on October 20, 2027.

                                         Hazel C. Keahey
                                         Clerk of Court

**December 19, 2014**          By:    s/ Debra L. Samler

                                           Deputy Clerk

As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>.  Filing fee is $455.00.

# In the United States Court of Federal Claims

No. 11-84C

(Filed: June 7, 2013)

```
************************************
                                   )    Patent case; claim construction for United
LIBERTY AMMUNITION, LLC,            )    States Patent No. 7,748,325
                                   )
              Plaintiff,            )
                                   )
       v.                          )
                                   )
UNITED STATES,                     )
                                   )
              Defendant.           )
                                   )
************************************
```

Stephen B. Judlowe, McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, New York, for plaintiff.  With him on the briefs were Joseph P. LaSalla, Michael Rato, and Riadh Quadir, Deutsch, Mulvaney & Carpenter, LLP, New York, NY, and Lawrence E. Bathgate II and Daniel F. Corrigan, Bathgate, Wegner & Wolf, P.C., Lakewood, New Jersey.

Walter W. Brown, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Stuart F. Delery, Principal Deputy Assistant Attorney General, and John Fargo, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## CLAIM CONSTRUCTION ORDER

LETTOW, Judge.

In this patent case, Liberty Ammunition, LLC ("Liberty") alleges that the United States ("the government") through the Department of Defense ("DOD") has infringed upon its patent for a firearms projectile, United States Patent No. 7,748,325 (the '325 patent), and thus is liable for damages under 28 U.S.C. § 1498(a).[1]  This patent pertains to lead-free "green bullet" technology.

---

[1]Subsection 1498(a) of Title 28 provides in pertinent part:

> Whenever an invention described in and covered by a patent
> of the United States is used or manufactured by or for the United
> States without license of the owner thereof or lawful right to use

1

The parties have submitted proposed constructions of the claim terms of the '325 patent. *See* Joint Claim Construction Statement, Ex. A, ECF No. 34. Of the fifteen claim terms identified by the parties as requiring construction, only two have an agreed interpretation. *Id.* For those two terms, the court accepts the mutually agreed constructions proffered by the parties. The proper constructions of the remaining thirteen terms were briefed by the parties and argued at a *Markman* hearing held on March 22, 2013.

## BACKGROUND

The innovation at issue bears on a bullet recently put into broad use by the U.S. Army, which plaintiff claims is identical to that described in the '325 patent, namely, a projectile which retains the same lethal force of a lead-based bullet but is lead-free and does not carry the negative environmental externalities associated with prior lead-based designs. *See Liberty Ammunition*, 101 Fed. Cl. at 583. The bullet consists of three components: a nose portion, a tail portion, and an "interface" portion connecting the nose and tail. *See* First Am. Compl., Ex. A ('325 patent), at cols. 8-9.

Prior to the advent of green-bullet technology, the standard-issue ammunition for the United States infantry was the M855 bullet. Pl.'s Opening Claim Construction Br. ("Pl.'s Br.") at 1-2. The M855 projectile consisted of a steel penetrator, a lead slug, and a full metal copper jacket. *Id.*, Pl.'s App. 1-1.[2] Due to concerns with low lethality and high environmental impact, the Army sought to develop a lead-free alternative, beginning in 1993. *Id.* at 2-3. After failing to develop a satisfactory projectile on its own, the Army entertained submissions from civilian developers. *See id.* at 3-1 to 2. Mr. PJ Marx was among those who responded to the Army, coming forward with a design that Army officials found "very promising." *Id.* at 11-1. Mr. Marx and government representatives entered into three non-disclosure agreements pertaining to this design, signed on February 17, 2005, June 23, 2005, and January 11, 2006, respectively. *See* First Am. Compl., Exs. B, C, D.

---

or manufacture the same, the owner's remedy shall be by action
against the United States in the United States Court of Federal
Claims for the recovery of his reasonable and entire compensation
for such use and manufacture.

28 U.S.C. § 1498(a). Liberty also claims that the government breached a confidentiality agreement by disclosing confidential information and by purchasing products embodying this information without consent of Liberty. First Am. Compl. ¶¶ 13, 18; *see also Liberty Ammunition, Inc. v. United States*, 101 Fed. Cl. 581, 586-92 (2011) (upholding the court's subject matter jurisdiction over Liberty's breach-of-contract claims but dismissing a pendent Lanham Act claim on jurisdictional grounds).

[2]Liberty's appendix has been subdivided into tabs. The first number in a citation to this appendix refers to a particular tab, and the number after the hyphen refers to the particular page number within that tab. The pages of the appendix are paginated sequentially within each tab. Thus, "Pl.'s App. 2-1" would refer to the first page of Tab 2.

On October 21, 2005, Mr. Marx applied for what became the '325 patent, which was later assigned to Liberty.  First Am. Compl., Ex. A.  On review by the assigned patent examiner, this application was initially rejected for enablement on a ground relating to "rifling engaging annular grooves."  Def.'s Opening Br. Regarding Claim Construction ("Def.'s Br.") at Def.'s App. A83.[3]  The examiner also considered that certain of the claims were anticipated by two prior references, the Hotchkiss patent (U.S. Patent 29,272) and Strandli patent (U.S. Patent 5,388,524).  *Id.* at A84-85.[4]  Liberty amended the application to address the examiner's objections, Def.'s A98, but the examiner then noted that the application was directed to multiple "patentable distinct species" and required Mr. Marx to elect only a single species, *id.* at A122-23, A132-34.  At that point, Mr. Marx elected to pursue those claims which were directed toward projectiles as generically embodied in Figure 1 of the application, shown below.  *Id.* at A148.



FIGURE 1

---

[3]The appendix accompanying the government's brief is sequentially paginated and will be cited by page without reference to numbered exhibits, *i.e.*, "Def.'s App. A-__."

Initially, the examiner opined that "the specification, while being enabling for a projectile that comprises annular grooves integrally formed in the exterior surface of the interface component, does not reasonably provide enablement for an embodiment that does not comprise such rifling engaging annular grooves."  Def.'s App. A83.  Subsequently, however, the applicant and the examiner reached a different conclusion, *viz.*, "[s]pecifically, the annular rings noted by Office were only referenced by [a]pplicant in page 3, line 6 of the specification and never disclosed to be essential.  Furthermore, annular rings are well known in the prior art and the absence thereof does not render [a]pplicant's claimed invention inoperable."  Def.'s App. A162.

[4]The Hotchkiss patent, issued on July 24, 1860, consists of three claims.  Hotchkiss projectiles are comprised of a body, a metal belt, and a cap.  *See* Def.'s App. A197-98.  The improvement upon prior art afforded by Hotchkiss projectiles was that the belt secured the portions of the projectile and "the whole would remain in one single projectile" during firing and flight.  *Id.* at A199.

The Strandli patent describes a projectile meant for use in target practice.  Def.'s App. A201.  These projectiles are formed from a hollow shell, a base, and rod or tube which connects the two prior to firing and impact.  *Id.*  Such projectiles have no explosive or bursting charges and are meant to prevent dangerous ricocheting of projectile fragments after impact.  *Id.* at A204.

After an interview with the examiner, Mr. Marx further amended the claims to use specific words and phrases to describe the elected species of projectile. *See* Def.'s App. A162-63.[5]

The '325 patent was issued by the U.S. Patent and Trademark office on July 6, 2010. The patent consists of two independent claims (Claims 1 and 32) and forty dependent claims. Claim 1 reads:

> A projectile structured to be discharged from a firearm, said projectile comprising:
>
> > a body including a nose portion and a tail portion,
> >
> > said body further including an interface portion disposed in interconnecting relation to said nose and tail portions, said interface portion structured to provide controlled rupturing of said interface portion responsive to said projectile striking a predetermined target,
> >
> > said interface portion disposed and dimensioned to define a reduced area of contact of said body with the rifling of the firearm, said interface portion maintaining the nose portion and tail portion in synchronized rotation while being fixedly secured to one another by said interface portion whereby upon said projectile striking said predetermined target said interface portion ruptures thereby separating said nose and tail portions of said projectile.

---

[5]Among other things, at points in the patent application, Mr. Marx "amend[ed] 'interface' to 'interface portion' to designate the limitation as structural and not relational." Def.'s App. A162. Also, to address the prior art from Hotchkiss (U.S. Patent 29,272), the phrase "controlled rupturing" was used, reflecting agreement that "the 'controlled rupturing' of the interface as claimed by [a]pplicant is not anticipated, suggested[,] or taught by *Hotchkiss*." Def.'s App. A162. Respecting "the [examiner's prior] anticipation rejection citing *Strandli* (U.S. Pat. 5,388,524)," the claims were amended to "define a reduced area of contact with the rifling" and to refer to an interface that "provide[s] controlled rupturing responsive to impact." Def.'s App. A162.

> Specifically:
>
> > [t]he detaching portion of *Strandli* is not disposed and dimensioned to define a reduced area of contact with the rifling. The detaching or bursting portion of *Strand[l]i* is formed integral to the tail and does not interconnect nose and tail as claimed by [a]pplicant. Furthermore, the interface of *Strandli* does not provide controlled rupturing responsive to impact as now claimed by [a]pplicant.

*Id.*

4

Claim 32, the second independent claim, describes:

A projectile structured to be discharged from a firearm, said projectile comprising:

> a body including a nose portion and tail portion,

> said body further including an interface portion disposed intermediate opposite ends of said body in interconnecting relation to said nose and tail portions, said interface portion structured to provide controlled rupturing of said interface portion responsive to said projectile striking a predetermined target, said interface portion maintaining said nose portion and tail portion in synchronized rotation while being fixedly secured to one another by said interface portion whereby upon said projectile striking said predetermined target said interface portion ruptures thereby separating said nose and tail portions of the projectile; and

> said exterior surface of said interface portion disposed and structured to define a primary area of contact of said body with an interior barrel surface of said firearm.

In 2010, the U.S. Army announced the development of its own bullet, the 5.56mm M855A1 Enhanced Performance Round.[6] Liberty alleges that the M855A1 is a copy of its patented green bullet, and thus that its manufacture and use infringes the '325 patent. First Am. Compl. ¶ 8.

## PROCEDURAL HISTORY

After Liberty filed suit in this court on February 8, 2011, the government moved for dismissal of the breach-of-contract count, at which point Liberty amended its complaint and the parties stipulated to denial of the government's motion to dismiss. *See* Joint Stipulation Regarding Pl.'s First Am. Compl. (July 18, 2011), ECF No. 11. A second motion to dismiss was filed by the government on July 28, 2011, pertaining to Liberty's non-patent claims. After briefing and a hearing, the court held that Liberty's claims related to the non-disclosure agreements were properly before the court, but that claims arising under the Lanham Act and under Florida unfair-competition law were not. *See Liberty Ammunition*, 101 Fed. Cl. at 586-92. The parties then proceeded with discovery and claim construction.

## DISCUSSION

A. *Standards for Claim Construction*

---

[6]On May 7, 2010, the Army submitted Patent Application No. 61332631 for its bullet, but this application apparently has been abandoned. *See* Pl.'s Br. at 13.

The scope and meaning of claims in a patent are questions of law to be addressed by the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-90 (1996). The most salient indicia of the construction of claim terms are found in the patent itself. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."). As a result, the court focuses on the patent's claims and specifications, as well as prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370. A court should construe claim terms according to the ordinary and customary meanings attributed by those of ordinary skill in the art at the date of the invention, which is the effective filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003) (considering those with ordinary skill in the art); *Markman*, 52 F.3d at 980 ("Th[e] construction of the patent is confirmed by the avowed understanding of the patentee, expressed by him, or on his [be]half, when his application for the original patent was pending.") (quoting *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227 (1880)).

A term with an "ordinary" meaning may require construction where the term might have more than one ordinary meaning, where the specifications indicate a claim may have a different scope, or where the ordinary meaning does not resolve the parties' dispute as to the proper claim scope. *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 920 (Fed. Cir. 2012). Additionally, a patentee may use ordinary words in an atypical fashion, identifying those unorthodox meanings in the patent specification or file history. *See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996). Accordingly, "it is always necessary to review the specifications to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582; *see also Markman*, 52 F.3d at 979. Prosecution history also may be important, both for the exclusion of such interpretations as were disclaimed during prosecution of the patent and for any possible introduction of new terms that may require interpretation. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). Each term should be interpreted within the context of its use. *Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive.").

Extrinsic evidence, such as expert testimony, inventor testimony, dictionaries, and scientific treatises, should be regarded as "less significant than the intrinsic record" when constructing the claim terms. *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). It may be relied upon by the court only if the intrinsic evidence cannot resolve ambiguities in the disputed claim terms. *See C.R. Bard*, 388 F.3d at 862 ("Our caselaw suggests that extrinsic evidence cannot alter any claim meaning discernible from intrinsic evidence.").

6

B.  *Specific Terms of the Claims Requiring Construction*

    1.  *"Interface" or "interface portion."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means an outer portion of the claimed projectile that holds the nose and tail portions together prior to striking a target. | Means an outer portion of the claimed projectile that (1) holds the nose and tail together prior to striking a target and (2) is not restricted in length, and thus can be extended to enclose one or both ends of the projectile. |

    Term 1 appears throughout the patent claims and the specification.  Both independent claims (Claims 1 and 32) contain the term, as do dependent Claims 2-9, 11-12, 14, 20-28, 31, and 33-42.  The court must adopt a construction of the term which encompasses all such uses.  *See Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.").

    Both Liberty and the government urge a construction inclusive of "an outer portion of the claimed projectile that holds the nose and tail portions together prior to striking a target."  The point of contention is whether the term must also include a stricture suggested by the government: that the interface or interface portion "is not restricted in length, and thus can be extended to enclose one or both ends of the projectile."  Based on a plain reading of the patent as a whole, the court cannot adopt this additional limitation in its construction of Term 1.

    The independent claims are silent as to the length of the interface, indicating no particular restriction in length.  Dependent Claim 20, however, expressly limits the length of the interface to 30 to 70 percent of the projectile length, and dependent Claim 21 limits the length of the interface to be equal to or "less than 50% of the overall projectile length."  Construing Term 1 to prohibit length restrictions would result in an inconsistency between usage of the term in the independent claims and the dependent claims.  The term, as it is employed in this patent, may designate either an interface with a length restriction, or an interface without a length restriction.  In short, a reference to "interface" or "interface portion" does not itself encompass the presence or absence of a length restriction, and therefore the characteristic of "not restricted in length" should not be read into the term.  *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

    Furthermore, certain claims dependent upon Claim 1 describe embodiments in which the interface encloses at least one of the nose or tail.  *See* Claims 8, 10.  Yet, neither Claim 32 nor any of its dependent claims describe such an embodiment.  Claim 32 references an interface portion "disposed intermediate opposite ends" of the body, indicating that an embodiment based on Claim 32 would require the interface to be positioned between the tail and nose, but not necessarily enclosing the tail or nose.  The question of whether interfaces may be extended to enclose the nose, tail, or both, is addressed by several specific dependent claims in the patent,

and that characteristic will not be read into the term as used in independent Claims 1 and 32 and in numerous other claims of the patent.

For the reasons above, the court adopts plaintiff's construction of Term 1, *i.e.*, that the interface or interface portion means **an outer portion of the claimed projectile that holds the nose and tail portions together prior to striking a target**.

2.  *"Structured to provide controlled rupturing."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means that the interface portion is structured to rupture (*i.e.*, break) upon striking a predetermined target, separating two or more of the components of the projectile [the specifics of which are described in each claim and their dependent claims]. | Means that the interface portion is structured (or constructed) so that as the claimed projectile penetrates a predetermined target, such as a soft material target, the projectile begins to tumble and this tumbling leads to the interface rupturing, causing the nose and tail portions to separate. |

This term appears in both of the independent claims, *i.e.*, Claims 1 and 32. The crux of the parties' disagreement over Term 2 appears to be whether the projectile is designed to be ruptured through tumbling alone or whether it could be ruptured by various means, including but not limited to tumbling, upon striking a target or object. Under the government's view, the '325 patent is limited to those projectiles which are ruptured through tumbling, which tumbling is the direct cause of the separation of the nose and tail. The court cannot adopt such a limited construction of Term 2.

The specification states that tumbling "typically result[s] in the interface rupturing." '325 patent at col. 3, lines 6-7. A few paragraphs later, the specification again describes a projectile rupturing after striking a soft target, "[d]ue at least in part to the forces exerted on the projectile body and the structural features of the interface during such tumbling." *Id.* at col. 5, lines 18-21. However, a predetermined target is not necessarily equivalent to a soft target. *See id.* at col. 5, lines 12-16 ("[S]eparation of the nose and tail portions from one another and possibly from the interface is facilitated when the projectile body strikes at least one predetermined category of targets such as, *but not necessarily limited to*, a soft target." (emphasis added)).

The '325 patented projectiles are designed to rupture, or to break into two or more components, responsive to striking a target or object, which may or may not be a soft target. Certainly, tumbling is one such means by which the projectile is ruptured and breaks into pieces. It is not the only means, however. *See* '325 patent at col. 5, lines 25-26 ("[T]he interface ruptures upon striking the target *and/or* during the tumbling procedure." (emphasis added)). Liberty recites in its brief a variety of factors which may affect whether a projectile experiences tumbling or some other species of rupture such as shearing, bursting, splitting, dislocating, bending, buckling, crunching, or fragmenting, including: "projectile yaw and the angle of attack between the velocity vector of the projectile and yaw angle, wind direction and speed, the target class (hard, soft, other), [and] the projectile velocity." Pl.'s Br. at 6. A cursory examination of the various embodiments modeled in the specification provides ample basis for the inference that

8

the component parts of a '325 projectile may be ruptured or broken through bursting, dislocating, or other action, even in the absence of a tumbling motion.  *See, e.g.,* '325 patent, Figs. 1A, 1C, reproduced below:[7]



[7]Essentially, all separations are caused by a combination of bending and buckling forces. *See e.g.*, Hr'g Tr. 31:21 to 32:22 (Mar. 22, 2013).  Among other things, the interface and tail are softer and more malleable than the nose and thus more susceptible to distortion and dislocation. As the nose portion encounters a target, its speed inevitably decreases while the tail continues at the original rate of speed for an instant.  The sudden disparity in rates of travel causes the tail to slam into the nose, either buckling or bending (or both) the tail and interface, and perhaps also the nose, which become separated by the disparate forces being applied to the elements of the projectile.  Whether this separation takes the form of tumbling, bursting, splitting, or other action depends on the specific force vectors applied at impact.

Additionally, the specification refers separately to "controlled fragmentation" in context with, but separable from, "tumbling." '325 patent at col. 5, lines 26-30 ("[T]he structural and operational features of the projectile provide a controlled fragmentation when the projectile body strikes at least a predetermined target, such as a soft material target including a human, animal, etc."); *see also id.* at col. 2, lines 56-57 ("controlled fragmentation of the projectile body"); *id.* at col. 2, lines 62-63 ("controlled fragmentation of the projectile").

The government argues that tumbling must be inexorably linked to rupturing because "[e]very time the word rupture appears in the patent, the word tumble or tumbling appears in close proximity." Hr'g Tr. 68:10-12. Yet, not a single instance of the words "tumble" or "tumbling" appears in any of the forty-two enumerated claims, whether in relation to soft targets or otherwise. Contrastingly, "rupturing" or some variation thereof appears no fewer than six times. In attempting to import a limitation from the specification into the claims, the government would have the court commit a "cardinal sin" of patent law. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001) ("[O]ne of the cardinal sins of patent law [is] reading a limitation from the written description into the claims.").

In short, the government's attempts to link all controlled rupturing to tumbling is contrary to the plain language of the claims and the specification of the '325 patent. Accordingly, the court adopts a modified form of plaintiff's proffered construction of Term 2, that is, "structured to provide controlled rupturing" means that **the interface portion is structured to rupture (*i.e.*, break) upon striking a target or object, separating two or more of the components of the projectile**.

3.  *"Reduced area of contact."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
| --- | --- |
| Means that the outer surface of the interface has one or more areas of circumference less than the maximum outer circumference of the interface. | Means that the area of contact between the projectile and the rifling of the firearm is less than that of a traditional jacketed projectile, which includes the M855. |

This term appears in independent Claim 1. Both parties' proffered constructions appear to be problematic. Liberty's proposed construction is self-referential, defined by a comparison between the interface and part of the interface. While Claim 1 addresses an interface "disposed and dimensioned to define a reduced area of contact of said body with the rifling of the firearm," it gives no clues within the claim itself as to what the area of contact has been reduced *from*. Liberty's definition does nothing to alleviate the problem of this missing antecedent. The term described by Liberty is not an area of contact which has been "reduced" from anything; possibly it more accurately describes an interface which is simply "smaller in some places than in others." Portions of the interface which are "reduced" under Liberty's definition could not possibly also be "areas of contact," since their comparative circumference would preclude contact with the rifling of a firearm. If Liberty means instead to say that "reduced area of contact" indicates that

10

there is less contact by the projectile with the rifling than there conceivably could have been, the term is reduced to mere tautology.

The government's proposed construction is more coherent in that it provides a referent for the claimed reduction: the area of contact is reduced compared to that of a "traditional jacketed projectile, which includes the M855." This comparison is somewhat consistent with the patent history set out in the specification, which notes that reduced contact area "compared to conventional projectiles" would improve upon prior art by "reducing heat buildup and improving barrel performance during sustained fire of the firearms." '325 patent at col. 1, lines 65-66 and col. 2, lines 46-49. The "conventional projectiles" referred to in the specification must logically be limited to those projectiles comparable to the ones enabled by the '325 patent, which is to say "all calibers generally ranging from .17 through [.]50 BMG." *Id.* at col. 2, line 28.[8] This is a more precise description of the limitation than "traditional jacketed projectile[s], which includes the M855" as offered by the government.

The government's definition also is partially deficient because it mischaracterizes the particular surface described in the '325 patent. Rather than the projectile generally, as the government indicates, it is the interface portion specifically which comprises the reduced area of contact. *See* Claim 1 ("said interface portion disposed and dimensioned to define a reduced area of contact of said body with the rifling of the firearm"); *see also* '325 patent at col. 2, lines 58-61 ("The disposition and structuring of the interface results in the positioning of an outer surface thereof so as to define the primary contact area between the body of the projectile and the rifling or interior surface of the barrel.").[9]

The court adopts a construction of Term 3, "reduced area of contact," as meaning that **the area of contact between the interface and the rifling of the firearm is less than that of a traditional jacketed lead bullet of calibers .17 through .50 BMG**.

    4.  *"Synchronized rotation."*

This term appears in independent Claim 1, and the parties agree that it means **that the nose, tail, and interface portions rotate in the same direction and at the same rate**. The court accepts and adopts this construction.

---

[8]"BMG" specifically refers to the Browning Machine Gun and thus ".50 BMG" refers to the cartridge developed for that machine gun (used for some time with the military-standard M2 heavy machine gun).

[9]The closely related Term 14 pertains to "primary area of contact."

11

**A-56**

5.  *"Fixedly secured."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
| --- | --- |
| Means that the nose, tail, and interface portions are connected, subject to being detached upon striking an intended target. | Means that the nose, tail, and interface portions are connected to each other in a secured fashion (*e.g.*, by employing a press-fitted frictional connection, and/or adding interior peripheral rims at the ends of the interface), such that the projectile assembly remains intact (and in synchronized rotation) during launch and flight from the firearm. |

This term appears in independent Claims 1 and 32.  The parties concur that the crux of Term 5 is that the three component parts of a '325 projectile are "secured" to each other, meaning that they are connected prior to use in the firearm.  The parties diverge over whether a description of the projectile's condition during launch and flight is appropriate, as well as whether methods of connection need be addressed in claim construction.

The government's inclusion of the projectile's condition "during launch and flight" is an appropriate addition to Liberty's construction of Term 5 because that condition is essential to the proper function of the interface.  The term "fixedly secured" appears once in each of the independent claims, both times in the context of describing the state of the projectile before impact ("fixedly secured") versus after impact ("ruptured").  The court thus finds it appropriate to incorporate the description of the condition of the projectile during launch and flight into its construction of Term 5.  Contrastingly, the examples of methods employed to affix the components to each other in the government's proposed construction ("press-fitted frictional connections and/or interior peripheral rims") are extraneous, unnecessary, and not supported by the text of the claims, and will not be imported by the court into its construction.

For the above reasons, Term 5, "fixedly secured," means **that the nose, tail, and interface are connected to each other in a securely fastened way such that they stay intact during launch and flight, prior to striking the target**.

6.  *"Removably connected to and separable."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
| --- | --- |
| Plain meaning. | Means that at least one of the nose and tail portions are designed to separate from the interface (and thus separate from each other) upon striking a predetermined target. |

This term appears in dependent Claim 2.  The plain meaning of Term 6 is not far afield from the elaborated definition offered by the government.  However, the government would insert "design" into the construction of Term 6 with reference to the nose or tail.  That reference is not supported by the patent claims.  Instead, the interface is an integral element of the design.

12

**A-57**

The court adopts the following construction for Term 6: "removably connected to and separable" means **that the nose, tail and interface are joined together in a way susceptible to separation upon striking a target or object**.

7. *"Separable from said interface."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means that at least one of the nose or tail portions can separate from the interface upon striking a predetermined target. | Means that the nose and/or tail portions are designed to separate from the interface after striking a target. |

Term 7 appears in dependent Claims 2, 3, 9, and 11. The term is similar to Term 6, and Liberty's and the government's constructions are closely akin to one another. Although Term 7 appears in Claims 2, 3, 9 and 11, only in Claims 2 and 3 is the claim tied to striking a "predetermined target" or "target" as suggested by both parties. Nonetheless, the patent as a whole indicates that separation of the nose and tail from the interface occurs as and when the projectile strikes a target or object. And, as with Term 6, the government's insertion of "design" is not well taken here.

The court adopts the following construction for Term 7: "separable from said interface" means **that at least one of the nose or tail portions can separate from the interface upon striking a target or object**.

8. *"Cooperatively structured."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Plain meaning. | Means that the nose, tail, and interface portions are designed and configured to facilitate separation of the nose and tail portions after striking a predetermined target. |

Term 8 appears in dependent Claim 5 of the '325 patent. Contrary to plaintiff's assertion, Term 8 requires more elaboration than plain meaning. The government's proposed construction is a valuable starting point, although not ideal. The government again inserts a "design" element where none is indicated in the patent or its specification. Claim 5, where Term 8 makes its sole appearance in the patent claims, uses "cooperatively structured" to describe the interaction between the nose, tail, and interface portions of the projectile.[10] The government's construction fails to account for the presence of the interface at the moment of separation, though the interface manifestly is one of the "cooperative components" of the projectile. *See* '325 patent, col. 7, lines 39-47 (referring to the benefits and advantages accruing from "the cooperative components of the nose portion, tail portion, and interface.").

---

[10]Claim 5 covers "[a] projectile as recited in claim 1 wherein said nose and tail portions and said interface are cooperatively structured to separate said nose and tail portions from one another upon said body striking a predetermined target."

13

Accordingly, the court adopts the following construction for Term 8: "cooperatively structured" means **formed and configured to enable the separation of the nose and/or tail portions from the interface in response to striking a target or object.**

9. *"Open ended construction."*

This term appears in dependent Claim 7, and the parties agree that it means **that the interface is not enclosed on at least one end.** The court accepts and adopts this construction.

10. *"Dimensioned and configured to receive at least one of said nose or tail portions therein."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Plain meaning. | Means that the hollow interior of the interface allows for insertion of (1) a portion of (or all of) the nose portion, or alternatively, (2) a portion of (or all of) the tail portion. |

This term appears in dependent Claim 8. The government's proposed claim construction is directly at odds with the plain meaning of Term 10, and consequently cannot be accepted by the court. The term in plain language describes an interface which may receive "at least one" of the nose or the tail portion of the projectile.[11] By saying "at least one," the claim contemplates an embodiment where both the nose and the tail might be received by the interface. This contemplation is confirmed in and by Claim 10, which is dependent on Claim 8, through its description of an embodiment where both the nose and tail are received within the hollow interior of the interface.[12] When the government states that Term 10 in Claim 8 describes an interface which receives "the nose portion, *or alternatively*... the tail portion," it precludes the possibility of an interface receiving both the nose *and* the tail. For that reason, government's proffered construction renders Claim 8 too narrow to encompass its dependent Claim 10, and cannot be adopted by the court. *See Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000) (holding that an independent claim or a claim upon which another claim depends, must by definition have broader scope than a dependent claim). The government in its reply brief concedes that the phrase "or alternatively" should be revised to "and/or" to resolve this issue. *See* Def.'s Reply Regarding Claim Construction at 15.

Additionally, the government seeks with its construction to introduce a new limitation in the term by altering the phrase "at least partially hollow interior," which appears in Claim 8, to "hollow interior," as stated in its proffered construction. Such a deviation is not warranted by any text of the patent or its specification.

---

[11]Claim 8 pertains to "[a] projectile as recited in claim 1 wherein said interface comprises an at least partially hollow interior dimensioned and configured to receive at least one of said nose or tail portions therein."

[12]Claim 10 addresses "[a] projectile as recited in Claim 8 wherein said hollow interior is dimensioned and configured to receive both of said nose and tail portions therein."

14

Term 10 is already stated in a simple and direct way, and the plain meaning of the term will suffice for its construction. As such, the court adopts the plain meaning of Term 10: **dimensioned and configured to receive at least one of said nose or tail portions therein**.

11. *"Dimensioned and configured to receive both of said nose and tail portions therein."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
| --- | --- |
| Plain meaning. | Means that the hollow interior of the interface allows for insertion of (1) a portion of (or all of) the nose portion and (2) a portion of (or all of) the tail portion. |

Term 11 appears in Claim 10, which, as previously explained, is dependent upon Claim 8 and thus must correlate to the construction of Term 10 that appears in Claim 8. By describing Term 11 as allowing for insertion of all or part of the nose and the tail portions of the projectile into the interface, the government proffers a construction directly at odds with its rejected construction of Term 10, which permits insertion of all or part of one or the other, but not both. The government cannot posit two entirely contrary constructions for terms so closely linked within the patent. The court's capacity for cognitive dissonance falls short of that required for acceptance of the government's construction.

Aside from internal inconsistencies, the government's proposed construction for Term 11 limits the claim in ways not indicated by the patent or its specifications, *e.g.*, by stating that the interface allows for insertion of "a portion of . . . or all of" the nose or tail portions. This elaboration would limit the plain language of Term 11, which states simply that the interface may receive "both of said nose and tail portions."

The meaning of Term 11 is plain on its face. The court thus adopts the plain meaning of Term 11: **dimensioned and configured to receive both of said nose and tail portions therein**.

12. *"Confronting engagement."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
| --- | --- |
| Means that the trailing end of the nose portion and the forward end of the tail portion are face to face with one another. | Means that the trailing end of the nose portion and the forward end of the tail portion are in physical contact (and not spaced apart). |

This term appears in dependent Claim 22.[13] Both parties agree that a "confronting engagement" describes a projectile in which the trailing end of the nose portion and the forward end of the tail portion face each other. The pertinent distinction between Liberty's and the government's proposed constructions of Term 12 is whether the confronting ends of the tail and

---

[13]Claim 22 states that "[a] projectile as recited in Claim 1 wherein said nose and tail portions include correspondingly positioned ends disposed in confronting engagement with one another or an interior of said interface."

15

**A-60**

nose portions must be in physical contact with one another. Not much can be gleaned in isolation from the context of the use of the pertinent term in Claim 22. The claim directly following Claim 22, Claim 23, is illuminating in this respect, however. That claim recites an otherwise similar embodiment, but one where the nose and tail are explicitly positioned with a predetermined space between each other, and the phrase "confronting engagement" is conspicuously absent.[14] This context indicates that "confronting engagement" involves physical contact. *See Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction . . . demands interpretation of the entire claim in context.").

The distinction between a confronting engagement and one where the nose and tail are spaced apart is reinforced in the specification. The specification distinguishes figures 1A and 1C from Figures 1 and 1B, stating that Figues 1 and 1B are "disposed in confronting engagement . . . thereby eliminating the presence of the spacing as represented in F[igures] 1A and 1C." '325 patent, col. 6, lines 9-11. The court accordingly concludes that a confronting engagement requires physical contact between the nose and tail portions of the projectile, as modeled in Figures 1 and 1B.

For the reasons stated, the court adopts the following construction of Term 12: "confronting engagement" means **that the trailing end of the nose portion and the forward end of the tail portion face, and are physically in contact with, each other**.

13.  *"Intermediate opposite ends."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Means between the forward end of the nose portion and the trailing end of the tail portion. | Means the interface is positioned between the front end and the rear end of the projectile body (such that the interface does not extend all of the way to the front or to the end of the projectile). |

This term appears in independent Claim 32. As discussed with relation to Term 1, "intermediate opposite ends" indicates by its plain meaning an embodiment where the interface is positioned between the tail and nose, though not necessarily enclosing the tail or nose. The government's proposed construction urges the adoption of an additional limitation, that the interface cannot extend to the front or to the end of the projectile. In pointing to the figures included with the patent application, the government correctly points out that no such extended interfaces were depicted as examples. *See* Def.'s Br. at 17. However, the sampling of embodiments provided by the figures does not comprise the entirety of all embodiments enabled by the patent. *Phillips*, 415 F.3d at 1323 ("[W]e have repeatedly warned against confining the claims to those embodiments . . . [and] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."). Consequently, the explicit limitation sought by the government is not warranted.

---

[14]Claim 23 pertains to "[a] projectile as recited in claim 1 wherein said nose and tail portions include correspondingly positioned ends disposed a predetermined spaced distance from one another within said interface, said predetermined spaced distance being less than 0.060." This claim essentially correlates to Figures 1A and 1C reproduced *supra*.

The court adopts the following construction of Term 13: "intermediate opposite ends" means **that the interface is positioned between or in the middle of the opposite ends of the forward end of the nose portion and the trailing end of the tail portion**.

14. *"Primary area of contact."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Plain meaning. | Means that the interface portion (1) defines the principal area of contact of the projectile with the barrel of a firearm and (2) is a reduced area of contact. |

Term 14 appears in independent Claim 32. The government attempts to import Term 3, "reduced area of contact," which appears in independent Claim 1, into Term 14, thereby imposing the limitation of "is a reduced area of contact" upon all primary areas of contact. Such an imposition is not warranted by the plain language of the patent. In fact, "primary area of contact" appears in Claim 32 at a place corresponding precisely with that of "reduced area of contact" in Claim 1. The interface in a Claim 1 embodiment is a reduced area of contact, while an interface derived from Claim 32 must be a primary area of contact. Such a deliberate shift in terminology cautions against conflation of the two distinct terms. Though their meanings may be similar, and may even be used to describe certain identical objects, the court cannot read into a term what the author of a patent has pointedly declined to provide. The court rejects the government's construction for impermissibly limiting Term 14.

Term 14 is best construed by the plain meaning of "primary area of contact," namely **that the exterior of the interface serves as the primary area where the projectile contacts the interior of a firearm barrel**.

15. *"Tapered portion."*

| Plaintiff's Proposed Claim Construction | Government's Proposed Claim Construction |
|---|---|
| Plain meaning. | Means that the interface portion contains an area (or areas) adjacent to one or both ends that has a gradually reduced outer diameter. |

Term 15 appears in dependent Claims 39 and 40. Its plain meaning provides a helpful starting point because the ordinary usages of "tapered" and "portion" are apt in the context of the '325 patent. The court need not resort to anything more complicated than the common meanings of the words when their meaning is obvious and not contradicted by the claims or specifications. *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). Here, the phrase "tapered portion" plainly refers to **a portion of the interface which exhibits a decreasing circumference**.

17

**A-62**

**CONCLUSION**

No extrinsic evidence is necessary for resolution of claim construction for the '325 patent. For the reasons detailed above, the fifteen terms identified by the parties shall be construed as stated.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 29, 2014

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: 7,748,325
ISSUE DATE: July 06, 2010

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. K. CARTER
Certifying Officer

1:11-cv-00084-CFL

Plaintiff's Trial
**Exhibit No. 1**



US007748325B2

(12) **United States Patent**          (10) **Patent No.:**     **US 7,748,325 B2**
    Marx                              (45) **Date of Patent:**         **Jul. 6, 2010**

(54) **FIREARMS PROJECTILE**

(75) Inventor: **PJ Marx**, Sarasota, FL (US)

(73) Assignee: **Liberty Ammunition, LLC**, Clearwater, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 729 days.

(21) Appl. No.: **11/255,261**

(22) Filed: **Oct. 21, 2005**

(65) **Prior Publication Data**

    US 2007/0089629 A1      Apr. 26, 2007

(51) **Int. Cl.**
    *F42B 14/02*    (2006.01)
    *F42B 30/02*    (2006.01)

(52) **U.S. Cl.** .................. **102/517**; 102/506; 102/524; 102/501

(58) **Field of Classification Search** ............... 102/524, 102/525, 526, 527, 501, 506, 512, 513, 517
    See application file for complete search history.

(56) **References Cited**

    U.S. PATENT DOCUMENTS

| 29,272 | A | * | 7/1860 | Hotchkiss | .................. | 102/525 |
| 36,197 | A | * | 8/1862 | Shaler et al. | ............. | 102/506 |
| RE1,410 | E | * | 2/1863 | Lindner | ..................... | 102/525 |
| 40,153 | A | * | 10/1863 | Billings | .................. | 102/525 |
| 693,329 | A | * | 2/1902 | Neubauer | .................. | 102/512 |
| 3,680,485 | A | * | 8/1972 | Zaid et al. | .................. | 102/506 |
| 4,128,059 | A | * | 12/1978 | Black | .................. | 102/513 |
| 5,388,524 | A | * | 2/1995 | Strandli et al. | .................. | 102/529 |
| 6,817,299 | B1 | * | 11/2004 | Cooke | .................. | 102/493 |

* cited by examiner

*Primary Examiner*—James S Bergin
(74) *Attorney, Agent, or Firm*—Anton J. Hopen; Smith & Hopen, P.A.

(57)        **ABSTRACT**

A projectile structured to be discharged from a firearm comprising a body including a nose portion and a tail portion separable from one another when the projectile strikes a target. The body further includes an interface disposed intermediate opposite ends of the body of the projectile and structured to removably interconnect the nose and tail portions. Separation of the nose and tail portions such as when striking a soft tissue or like material target is caused by the tumbling of the projectile and the cooperative structuring of the interface to facilitate separation of the nose and tail portions. Further, the interface is disposed, dimensioned and structured to define the primary area of contact of the projectile body with the rifling or interior surface of the barrel of the firearm. At least one additional embodiment of the projectile comprises one of the nose or tail portions, preferably the tail portion structured to contain a supplemental payload which is carried to the target upon discharge of the firearm.

**42 Claims, 6 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 05/19/2014



FIGURE 1

Copy provided by USPTO from the PIRS Image Database on 05/19/2014



FIGURE 1A

Copy provided by USPTO from the PIRS Image Database on 05/19/2014



FIGURE 1B

Copy provided by USPTO from the PIRS Image Database on 05/19/2014



FIGURE 1C

Copy provided by USPTO from the PIRS Image Database on 05/19/2014



A-17130



FIGURE 5

FIGURE 6

FIGURE 7

Copy provided by USPTO from the PIRS Image Database on 05/19/2014

A-17131

US 7,748,325 B2

1

# FIREARMS PROJECTILE

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention is directed to projectile structured to be discharged from a firearm and comprising separable nose and tail portions and an interconnecting interface. The interface is structured to facilitate concurrent, synchronization rotation of the nose portion, the interface and the tail portion as the projectile travels through the bore of the firearm and as it exits therefrom. The interface is dimensioned and disposed to define a reduced contact area of the projectile body with the rifling or interior surface of the barrel of the firearm.

2. Description of the Related Art

The latter part of the twentieth century brought environmental concerns into the ammunition field. The resulting changes included the United States military reducing the use of copper jacketed lead projectiles in an effort to reduce lead contamination. In addition, Oak Ridge National Laboratory was given the task of finding a lead free alternative to be used in the structuring and design of firearm projectiles. This research led to the development of a tungsten/tin compound known in the industry as "Green Bullet". Practical application and formation of this material involves tungsten powder bound together with tin or nylon and inserted into a jacket in place of the formerly used lead material. The performance characteristics of the resulting projectiles are equivalent to conventional lead filled projectiles but involve a significantly higher cost of production.

Accordingly, with the intended elimination or reduction in the use of lead in firearm projectiles there is a significant need in the firearm industry for a projectile capable of being tailored to assume various densities while distinguishing the weight of the projectile from its size. Currently, NATO 5.56 mm M855(SS109) projectiles comprise a steel/lead core placed in a copper jacket which weighs 62 grains. Ideally, an improved projectile could be proposed and developed having the same physical dimensions but having an increased weight, of for example 107 grains or a 72 percent weight increase. In order to achieve the same weight utilizing the conventional jacketed lead projectile is a significant change in the length of the projectile would have to be assumed. This additional length would decrease the space available for gun powder thereby reducing the propelling charge of the projectile. Moreover, the increased length in order to accomplish the desired increase in weight would also require a different rifling twist rate on the interior barrel surface of the firearm.

Accordingly, a desired and proposed improvement in projectiles would comprise an increase in the weight of the projectile with no decrease in case volume. Moreover, this would result in increased terminal energy which translates into energy delivered to the target upon impact of the projectile. More specifically, greater density means improved ballistic coefficient to the extent that an improved and proposed projectile would lose less of its initial velocity at long range target distances than jacketed lead or steel projectiles. As a result, an improved projectile would have increased accuracy as well as greater terminal energy and penetration characteristics.

Furthermore, an increased need in the firearms industry for an improved projectile would preferably involve a projectile which eliminates the use of a jacketed projectile. In contrast, a proposed projectile would have an exterior surface which engages the rifling along a reduced contact area as compared to conventional projectiles. Additional improvements may involve the use of a copper alloy in forming portions of the

2

exterior surface of the projectile body. In the alternative, the exterior surface defining the contact area of the improved projectile could be made from other alloys or polymers. Therefore the design and structuring of a proposed projectile would result in a contact area thereon which would be significantly less than a traditional jacketed lead bullet. Accordingly, by reducing the contact area of the projectile, barrel friction would be significantly reduced. In turn, heat buildup would be reduced and the barrel performance during sustained fire of such projectiles would be greatly improved. Other advantages would include the increase in barrel life of the firearm and reduced fouling. Additional performance characteristics of a proposed and improved projectile would provide significantly greater penetration when impacting hard targets such as armor, glass, vehicles, etc. than conventional jacketed lead projectiles. Additional physical characteristics of a proposed projectile would provide capabilities of delivering supplemental payloads while offering controlled fragmentation against soft targets (humans/animals).

Finally, the practical application and manufacturing associated with such a proposed preferred projectile in quantities adequate for the military and law enforcement needs would be significantly reduced due to the relative simplicity of the non-jacketed projectile, as proposed. Moreover, projectiles could be produced at a modest cost, especially as compared to the "Green Bullet" technology as briefly described above, while enabling the projectiles to be produced in all calibers generally ranging from .17 through 50 BMG while significantly improving the performance of all small caliber weapons systems.

## SUMMARY OF THE INVENTION

The present invention is directed to a projectile structured to be discharged from a firearm and designed to overcome the disadvantages and problems associated with conventional firearm projectiles such as, but not limited to lead or steel jacketed projectiles.

Moreover, the projectile of the present invention eliminates the use of lead and the provision of an outer jacket. As such, specified portions of the exterior surface of the body of the projectile engage the rifling along an exterior surface area disposed and dimensioned to significantly reduce the area of contact of the projectile body with the rifling or interior surface of the barrel of the firearm. By reducing the contact area of the projectile, barrel friction is reduced thereby reducing heat buildup and improving barrel performance during sustained fire of the firearms. An additional benefit is the increase in barrel life and the reduction of fouling.

More specifically, the projectile of the present invention in one or more of the preferred embodiments to be described in greater detail hereinafter, comprises a body including a nose portion and a tail portion. In addition, the projectile body further includes an interface disposed intermediate opposite ends of the body and structured to interconnect the nose and tail portions in a manner which provides controlled fragmentation of the projectile body, especially when the projectile strikes a soft target. The disposition and structuring of the interface results in the positioning of an outer surface thereof so as to define the primary contact area between the body of the projectile and the rifling or interior surface of the barrel.

As set forth above, controlled fragmentation of the projectile, when striking at least a first predetermined target (soft material), is accomplished by the nose and tail portions of the projectile body being separable from one another. Such separation is facilitated by one or both of the nose and tail portions being removably attached or connected to the interface. Also,

Copy provided by USPTO from the PIRS Image Database on 05/19/2014

US 7,748,325 B2

| 3 | 4 |

as will be explained in greater detail hereinafter, the interface is structured to rupture in certain instances such as, but not limited to, when the projectile strikes a predetermined target such as a human or animal target. More specifically, when the projectile body of the present invention penetrates a soft material target it begins to "tumble" typically resulting in the interface rupturing. As a result, the nose and tail portions separate from one another by means of the rupturing of the interface and/or the detachment of one or both of the nose and tail portions from the interface which may be facilitated by the rupturing of the interface.

Additional structural features of the projectile include at least one of the nose or tail portions, and preferably the tail portion, structured to contain and carry a supplemental payload for delivery to the target. Such supplemental payload may include, but are not limited to, Warfarin, Coumadin, Heparin, Lovenox and Fragmin, all of which are anti-coagulants. In addition, the supplement payload may include Isosorbide Dinitrate, Isosorbide Mononitrate and Hydralazine, all of which may be classified under the category of vasodilators. Additionally, the supplemental payload may include various isotopes for tracking such as RFI tags, SPLAT (Sticky Polymer Lethal Agent Tag), Smartdust, or other chemical agents. Therefore, the controlled fragmentation generally defined herein as a separation of the nose and tail portions of the projectile body will expose the targeted person, animal, etc, to the chemical agent defining the delivered payload, thereby resulting in the intended effect on the target.

The versatility of the manufacturing and performance characteristics of the projectile of the various embodiments of the present invention may also be attributed to the formation of the various nose and tail portions from high density metal matrix composites, metals or ceramics, wherein the interconnecting interface is preferably, but not necessarily, formed from a copper alloy. As a result, the projectile of the present invention may be produced on a mass scale using materials and manufacturing equipment currently available and known in the projectile production industry. Accordingly, production can occur in a relatively short period of time from initial startup and at a relatively modest expense, especially when compared to customized projectiles currently under investigation. Finally, the subject projectile can be produced in virtually all calibers from .17 through 50 BMG and can significantly improve the performance of all small caliber weapons systems with which it is used.

These and other objects, features and advantages of the present invention will become clearer when the drawings as well as the detailed description are taken into consideration.

BRIEF DESCRIPTION OF THE DRAWINGS

For a fuller understanding of the nature of the present invention, reference should be had to the following detailed description taken in connection with the accompanying drawings in which:

FIG. 1 is a sectional view of one preferred embodiment of the projectile of the present invention.

FIG. 1A is a sectional view of yet another preferred embodiment of the projectile of the present invention.

FIG. 1B is a sectional view of yet another preferred embodiment of the projectile of the present invention.

FIG. 1C is a sectional view of yet another preferred embodiment of the projectile of the present invention.

FIG. 2 is a side view of a head portion of the embodiment of the projectile of FIG. 1.

FIG. 3 is a side view of another embodiment of a tail portion of the projectile which could be incorporated in the embodiment of FIG. 1.

FIG. 4 is a side view in detail of an interface component of the preferred embodiment of FIG. 1.

FIG. 5 is a side view of a head portion of the projectile of the embodiment of FIGS. 1B and 1C.

FIG. 6 is a side view of another embodiment of the tail portion of the projectile similar to the embodiment of FIGS. 1B and 1C.

FIG. 7 is a sectional view in detail of yet another embodiment of an interface of the projectile as represented in FIGS. 1B and 1C.

Like reference numerals refer to like parts throughout the several views of the drawings.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

As shown in the accompanying Figures, the present invention is directed to a projectile generally indicated as 10 of the type structured to be fired from a firearm. More specifically, the projectile 10 includes a body, generally indicated as 12, which comprises a nose portion 14 and a tail portion 16 shown in detail in FIGS. 2, 3, 5, and 6 respectively. In addition, the projectile body 12 includes an interface 18, shown in detail in FIGS. 4 and 7, disposed intermediate the opposite ends of the projectile body 12 in interconnecting relation to the nose portion 14 and the tail portion 16 as demonstrated in FIG. 1.

Structural features associated with one or more preferred embodiments of the projectile 10 include the nose and tail portions 14 and 16 respectively, formed of high density metal matrix composites, metals, alloys, or ceramics. More specifically, the nose and tail portions 14 and 16 can each be formed from a material which contains one or more of the following: aluminum, antimony, beryllium, bismuth, boron carbide, brass, bronze, chromium, cobalt, copper, gold, iridium, iron, lead, magnesium, mercury, molybdenum, nickel, palladium, platinum, rhodium, silicon carbide, silver, steel, tantalum, tellurium, tin, titanium, tungsten, tungsten carbide, depleted uranium, zinc and zirconium.

The interface 18 may be made from a copper alloy similar to gilding metal. However, material from which the interface 18 is formed may vary to include other appropriate alloys, polymers, etc, including materials which contain one or more of the following: aluminum, bronze, brass, chromium, copper, epoxy, fiberglass, Kevlar, gold, graphite, iron, lead, magnesium, mercury, molybdenum, nickel, nylon, palladium, polycarbonate, polyester, polyethylene, polystyrene, polyamide, poly vinyl chloride, polyurethane, phenolic, thermoplastic polymer, thermoset polymer, rhodium, rubber, silicon, silver, steel, tantalum, tellurium, tin, titanium, Teflon, Torlon, Ultem, zinc, zirconium. As represented in both FIGS. 1 and 4, the interface 18 includes an at least partially hollow interior 20 and an open ended construction defined by at least one but preferably both oppositely disposed open ends 22 and 24. Other structural features of the interface 18 include an at least partially irregular exterior surface 28 including a plurality of recessed, spaced apart, annular grooves 26 integrally formed in the exterior surface 28.

A review of FIGS. 1, 1A, 1B and 1C clearly indicates that the interface 18, in each of the various preferred embodiments of the present invention, is disposed in interconnecting relation to both the nose portion 14 and the tail portion 16. As such, the open ended construction, comprising oppositely disposed open ends 22 and 24, as well as the at least partially hollow interior 20 are cooperatively dimensioned and config-

Copy provided by USPTO from the PIRS Image Database on 05/19/2014

US 7,748,325 B2

5

ured to receive the connecting trailing section 14' of the nose portion 14 and the leading section 16' of the tail portion 16. Insertion of the nose and tail portions 14 and 16 and the fixed or removable connection to the interface 18 can be accomplished by a friction, press fitted securement as the connecting portions 14' and 16' pass into the at least partially hollow interior 20 through the open ends 24 and 22 of the interface 18.

Moreover, the press fitted insertion of the nose portion 14 and the tail portion 16 into the interface 18 may be structured to define either a fixed connection or a removable connection. With a firm, secure but removable connection, a separation of the nose and tail portions 14 and 16 from one another and possibly from the interface 18 is facilitated when the projectile body 12 strikes at least one predetermined category of targets such as, but not necessarily limited to, a soft target. More specifically, when the projectile body 12 penetrates a soft target (human, animal, etc.) it begins to "tumble". Due at least in part to the forces exerted on the projectile body 12 and the structural features of the interface 18 during such tumbling, the interface 18 will separate or rupture.

As set forth above, the connection between the interface 18 and the nose and tail portions 14 and 16 may be fixed. As such, the nose and tail portions 14 and 16 separate from one another by the fact that the interface 18 ruptures upon striking the target and/or during the tumbling procedure. Accordingly, the structural and operational features of the projectile 10 provide a controlled fragmentation when the projectile body 12 strikes at least a predetermined target, such as a soft material target including a human, animal, etc. At the same time, the projectile 10 provides significantly greater penetration against hard targets than jacketed lead/steel projectiles as conventionally structured. Yet another feature associated with the various preferred embodiments of the present invention is the existence of a firm, secure interconnection between the interface 18 and each of the nose and tail portions 14 and 16 respectively. Such a secure connection or attachment between the nose portion 14, the interface 18 and the tail portion 16 will assure that all these components rotate with one another as the projectile passes through the barrel and thereafter as the projectile exits the barrel. Such rotation is further defined by the nose portion 14, interface 18 and tail portion 16 all rotating in a common direction and in a synchronized manner such that rotation of all portions of the projectile rotate while being fixedly secured to one another such that the rotation of the projectile is "synchronized". Moreover, any movement or "slippage" of the nose portion 14, interface 18 and tail portion 16 relative to one another during the flight of the projectile is prevented as the projectile rotates during travel through the barrel and during flight thereafter.

It should be noted that distinguishing features of the various preferred embodiments as represented in FIGS. 1 through 7 comprises a different configuration and/or dimension of the nose portion 14, tail portion 16 and interface 18. Further, as can be seen throughout a representation of the structural and dimensional modifications of the various preferred embodiments of the present invention, the nose and tail portions have a combined length equal to one hundred percent of the length of the projectile as clearly demonstrated in FIGS. 1 and 1B. However, as represented in FIGS. 1A and 1C, the embodiments disclosed therein include a predetermined spacing as at 19 existing between the corresponding ends or faces of the trailing section 14' the nose portion 14 and the leading section 16' of the tail portion 16. As such, the combined length of the nose and tail portions may be eighty to ninety percent or greater than the total length of the projectile with the provision of the spacing 19. Further, in at least one additional

6

preferred embodiment, the trailing section 14' of the nose portion 14 and the leading section 16' of the tail portion 16 are spaced apart a distance of 0.060 inches or less when the projectile is completely assembled in the form demonstrated in FIGS. 1A and 1C. As is also clearly represented, FIGS. 1 and 1B represent different preferred embodiments of the present invention, wherein correspondingly disposed ends or faces of the trailing portion 14' and the leading portion 16' are disposed in confronting engagement with one another on the interior of the interface 18 thereby eliminating the presence of the spacing 19 as represented in FIGS. 1A and 1C.

Additional dimensional features directed to the structure of the projectile 10, the body 12 and its various components comprise the nose portion 14 having a greater overall length than that of the interface 18. Further, the overall length of the tail portion is equal to or greater than fifty percent of the overall length of the interface 18. Further, the length of the trailing section 14' and the leading section 16' which are disposed and connected on the interior of the interface 18 each represent between thirty percent and seventy percent of the overall length of the interface 18. Comparatively, in at least one embodiment, the length of the interface 18 comprises between thirty to seventy percent of the overall length of the projectile 10.

As with the structural dimensions of the body 12 and the various components associated therewith, the density of the projectile may vary such that average total density of the nose portion 14, tail portion 16 and interface 18 collectively comprise a density that is greater than 11.5 grams per cubic centimeter. A lighter version of the same projectile may be defined, wherein an average total density of the nose portion 14, tail portion and interface 18 collectively include a density greater than 7 grams per cubic centimeter.

Another operative feature of at least additional preferred embodiments of the projectile 10, such as represented in Figures comprises the provision of a recess or cavity generally indicated as 30 in at least one of the nose and tail portions 14 and 16 and preferably in the tail portion 16. In a most preferred embodiment, the recess or cavity 30 is formed adjacent or contiguous to the front or end face 16" of the leading section 16' of the tail portion 16 and is dimensioned and configured to contain a supplemental payload. The supplemental payload may comprise any chemical or other material agent specifically intended to affect the target struck by the projectile body 12. Moreover, possible payloads include anticoagulants such as, but not limited to, Warfarin, Coumadin, Heparin, Lovenox and Fragmin. In addition, the chemical agents defining the supplemental payload may include vasodilators including Isosorbide Dinitrate, Isosorbide Mononitrate and Hydralazine. Also the payload may comprise various isotopes for tracking a target including RFI tags, SPLAT (Sticky Polymer Lethal Agent Tag), Smartdust and a variety of other materials. Structuring of the tail portion 16 to include the supplemental payload in cooperation with the structuring of the other components with the projectile body 12 which facilitates the aforementioned controlled fragmentation facilitate the delivery of the supplemental payload to the intended target. As should be apparent, a separation of the nose portion 14 and the tail portion 16 by detachment of the interface 18 or the rupturing thereof will expose the supplemental payload to the target penetrated by the projectile body 12.

Also, it is emphasized that the projectile body 12 is not jacketed as in conventional copper jacketed projectiles. However, an additional operative feature of the interface 18 in accord with its disposition and structure is directed to the exterior surface 28 thereof which defines a reduced, primary

Copy provided by USPTO from the PIRS Image Database on 05/19/2014

US 7,748,325 B2

7                                            8

contact and/or substantially exclusive contact area between the projectile body 12 and the rifling or interior surface of the barrel of the firearm from which it is discharged. The significantly reduced area of contact between the projectile body and the rifling of the barrel, than that of a traditional jacketed bullet, results in significantly reduced bore friction and heat buildup. As a result, barrel performance is improved during sustained fire of the firearm thereby increasing the barrel life and reducing the occurrence of fouling.

Yet another feature of one or more of the preferred embodiments of the present invention includes the interface 18 having a tapered or other appropriate configuration generally indicated as 50 located at least at one end thereof. As such, the tapered configuration 50 facilitates or aids in the aerodynamic configuration of the entire projectile 10 thereby facilitating the flight of the projectile 10 after it leaves the barrel of the firearm. Further, in additional preferred embodiments of the present invention such as represented in FIGS. 1, 1A and 4, the interface 18 includes both end portions as at 50 and 50' having the aforementioned tapered configuration. Such tapered configuration not only facilitates the aerodynamic flight of the projectile 10, but further serves to at least partially enclose and facilitate gripping engagement of the interface 18 with the nose portion 14 and tail portion 16 as the trailing section 14' and the leading section 16' are connected to and extend within the interior of the interface 18.

Reference is also directed to the embodiment of FIGS. 1 and 1A wherein secure and fixed engagement between the interface 18 and the nose portion 14 and tail portion 16 is facilitated by the inwardly directed, somewhat interior peripheral rims 52 and 52' located at opposite ends of the interface 18. The peripheral rims 52 and 52' are used to maintain a fixed secure engagement between the interface 18 and the nose and tail portions 14 and 16. As set forth above, such fixed engagement aids in the concurrent, synchronized rotation of the nose portion 14, the interface 18 and the tail portion 16 as the projectile 10 travels through the bore of the firearm and as it exits therefrom.

Finally, structural and operative features of the projectile 10, including the cooperative components of the nose portion 14, tail portion 16 and interface 18, overcome many of the disadvantages and problems normally associated with conventional firearm projectiles through the provision of a non-jacketed structure and the elimination of lead. Moreover, the versatility of the projectile of the present invention is demonstrated by providing controlled fragmentation against soft targets and the delivery of a variety of supplemental payloads.

Since many modifications, variations and changes in detail can be made to the described preferred embodiment of the invention, it is intended that all matters in the foregoing description and shown in the accompanying drawings be interpreted as illustrative and not in a limiting sense. Thus, the scope of the invention should be determined by the appended claims and their legal equivalents.

Now that the invention has been described,

What is claimed is:

1. A projectile structured to be discharged from a firearm, said projectile comprising:

a body including a nose portion and a tail portion,

said body further including an interface portion disposed in interconnecting relation to said nose and tail portions, said interface portion structured to provide controlled rupturing of said interface portion responsive to said projectile striking a predetermined target,

said interface portion disposed and dimensioned to define a reduced area of contact of said body with the rifling of the firearm, said interface portion maintaining the nose

portion and tail portion in synchronized rotation while being fixedly secured to one another by said interface portion whereby upon said projectile striking said predetermined target said interface portion ruptures thereby separating said nose and tail portions of said projectile.

2. A projectile as recited in claim 1 wherein at least one of said nose and tail portions are removably connected to and separable from said interface upon said body striking a predetermined target.

3. A projectile as recited in claim 2 wherein each of said nose and tail portions are separable from said interface upon said body striking a predetermined target.

4. A projectile as recited in claim 3 wherein said interface is structured to rupture upon said body striking a predetermined target.

5. A projectile as recited in claim 1 wherein said nose and tail portions and said interface are cooperatively structured to separate said nose and tail portions from one another upon said body striking a predetermined target.

6. A projectile as recited in claim 5 wherein said interface is structured to rupture upon said body striking a predetermined target.

7. A projectile as recited in claim 1 wherein said interface includes an open ended construction dimensioned and configured to facilitate insertion of at least one of said nose and tail portions on an interior of said interface.

8. A projectile as recited in claim 1 wherein said interface comprises an at least partially hollow interior dimensioned and configured to receive at least one of said nose or tail portions therein.

9. A projectile as recited in claim 8 wherein at least one of said nose and tail portions is separable from said interface.

10. A projectile as recited in claim 8 wherein said hollow interior is dimensioned and configured to receive both of said nose and tail portions therein.

11. A projectile as recited in claim 10 wherein both said nose and tail portions are separable from said interface.

12. A projectile as recited in claim 10 wherein said interface comprises substantially oppositely disposed open ends each dimensioned to receive a different one of said nose and tail portions into said hollow interior of said interface.

13. A projectile as recited in claim 12 wherein said nose and tail portions are separable from one another.

14. A projectile as recited in claim 13 wherein said interface is structured to rupture upon said body striking a predetermined target.

15. A projectile as recited in claim 14 wherein at least one of said nose and tail portions comprises a supplemental payload connected thereto and carried thereby to a target.

16. A projectile as recited in claim 15 wherein said at least one of said nose or tail portions is structured to receive the supplemental payload at least partially on an interior thereof.

17. A projectile as recited in claim 1 wherein said nose and tail portions have a combined length equal to 100% of the projectile length.

18. A projectile as recited in claim 1 wherein said nose and tail portions have a combined length which is equal to or greater than 90% of the projectile length.

19. A projectile as recited in claim 1 wherein said nose and tail portions have a combined length which is equal to or greater than 80% of the projectile length.

20. A projectile as recited in claim 1 wherein said interface has an overall length equal to generally about 30% to 70% of the overall length of the projectile.

21. A projectile as recited in claim 1 wherein said interface has an overall length equal to or less than 50% of the overall projectile length.

Copy provided by USPTO from the PIRS Image Database on 05/19/2014

US 7,748,325 B2

9

22. A projectile as recited in claim 1 wherein said nose and tail portions include correspondingly positioned ends disposed in confronting engagement with one another on an interior of said interface.

23. A projectile as recited in claim 1 wherein said nose and tail portions include correspondingly positioned ends disposed a predetermined spaced distance from one another within said interface, said predetermined spaced distance being less than 0.060".

24. A projectile as recited in claim 1 wherein the overall length of said nose portion is greater than the overall length of said interface.

25. A projectile as recited in claim 1 wherein the overall length of said tail portion is equal to or greater than 50% of the overall length of said interface.

26. A projectile as recited in claim 1 wherein said nose portion includes a trailing section and said tail portion includes a leading section, each of said trailing and leading sections connected to said interface on an interior thereof, an interior length of each of said trailing and leading sections comprising between 30% to 70% of the overall length of said interface.

27. A projectile as recited in claim 1 said nose portion, said tail portion and said interface collectively comprise an average total density of greater than 11.5 g/cc.

28. A projectile as recited in claim 1 said nose portion, said tail portion and said interface collectively comprise an average total density greater than 7 g/cc.

29. A projectile as recited in claim 1 wherein said nose portion is formed from a material selected from the group consisting of: aluminum, antimony, beryllium, bismuth, boron carbide, brass, bronze, chromium, cobalt, copper, gold, iridium, iron, lead, magnesium, mercury, molybdenum, nickel, palladium, platinum, rhodium, silicon carbide, silver, steel, tantalum, tellurium, tin, titanium, tungsten, tungsten carbide, depleted uranium, zinc and zirconium.

30. A projectile as recited in claim 1 wherein said tail portion is formed from a material selected from the group consisting of: aluminum, antimony, beryllium, bismuth, boron carbide, brass, bronze, chromium, cobalt, copper, gold, iridium, iron, lead, magnesium, mercury, molybdenum, nickel, palladium, platinum, rhodium, silicon carbide, silver, steel, tantalum, tellurium, tin, titanium, tungsten, tungsten carbide, depleted uranium, zinc and zirconium.

31. A projectile as recited in claim 1 wherein said interface is formed from a material selected from the group consisting of: aluminum, bronze, brass, chromium, copper, epoxy, fiberglass, Kevlar, gold, graphite, iron, lead, magnesium, mercury, molybdenum, nickel, nylon, palladium, polycarbonate, polyester, polyethylene, polystyrene, polyamide, poly vinyl chloride, polyurethane, phenolic, thermoplastic polymer, thermoset polymer, rhodium, rubber, silicon, silver, steel, tantalum, tellurium, tin, titanium, Teflon, Torlon, Ultem, zinc, zirconium.

32. A projectile structured to be discharged from a firearm, said projectile comprising:

10

a body including a nose portion and tail portion,

said body further including an interface portion disposed intermediate opposite ends of said body in interconnecting relation to said nose and tail portions, said interface portion structured to provide controlled rupturing of said interface portion responsive to said projectile striking a predetermined target, said interface portion maintaining said nose portion and tail portion in synchronized rotation while being fixedly secured to one another by said interface portion whereby upon said projectile striking said predetermined target said interface portion ruptures thereby separating said nose and tail portions of the projectile; and

said exterior surface of said interface portion disposed and structured to define a primary area of contact of said body with an interior barrel surface of said firearm.

33. A projectile as recited in claim 32 wherein said nose portion and said tail portion are at least partially secured within said interface in predetermined spaced relation to one another,

34. A projectile as recited in claim 33 wherein said nose portion includes a trailing section and said tail portion includes a leading section; said trailing and leading sections are fixedly connected to said interface on the interior thereof.

35. A projectile as recited in claim 34 wherein said leading and trailing sections are fixedly secured to said interface such that said nose portion, said tail portion and said interface concurrently rotate with one another in a common direction and synchronized manner as the projectile travels through and beyond a barrel of the firearm.

36. A projectile as recited in claim 35 wherein said trailing and leading sections are disposed in confronting relation to one another on an interior of said interface.

37. A projectile as recited in claim 35 wherein said trailing section and said leading section are disposed in spaced relation to one another on an interior of said interface.

38. A projectile as recited in claim 32 wherein said interface comprises a greater outside diameter along at least a portion of a length thereof than either said nose portion or said tail portion.

39. A projectile as recited in claim 38 wherein said interface comprises a tapered portion disposed and dimensioned to facilitate isolation of at least said nose portion from contact with an internal surface of the barrel.

40. A projectile as recited in claim 32 wherein said interface comprises a tapered portion disposed and dimensioned to facilitate aerodynamic flight of said body.

41. A projectile as recited in claim 32 wherein said interface is connected to said nose portion and disposed and structured to isolate said nose portion from contact with an internal surface of the barrel of the firearm.

42. A projectile as recited in claim 32 wherein said exterior surface of said interface comprises a substantially irregular configuration.

\* \* \* \* \*

Copy provided by USPTO from the PIRS Image Database on 05/19/2014

A-17136

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing BRIEF OF THE DEFENDANT-APPELLANT, THE UNITED STATES was filed electronically using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.


May 26, 2015                                  /s/Walter W. Brown

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(5)-(7) of the Federal Rules of Appellate Procedure, I

hereby certify that the Brief of the Defendant-Appellant, The United States

contains no more than 14,000 words, proportionally spaced, as recorded in the

document statistics for this document in Microsoft Word 2010, which provides the

following information:

Typeface:          Times New Roman, proportionally spaced, 14 point.

Word Count:        13,854 (excluding the parts of the Brief exempted by

Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Federal

Circuit Rule 32(b)).

 /s/Walter W. Brown
WALTER W. BROWN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
Telephone:   (202) 307-0341
Facsimile:   (202) 307-0345

Attorney for the United States

May 26, 2015