No. 2015-5057, -5061

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**LIBERTY AMMUNITION, INC.,**
*Plaintiff-Cross-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS,
IN 11-CV-84, JUDGE CHARLES F. LETTOW

## RESPONSE AND REPLY BRIEF OF
## THE DEFENDANT-APPELLANT, THE UNITED STATES

BENJAMIN C. MIZER
**Principal Deputy Assistant Attorney General**

JOHN J. FARGO
**Director**

Of Counsel:                        WALTER W. BROWN
CONRAD J. DeWITTE, JR.             **Attorney**
Department of Justice              **Commercial Litigation Branch**
                                   **Civil Division**
                                   **Department of Justice**
                                   **Washington, DC  20530**
                                   **Telephone:    (202) 307-0341**
September 4, 2015                  **Facsimile:    (202) 307-0345**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ........................................................................v

TABLE OF ABBREVIATIONS ...................................................................x

STATEMENT OF CROSS-APPEAL ISSUES .......................................1

STATEMENT OF RELEVANT FACTS ...................................................1

    A.    FT. BENNING NDA SIGNED BY LT. COL. DEAN ......................................2

    B.    LT. COL. DEAN'S DUTIES WHEN NDA WAS SIGNED ...........................3

    C.    TESTING OF EPIC ROUNDS ...................................................................5

    D.    SOCOM AND SBIR CONTRACTS ........................................................5

        1.    Disclosures to Tucker Campion.................................................6

        2.    Phase I SBIR Proposal and Eventual Contract .........................7

        3.    Phase II SBIR Contract .............................................................8

    E.    LIBERTY'S DISCLOSURES TO ATF .......................................................8

    F.    MANUFACTURE OF A1 PROJECTILES ....................................................9

SUMMARY OF ARGUMENT .................................................................10

ARGUMENT ............................................................................................15

    I.    STANDARDS OF REVIEW ............................................................15

    II.    THE A1 PROJECTILES DO NOT INFRINGE UNDER PROPER CONSTRUCTIONS OF THE "INTERMEDIATE OPPOSITE ENDS," "REDUCED AREA OF CONTACT," AND "CONTROLLED RUPTURING" LIMITATIONS............................17

        A.    OPEN TRANSITIONAL LANGUAGE DOES NOT PERMIT READING "INTERMEDIATE" OUT OF THE CLAIM. ......................................18

B.   THE TRIAL COURT'S CONSTRUCTION OF "REDUCED AREA OF CONTACT" IS INDEFINITE, BECAUSE IT FAILS TO REFERENCE THE M855—THE ONLY EXAMPLE OF A TRADITIONAL JACKETED LEAD PROJECTILE IN THE SPECIFICATION...................................23

1.   The Government Explicitly Argued for the Use of M855 As an Objective Standard and So Did Not Waive Its Arguments Regarding the Construction of "Reduced Area of Contact.".............................................................25

2.   The Specification Clearly References the M855 (and Only the M855) As a Traditional Jacketed Lead Bullet.27

3.   No Rationale Supports a Conclusion That the Trial Court's Construction Is Definite. ....................................28

C.   THE TRIAL COURT FAILED TO PROPERLY CONSTRUE "CONTROLLED RUPTURING" BY IGNORING THE "PRESENT INVENTION" LANGUAGE OF THE SPECIFICATION AND THE PROSECUTION HISTORY. ............................................30

1.   The Specification Characterizes "Rupturing" Due to Tumbling As the "Present Invention." ...........................31

2.   The Cooke Reference Discloses an Interface That Breaks Up on Impact, but Without Tumbling. ...........................33

III.  IF INFRINGED, THE ASSERTED CLAIMS ARE OBVIOUS BASED ON A COMPARISON OF THE PRIOR ART TO THE "CONTROLLED RUPTURING" LIMITATION AND UNDER THE CURRENT LAW OF OBVIOUSNESS. ............................................34

A.   THE TRIAL COURT IMPROPERLY CONSIDERED THE GOVERNMENT'S PRIMARY PRIOR-ART REFERENCES IN APPLYING ITS CONSTRUCTION OF "CONTROLLED RUPTURING.".................35

1.   The Leussler '416 Patent and the Nosler '420 Patent Teach Interfaces That Meet the "Controlled Rupturing" Limitation. ....................................................35

2.   The Trial Court Incorrectly Distinguished the Leussler and Nosler Patents on Unclaimed Features....................38

3.    Liberty Fails to Address the Explicit Disclosures of the M855/M855 LFS Projectiles in the McElroy '879 Patent. ............................................................................40

B.    DESPITE CITING APPROPRIATE STANDARDS, THE TRIAL COURT APPLIED AN IMPROPER LEGAL FRAMEWORK IN ITS OBVIOUSNESS ANALYSIS....................................................................41

1.    The Trial Court Improperly Applied the Pre-*KSR* Test for Obviousness. ...............................................................41

2.    The Trial Court Applied the Perspective of the Inventor, Rather Than of One of Ordinary Skill. ...........................44

3.    Liberty's Evidence of Secondary Considerations Lacks a Nexus With the Claimed Invention. ...............................45

IV.    THE TRIAL COURT REASONABLY CALCULATED A ROYALTY RATE AFTER WEIGHING BOTH PARTIES' VALUATIONS UNDER THE *GEORGIA-PACIFIC* FACTORS. ....47

A.    LIBERTY'S 2010 LICENSE TO THE ARMY WOULD HAVE BEEN BARE AND NON-EXCLUSIVE. ......................................49

B.    A *DE FACTO* EXCLUSIVE LICENSE WOULD REDUCE THE ROYALTY RATE. ......................................................51

C.    LIBERTY'S UNSUPPORTED "MARKET RISK" ARGUMENT IS NOT PROBATIVE....................................................52

V.    THE TRIAL COURT LACKED JURISDICTION TO AWARD A PROSPECTIVE ROYALTY UNDER SECTION 1498. ...................53

VI.    LT. COL. DEAN LACKED ACTUAL AUTHORITY TO SIGN AN NDA ON BEHALF OF THE GOVERNMENT.................................57

A.    LT. COL. DEAN LACKED IMPLIED ACTUAL AUTHORITY TO SIGN NDAS BECAUSE THAT ACTIVITY WAS NOT "INTEGRAL" TO ANY OF HIS DUTIES.........................................................58

B.    LT. COL. DEAN'S TITLE DOES NOT ESTABLISH THAT HE OR ANYONE ELSE IN HIS OFFICE HAD IMPLIED ACTUAL AUTHORITY..............................................................61

CONCLUSION ...................................................................................................62

# TABLE OF AUTHORITIES

## Cases

*ABT Sys., LLC v. Emerson Elec. Co.*,
   2015 WL 4924160 (Fed. Cir. Aug. 19, 2015) ...............................................45

*Agrizap, Inc. v. Woodstream Corp.*,
   520 F.3d 1337 (Fed. Cir. 2008) ...................................................................45

*Boeing Co. v. United States*,
   86 Fed. Cl. 303 (2009) ................................................................................15

*Brunner v. United States*,
   70 Fed. Cl. 623 (2006) ......................................................................... 60, 61

*City of El Centro v. United States*,
   922 F.2d 816 (Fed. Cir. 1990) .....................................................................57

*Council for Tribal Emp't Rights v. United States*,
   112 Fed. Cl. 231 (2013),
   *aff'd*, 556 Fed. Appx. 965 (Fed. Cir. 2014) .................................................58

*Cruz-Pagan v. United States*,
   35 Fed. Cl. 59 (1996) ..................................................................................15

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ...................................................................30

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
   851 F.2d 1387 (Fed. Cir. 1988) ........................................................... 45, 46

*Dippin' Dots, Inc. v. Mosey*,
   476 F.3d 1337 (Fed. Cir. 2007) ........................................................... 20, 21

*Dow Chem. Co. v. Nova Chems. Corp.*,
   2015 WL 5060947 (Fed. Cir. Aug. 28, 2015) ..............................................30

*eBay, Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) .....................................................................................54

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
   227 F.3d 1361 (Fed. Cir. 2000) ...................................................................47

*Exxon Res. & Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001) ....................................................25

*Fed. Crop Ins. Corp. v. Merrill*,
    332 U.S. 380 (1947)............................................................... 57, 58

*Finnigan Corp. v. U.S. Int'l Trade Comm'n*,
    180 F.3d 1354 (Fed. Cir. 1999) ....................................................27

*Flexfab, LLC v. United States*,
    62 Fed. Cl. 139 (2004),
    *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005)...........................................59

*Ga.-Pac. Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970),
    *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971) .........................16

*Gaylord v. United States*,
    98 Fed. Cl. 389 (2011),
    *rev'd and remanded*, 678 F.3d 1339 (Fed. Cir. 2012)...................56

*Gaylord v. United States*,
    678 F.3d 1339 (Fed. Cir. 2012) ....................................................55

*Gaylord v. United States*,
    777 F.3d 1363 (Fed. Cir. 2015) ........................................... 15, 56

*Graham v. John Deere Co. of Kan. City*,
    383 U.S. 1 (1966)..........................................................................40

*H. Landau & Co. v. United States*,
    886 F.2d 322 (Fed. Cir. 1989) ......................................................59

*Hughes Aircraft Co. v. United States*,
    86 F.3d 1566 (Fed. Cir. 1996),
    *vacated on other grounds*, 520 U.S. 1183 (1997) .......................16

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ......................................................50

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ......................................................42

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982)......................................................................56

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014),
    *petition for cert. filed*, 83 U.S.L.W. 3873 (U.S. May 15, 2015)
    (No. 14-1362) ................................................................... 29, 30

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004) ..................................................47

*Irving Air Chute Co. v. United States*,
    93 F. Supp. 633 (Ct. Cl. 1950)............................................... 54, 55

*KSR Int'l Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007)............................................................. 41, 42

*Leesona Corp. v. United States*,
    599 F.2d 958 (Ct. Cl. 1979) .......................................................53

*Leonardo v. United States*,
    63 Fed. Cl. 552 (2005),
    *aff'd*, 163 Fed. Appx. 880 (Fed. Cir. 2006)........................... 61, 62

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996) ....................................................28

*Moleculon Res. Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed. Cir. 1986) ..................................................22

*Monarch Assurance P.L.C. v. United States*,
    244 F.3d 1356 (Fed. Cir. 2001) ..................................................15

*Motorola, Inc. v. United States*,
    729 F.2d 765 (Fed. Cir. 1984) ....................................................53

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)................................................................29

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ..................................................27

*Office of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990)............................................................................58

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
   778 F.3d 1021 (Fed. Cir. 2015) ........................................................32

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ........................................................43

*Pitcairn v. United States*,
   547 F.2d 1106 (Ct. Cl. 1976)..................................................... 54, 55

*Promega Corp. v. Life Techs. Corp.*,
   773 F.3d 1338 (Fed. Cir. 2014) ........................................................20

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
   717 F.3d 929 (Fed. Cir. 2013) ..........................................................32

*Roy v. United States*,
   38 Fed. Cl. 184 (1997)......................................................................58

*Sage Prods., Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420 (Fed. Cir. 1997) ........................................................27

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) ........................................................27

*Shire Dev., LLC v. Watson Pharms., Inc.*,
   787 F.3d 1359 (Fed. Cir. 2015) ........................................................17

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
   926 F.2d 1161 (Fed. Cir. 1991) ........................................................16

*Spectrum Int'l, Inc. v. Sterlite Corp.*,
   164 F.3d 1372 (Fed. Cir. 1998) .................................................. 21, 22

*Standard Mfg. Co., Inc. v. United States*,
   42 Fed. Cl. 748 (1999)......................................................................52

*Tektronix, Inc. v. United States*,
   552 F.2d 343 (Ct. Cl. 1977)..............................................................48

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) ...................................................40

*Telenor Satellite Servs., Inc. v. United States*,
    71 Fed. Cl. 114 (2006) .................................................................60

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015)...................................................................16

*Tracy v. United States*,
    55 Fed. Cl. 679 (2003).................................................................58

*Trauma Serv. Grp. v. United States*,
    104 F.3d 1321 (Fed. Cir. 1997) ..................................................57

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ..................................................52

*United States v. Nordic Vill., Inc.*,
    503 U.S. 30 (1992).......................................................................54

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948)............................................................. 16, 52

*Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ............................................ 51, 52

*Wright v. United* States,
    53 Fed. Cl. 466 (2002).................................................................51

## Statutes

28 U.S.C. § 1498.................................................................................53

35 U.S.C. § 112............................................................................ 23, 28

35 U.S.C. § 271.................................................................................54

# TABLE OF ABBREVIATIONS

### *Parties*

| | |
|---|---|
| Government | Defendant-Appellant, the United States |
| Liberty | Plaintiff-Cross-Appellant, Liberty Ammunition, Inc. |

### *Patent-in-suit*

| | |
|---|---|
| '325 patent | U.S. Patent No. 7,748,325 B2 (issued to Marx) |

### *Other Entities*

| | |
|---|---|
| ARL | Army Research Laboratory |
| Army | U.S. Army |
| ATK | Alliant Techsystems Inc. |
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| DEA | U.S. Drug Enforcement Agency |
| DCD | Directorate of Combat Development |
| LCAAP | Lake City Army Ammunition Plant |
| NATO | North Atlantic Treaty Organization |
| PM-MAS | Program Manager-Maneuver Ammunition Systems |
| SOCOM | U.S. Special Operations Command |
| Trial court | United States Court of Federal Claims |
| USAMU | U.S. Army Marksmanship Unit |

### *Prior Art*

| | |
|---|---|
| Cooke reference | U.S. Patent No. 6,817,299 B1 (issued to Cooke) |

| Leussler '416 patent | U.S. Patent No. 1,967,416 (issued to Leussler) |
| McElroy '879 patent | U.S. Patent No. 6,973,879 B1 (issued to McElroy *et al.*) |
| Nosler '420 patent | U.S. Patent No. 3,003,420 (issued to Nosler) |

### *Brief References*

| DBr. | Citation to Brief of the Defendant-Appellant, the United States |
| PBr. | Citation to Plaintiff-Cross-Appellant Liberty Ammunition, Inc.'s Brief in Opposition to the Government's Appeal and in Support of Liberty's Cross-Appeal |

### *Exhibit References*

| (__:__) | Column and line number of cited patents |
| A___ | Citation to joint appendix |
| PTX | Plaintiff's Trial Exhibit |

### *Other Abbreviations*

| A1 projectiles | M855A1 and M80A1 small-arms projectiles |
| CEO | Chief Executive Officer |
| EPIC | Enhanced Performance Incapacitative Composite |
| F.A.R. | Federal Acquisition Regulations |
| NDA | Non-Disclosure Agreement |
| SBIR | Small Business Innovative Research |
| TCM-Ranges | Training and Doctrine Command (TRADOC) Capability Manager-Ranges |

## STATEMENT OF CROSS-APPEAL ISSUES

In showing contractual authority, the plaintiff must present factual evidence sufficient to establish that the government agent had express or implied actual authority to bind the government in contract. In determining patent damages under section 1498, a trial court conducts a fact-specific analysis to determine "reasonable and entire compensation" for the government's use and/or manufacture of the claimed invention. This Court reviews such factual determinations for clear error.

Accordingly, the following issues are presented on cross-appeal:

1.     Did the trial court clearly err in finding that a government agent lacked implied actual authority to bind the government through an NDA by determining that signing NDAs was not "integral" to the agent's duties in interacting with industry representatives?

2.     Did the trial court clearly err in finding a reasonable royalty rate of 1.4 cents per round based on a hypothetical negotiation for a bare, nonexclusive license, having carefully weighed expert testimony based on the *Georgia-Pacific* factors?

## STATEMENT OF RELEVANT FACTS

Seeking to market ammunition he had recently developed, PJ Marx, the inventor of the '325 patent, first met with Paul Riggs, a PM-MAS engineer, at

Picatinny Arsenal on February 16, 2005. DBr. 15. At the meeting, Mr. Marx, a novice ammunition developer, showed Mr. Riggs a sample 100-grain, tungsten-based EPIC projectile[1] that featured an abbreviated interface and annular grooves, like those depicted on the cover of the '325 patent. DBr. 17.

As a participant in the Green Ammunition Program, Mr. Riggs noted several deficiencies in Mr. Marx's bullet as a potential solution. He explained that at 100 grains,[2] the EPIC projectile was too heavy, as the weight had to be similar to the M855 to be a "ballistics match" for existing weapon systems. DBr. 16 (citing, *inter alia*, A11326 (Riggs)). Mr. Riggs further explained that Mr. Marx's bullet would be difficult to manufacture on a large scale. A12100-03 (Riggs).

### A.    Ft. Benning NDA Signed By Lt. Col. Dean

Mr. Marx nonetheless traveled to Ft. Benning the very next day and met with Lt. Col. Glenn Dean, Chief of the Small Arms Branch of the DCD, and John Amick, a civilian contractor assisting Dean. DBr. 16. At Marx's request, all three signed an NDA. A13023-25; A6 (citing A10319-20 (Marx)). The stated purpose of the NDA was to "enable the Parties to advance their efforts in the current or potential business of marketing defense related products." A13023 (¶1.3). After

---

[1]    As with the government's opening brief, this brief also uses the terms "bullet" and "projectile" interchangeably. Also, this brief identifies a bullet with a ready-to-fire cartridge case as a "round." *See* DBr. 5 n.2.

[2]    "Grain" is a unit of weight measurement frequently used in the art of small-arms ammunition.

signing the NDA, Mr. Marx provided fifty fully-loaded EPIC rounds and a sample EPIC projectile (previously shown to Mr. Riggs), along with bullet-velocity test results.  A10361 (Marx); A10491-92 (Amick); A10066-71 (Dean); DBr. 17.  Mr. Marx left the EPIC rounds at Ft. Benning for Army testing, but retained the copy of his test data.  DBr. 17.

### B.     Lt. Col. Dean's Duties When NDA Was Signed

At that time, Lt. Col. Dean was serving as Chief of the Small Arms Branch of the DCD at Ft. Benning and as part of his duties he frequently interacted with industry representatives regarding potential new technologies that could be useful for soldiers.  A10119, A10129-30 (Dean).  In his role, Lt. Col. Dean was not a contracting officer, did not have a contracting warrant, and did not interact with contracting officers.  A10131-32 (Dean).

Lacking expertise in designing ammunition, A10118-19, Lt. Col. Dean's primary duty was drafting requirements for developers of Army weapon systems based on his evaluation of the needs of soldiers and the technological capabilities existing in industry.  A10048-49 (Dean); *see also* A10488 (Amick).  While industry representatives frequently showed their proprietary and confidential information to Lt. Col. Dean, only rarely did he sign an NDA.  A10129-31 (Dean). Lt. Col. Dean testified that he signed less than five NDAs in his two years as Chief.

A10131 (Dean).  Mr. Amick's experience was similar.  A10475-76, A10499-501

(Amick).

After meeting with Mr. Marx, Lt. Col. Dean wrote an email to a number of

small-arms developers within the Army and SOCOM, seeking to interest them in

the EPIC technology.  A13032; A7.  While Lt. Col. Dean suggested that the EPIC

projectile be considered an "alternative" within the ongoing Green Ammunition

Program, he also recognized that the round would need to receive further

evaluation.  *Id.*

By the time of Marx's February 2005 meetings, the Army (along with

LCAAP-contractor ATK) had already completed Phase I of the Green Ammunition

Program, an effort to address "erratic flight" problems associated with the M855

LFS projectile, in which the Army replaced the lead slug of the M855 with a

tungsten-based material (but did not otherwise alter the round's structure).[3]  *See*

A13951 (showing alternative slug materials); DBr. 6-7.  While manufacturing

issues causing the flight problem were resolved, tungsten was becoming too

expensive and improving the lethality of the M855 was becoming a priority.  DBr.

6-7.  Thus, the Army began formulating a new Phase II program to completely

redesign the M855.  *Id.*

---

[3]    While generally described as a lead slug, the M855 slug is actually
composed of a lead-antimony alloy.  A13951; A15779 (1:49).

The Army was considering industry involvement in the upcoming Phase II program at the time of Dean's email, but it ultimately decided a few months later to proceed with an Army-ATK-only effort. DBr. 9. By August 19, 2005, the Army, led by ARL engineer Dr. James Newill, had generated formal drawings of Concept 2 (also known as Concept B).[4] DBr. 11. Concept B featured the basic structure and materials seen in the final design of the M855A1. DBr. 11-12.

### C.    Testing of EPIC Rounds

The EPIC projectiles were not tested until the USAMU shot ten test rounds in early November 2005. A15193-94. Though Liberty does not address these results, the EPIC projectiles tested poorly in terms of muzzle velocity, accuracy, and hard-target capability. DBr. 18; A11.

### D.    SOCOM and SBIR Contracts

Following these disappointing test results, Mr. Marx had few contacts with the Army but instead began focusing his efforts on SOCOM. DBr. 18-19. These efforts ultimately led to two SBIR contracts: a Phase I contract completed in 2007

---

[4]    Notebook entries from ARL engineer Dr. Joseph South evidence handwritten drawings of Concept B on August 9, 2005. A14873-77. Nevertheless, Liberty alleges such documentation is insufficient in view of Army regulations purporting to require formal laboratory notebooks. PBr. 14 n.13. This, however, ignores the many development documents cited by the government, DBr. 5-14, and testimony that the Army developers did not keep formal notebooks. A11463-64 (Newill).

and a subsequent Phase II contract, awarded in 2012 and completed just prior to trial.

### 1.    Disclosures to Tucker Campion

In May 2005, Mr. Marx was introduced to Thomas "Tucker" Campion,[5] a SOCOM contractor working to expand the existing capabilities of SOCOM weapons. A10962-63 (Campion). In their initial conversation, Mr. Marx explained that he was working on a heavier (greater than 90-grain) projectile. Mr. Campion wanted to write a SBIR topic that would lead to a contract for Mr. Marx. A10963-64 (Campion).

After Mr. Campion signed an NDA on June 23, 2005, A14444-46, Mr. Marx shared details of his EPIC technology. While Liberty characterizes this as a "full disclosure," PBr. 12, it does not describe what was actually provided. On August 4, 2005, Mr. Campion reported that he "just got [his] hands on the Liberty Ammunition 115gr 5.56 mm round . . . . [featuring] a sintered tungsten heavy alloy . . . with a 316 bronze jacket." A13494-95; A10981-82 (Campion). Like the rounds provided to Ft. Benning, this sample projectile featured an open-ended interface with annular grooves, a design "very similar" to that depicted on the cover of the '325 patent. A10354 (Marx). At 115 grains, however, this design was

---

[5]    Mr. Campion is frequently referred to by his nickname, "Tucker." A10948.

even heavier than earlier EPIC prototypes. *Id.* Mr. Campion later obtained data on the projectile, called the EPIC 115, and shared it with Army contacts. A13920-22; A14436-42.

### 2.    Phase I SBIR Proposal and Eventual Contract

Assisted by Mr. Campion, Mr. Marx ultimately submitted a proposal for a Phase I SBIR contract on January 13, 2006, which again described projectiles like those disclosed previously to the Army and Mr. Campion. DBr. 19 (citing A14447-72). While Liberty alleges that the Army copied designs provided in the SBIR proposal, PBr. 13-15, the evidence does not support this. Each and every design described in the proposal features an abbreviated interface that fails to reach either end of the projectile, and many further include annular grooves.[6] A14447-72. Moreover, the projectiles are described as exhibiting yaw-dependent performance. A14451 (describing gel shot as suggesting "yaw-induced" fragmentation), A14465 (describing bullet that "tumbles and breaks"); A10380-81, A10384-86 (Marx).

In contrast, the Army, during the same time period, was already making and testing reverse-jacketed Concept B prototypes that featured the yaw-independent

---

[6]    This includes the drawing of the 62-grain EPIC projectile referenced in Liberty's briefing. PBr. 12; A14457-59 (Figures 9, 10). Typically, the proposal highlighted heavier embodiments, including the EPIC 116, the 116-grain projectile ultimately tested under the contract. DBr. 19 n.13; A14473-530.

performance of the eventual M855A1.  By the time Dr. Newill reviewed the SBIR proposal on July 31, 2006, PBr. 13, testing of the Concept B projectiles had been completed.  DBr. 11.

### 3.    Phase II SBIR Contract

Liberty's successful efforts towards an eventual Phase II SBIR contract began with a demonstration to SOCOM employee John Bennett on September 8, 2010.  A15346.  By this time, which post-dates the fielding of the M855A1, DBr. 20, Liberty was demonstrating very different projectiles than those used in its Phase I contract.  A13946-47.  Specifically, Liberty demonstrated 4.6 mm caliber projectiles that featured "a reverse drawn copper jacket, a copper core, and a steel penetrator."  A13946.

After this demonstration, SOCOM guided Liberty to a successful Phase II SBIR proposal that related to the same 4.6 mm caliber pistol ammunition, a caliber for which SOCOM was unsatisfied with its suppliers.  A10780-81, A10790-91 (Bennett); A10390-91 (Marx); A15338, A15346.  The Phase II contract was awarded on March 26, 2012, and completed in 2013.  A15347; A10343-47 (Marx).

### E.    Liberty's Disclosures to ATF

Liberty also points to a December 24, 2012 letter, A14421-24, from Earl Griffith, Chief of the Firearms Technology Branch of the ATF to a Liberty representative as evidence of a Liberty design closely resembling the M855A1.

PBr. 16.  This letter denied Liberty's request, A14409-20, that their 5.56 mm rounds not be classified as "armor-piercing" ammunition, which would preclude commercial sales.  A14421-24.  Analyzing Liberty's attached drawings of a 62-grain reverse-jacket bullet, Mr. Griffith concluded that the Liberty bullet "closely duplicate[s] the design and materials used in the . . . M855A1 . . . ."  A14422.  Like the Phase II SBIR documents, this disclosure post-dates the fielding of the M855A1 in June 2010.  DBr. 12.

Mr. Griffith's decision to classify the ammunition as armor piercing was based merely on the fact that it (i) had a substantial steel core and (ii) could be loaded in a handgun.  A14423-24; A10742-43 (Griffith).  His analysis was strictly limited to those factors.  A10747-48 (Griffith) (recognizing designs were not identical).[7]

### F.    Manufacture of A1 Projectiles

The government began large-scale manufacture of the M855A1 in 2010. Since that time, the Army has chiefly manufactured the M855A1 round at LCAAP, a government-owned, contractor-operated (presently ATK) facility in Independence, Missouri.  A10835-41 (McCleerey).  Additionally, a smaller proportion of M855A1 rounds are manufactured by a "second source," Olin-

---

[7]    Indeed, the dimensions of the Liberty bullet and its components differ significantly from the M855A1.  A14419; A13563.

Winchester Corporation (Olin), at Olin's own facilities. A17731-35; A10897 (McCleerey). The government had ordered approximately 1.2 billion M855A1 rounds by the time of trial in 2014. A17738 (including orders predating issuance of the '325 patent); A10851-59 (McCleerey) (explaining PTX 49).

At the time of trial, the M80A1 was being qualified and had not been manufactured on a large scale. DBr. 14. Nevertheless, the court considered infringement of the M80A1 based on a small qualification order that was executed in February 2014. A15910-17. The Army anticipates that the M80A1 will also be manufactured at LCAAP and Olin.

## SUMMARY OF ARGUMENT

In February 2011, Liberty sued in the Court of Federal Claims, alleging that the government (i) infringed the '325 patent and (2) breached three NDAs executed with the patent's inventor, PJ Marx.[8] At trial, Liberty ultimately prevailed on its patent infringement claim, but not its breach-of-contract claim. The court awarded damages based on a 1.4 cent per-round-royalty, for both past and future manufacture of the A1 projectiles. Liberty, in its cross-appeal, is

---

[8]     Though Liberty assented to the government's Statement of the Case, PBr. 4, the government has identified two date errors. Liberty filed suit on February 8, 2011, not February 25. DBr. 3; A64. Also, the court's *Markman* decision issued on June 7, 2013, not June 13. DBr. 3; A65.

challenging a number of specific factual findings relating to contractual authority and damages, all supported by considerable evidence.

Regarding damages, Liberty appeals the trial court's determination that a cost savings (baseline royalty rate) of 5 cents per round should be reduced to 1.4 cents per round as the awarded reasonable royalty rate for the patented technology. According to the court, this adjustment was warranted because Liberty could have only offered a bare, nonexclusive license in the hypothetical negotiation. In other words, the Army would have to generate substantial know-how and manufacturing expertise to apply the technology to a particular product and would only need a nonexclusive license. The trial court's finding rests on the well-established view that a reasonable royalty under section 1498 is for a bare, nonexclusive license under the patent.

Though not asserted at trial, Liberty now argues that the hypothetical license would not be bare. Even if this argument was not waived, Liberty offers no evidence supporting the position that it had requisite know-how or expertise to provide the government. In particular, Liberty fails to acknowledge that it was a small company focused on licensing its technology in 2010, the time of the hypothetical negotiation.

As a fallback position, Liberty also argues the license was *de facto* exclusive as it could not sell its ammunition commercially in the United States. This

argument ignores that Liberty could have sold to foreign entities, and that a limited

U.S. market, in fact, weighs in favor of a lower royalty rate.

Regarding its breach of contract claim, Liberty appeals the court's finding

that Lt. Col. Dean, as Chief of the Smalls Arms Branch of the DCD, did not have

implied actual authority to sign an NDA.  Though Liberty asserts that the trial

court improperly relied on only evidence of Dean's lack of express contractual

authority, the court *also* found that signing NDAs was *not integral* to Dean's duties

in evaluating new technologies for soldiers.  In his frequent interactions with

industry representatives, Dean only signed a few NDAs during his two-year tenure.

Accordingly, Liberty failed to meet its burden of proof.

In responding to issues raised by the government's appeal, Liberty

frequently misstates the applicable law and fails to address critical issues.

Regarding infringement, Liberty fails to properly address issues raised regarding

the construction of the claim terms "intermediate opposite ends," "reduced area of

contact," and "controlled rupturing."

For "intermediate opposite ends," Liberty reads the word "intermediate" out

of the claim based on the open transition term "comprising."  Yet this Court has

repeatedly rejected this argument in other cases.

For "reduced area of contact," a term of degree in independent claim 1,

Liberty fails to address issues of definiteness under section 112, thereby leaving

the limitation's boundaries uncertain. Accordingly, Liberty can offer no principled

reasons for how the M855A1 can meet the limitation when its contact area is

significantly greater than the predecessor M855. The M855 is the only example in

the specification of a traditional jacketed lead bullet (the very type of bullet for

which the patentee sought to reduce contact area). Similarly, Liberty cannot

explain how the M80A1 meets the limitation when its contact area is significantly

greater than the leaded 7.62 mm caliber predecessor, the M80.

For "controlled rupturing," Liberty fails to acknowledge that "rupturing" due

to "tumbling" is not merely a description in the '325 patent. Rather, it is put forth

as the "present invention," and in light of repeated specification disclosures, should

be limiting. Likewise, Liberty misinterprets the Cooke reference, distinguished in

prosecution as not disclosing "controlled rupturing" responsive to impact. In

Liberty's view, Cooke only discloses interface "rupturing" not responsive to

impact. But, in fact, the outer surface of the Cooke projectile "ruptures" due to

explosive detonation that occurs only after "target penetration." Thus, the prior art

falls within the court's construction, which permits "rupturing" by any means.

Regarding validity, Liberty again fails to properly compare the disclosures

of the government's principal prior-art references (the Leussler '416 patent, the

Nosler '420 patent, and the M855/M855 LFS projectiles as described in the

McElroy '879 patent) to the court's construction of "controlled rupturing." Liberty

alleges that Leussler and Nosler projectiles flatten or "mushroom" on impact, but do not break apart. But these references clearly disclose embodiments where the outer jacket (interface) of the projectile fails, leading to separation or dispersal of the nose portion. Thus, both meet the requirements of the court's construction of "controlled rupturing," even though "mushrooming" itself is an unclaimed feature.

Liberty further argues that the government failed to prove that "controlled rupturing" was inherent in the performance of the M855/M855 LFS, even though explicitly shown in the McElroy '879 patent. Specifically, McElroy explains that the M855 projectile breaks up on impact due to the "intrinsic weakness" of the projectile's jacket (interface).

Liberty, like the court, also fails to apply the proper legal framework to its obviousness analysis. While Liberty notes that the court cited law setting forth the post-*KSR* test of obviousness, the trial court's overly rigid analysis evidences that it strictly applied the teaching-suggestion-motivation test and used the perspective of the inventor, Mr. Marx, and not one of ordinary skill in the art. Both are inconsistent with *KSR*. As a result, Liberty, like the trial court, fails to consider the specific motivations to combine references offered by the government's expert for each asserted claim.

Finally, Liberty offers no meaningful arguments for why the trial court had jurisdiction to award prospective relief under the waiver of sovereign immunity

provided by section 1498.  Instead, Liberty argues by analogy to private litigation

under section 271 or misinterprets section 1498 cases only involving the award of a

royalty for past government activities.

## ARGUMENT

### I.    STANDARDS OF REVIEW

The Federal Circuit reviews legal conclusions by the Court of Federal

Claims *de novo* and reviews its factual findings for clear error.  *Gaylord v. United

States*, 777 F.3d 1363, 1367 (Fed. Cir. 2015) (citations omitted).  Though Liberty

did not identify any standards of review for its cross-appeal, the issues raised are

purely factual and should be reviewed for clear error.

A determination of contractual authority is an issue of fact, for which

Liberty bears the burden of proof.  *See Monarch Assurance P.L.C. v. United States*,

244 F.3d 1356, 1360-61 (Fed. Cir. 2001).  Here, the central issue is whether the

government agent possessed implied actual authority to enter into an NDA (the

contract-at-issue), a factual determination of whether signing NDAs was "integral"

to the agent's duties.  *See Cruz-Pagan v. United* States, 35 Fed. Cl. 59, 61 (1996).

Likewise, the determination of a reasonable royalty "requires a highly case-

specific and fact-specific analysis . . . ."  *Boeing Co. v. United States*, 86 Fed. Cl.

303, 311 (2009).  To calculate a royalty rate, the court analyzed the factors

specified in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116,

1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971). For this analysis, the royalty rate can only be overturned where this Court is "left with the definite and firm conviction that a mistake has been made." *Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1571 (Fed. Cir. 1996) (citing *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991) and quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)), *vacated on other grounds*, 520 U.S. 1183 (1997).

Liberty does address the standard for reviewing claim constructions challenged in the government's appeal. It argues that the trial court's constructions should be given deference under *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015), as the court reached certain conclusions "based upon evidence submitted by the parties' experts during claim construction proceedings and related briefing." PBr. 31 n.19. While the parties did present extrinsic evidence on the disputed limitations, the trial court nonetheless stated that "[n]o extrinsic evidence is necessary for resolution of claim construction for the '325 patent."[9] A63. Accordingly, deference is not triggered simply because the parties presented

---

[9]    The trial court did cite to Liberty's attorney arguments in discussing the "controlled rupturing" limitation, A53-54 & 54 n.7 (citing, *inter alia*, A637). But the court further explained that the patent's described embodiments amply supported the "inference[s]" asserted by Liberty. A53-54.

extrinsic evidence. *See Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1364-65 (Fed. Cir. 2015).

## II.     THE A1 PROJECTILES DO NOT INFRINGE UNDER PROPER CONSTRUCTIONS OF THE "INTERMEDIATE OPPOSITE ENDS," "REDUCED AREA OF CONTACT," AND "CONTROLLED RUPTURING" LIMITATIONS.

The A1 projectiles do not infringe any asserted claim based on the construction of three limitations included in independent claims 1 and 32 of the '325 patent.  Claim 1 requires an interface that "defines a reduced area of contact" of the projectile with the firearm's rifling.  Claim 32 requires an interface that is "disposed intermediate opposite ends" of the projectile body.  *See* DBr. 23-24.  Additionally, both independent claims require an interface that is "structured to provide controlled rupturing," which leads to separation of the nose and tail portions of the claimed projectile.  Based on improper constructions, the trial court's infringement ruling should be reversed because the A1 projectiles do not meet *two limitations* in each independent claim, and thus, each asserted claim.[10]

---

[10]     Because the government only alleged that the A1 projectiles did not meet the "reduced area" and "intermediate opposite ends" limitations at trial, Liberty insinuates that they are the only limitations-at-issue for infringement.  PBr. 26-27, 33-34.  This is misleading.  Based on the court's broad construction during *Markman* proceedings, the government did not argue at trial that the A1 projectiles met the "controlled rupturing" limitation.  DBr. 49 (citing A15165-66 (¶¶82-84)).

### A.    Open Transitional Language Does Not Permit Reading "Intermediate" Out of the Claim.

In its *Markman* decision, the trial court construed the term "intermediate opposite ends" to mean that "the interface is positioned between or in the middle of the opposite ends of the forward end of the nose portion and the trailing end of the tail portion." A62.  In turn, the court's decision rejected the government's proposed construction that required the interface to be "positioned between the front end and the rear end of the projectile body (such that the interface does not extend all of the way to the front or to the end of the projectile)." A61.  The court explained that this "explicit limitation" was "not warranted," but nonetheless vaguely stated that the language "indicates by its plain meaning an embodiment where the interface is positioned between the tail and nose, though not necessarily enclosing the tail or nose." *Id.*; *see also* DBr. 34-35.

At trial, the government contended that the A1 projectiles did not meet the limitation because the A1 reverse jackets (1) enclose the rear of the projectile and (2) extend over two-thirds of the projectile length, leaving only a portion of the penetrator (nose portion) exposed.  DBr. 35 (citing A12231-34 (Kitchens)).



**Diagram of the M855A1.  A13 (displaying engineering drawing on A13563).**

The unitary reverse jackets of the A1 projectiles are simply not "intermediate" in

any way, and the limitation should not be construed to permit the interface to reach

either end of the projectile.  *See* DBr. 35; *see also* A14 (displaying M80A1

engineering drawing provided at A14782).

    After trial, however, the court explicitly ruled that "intermediate opposite

ends" only requires the projectile's interface to cover the middle portion of the

projectile and, in turn, can extend to enclose one or both projectile ends.  A20-21.

In the court's view, the inclusion of the open transition term "including"[11] just

prior to the language "intermediate opposite ends" permits the inclusion of

additional interface length.  A21.

    On appeal, Liberty similarly asserts that the "open" transitional language in

claim 32 supports the trial court's understanding of "intermediate opposite ends."

PBr. 27.  Rather than focusing on the term "including," Liberty makes the same

arguments based on the language "comprising" in the preamble of claim 32.  PBr.

---

[11]    The language of claim 32 also employs the open transition term
"comprising" in its preamble.

27-29. Specifically, Liberty argues that this transitional language permits "additional dispositions of the interface," or in other words, additional interface length. PBr. 27 n.16.

Liberty, however, misinterprets the applicable law. While "comprising" permits additional, unrecited elements to the claimed combination, adding length to the interface of claim 32 does not constitute an additional, unrecited element. Rather, it is an impermissible abrogation of a required claim element. In this sense, Liberty incorrectly distinguishes this case from *Promega Corp. v. Life Techs. Corp.*, 773 F.3d 1338 (Fed. Cir. 2014), *petition for cert. filed,* 84 U.S.L.W. 3019 (U.S. Jun. 26, 2015) (No 14-1538). PBr. 27-28 n.16. In *Promega*, this Court rejected the argument that the preamble language "comprising" could expand a claim's scope "at a key limitation." *Promega Corp.*, 773 F.3d at 1350. Such language permits additional, unrecited elements, but "does not reach into each [limitation] to render every word and phrase therein open-ended." *Id.* (quoting *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007)). This is precisely what the trial court has done, by broadening the claimed "interface disposed intermediate opposite ends" to cover any and all interfaces that cover the middle of the projectile in some fashion.

Liberty likewise errs in arguing that *Dippin' Dots* and *Spectrum International* are somehow distinguishable because they "involve situations where

the patentee intentionally and specifically narrowed the term at issue." PBr. 28 &

28 n.17. Liberty argues that *Dippin' Dots* stands for the proposition that

"comprising" cannot broaden a claim term that had been narrowed during

prosecution. PBr. 28 n.17. This is an inaccurate reading, as the Court's

statements in that case were not tied to the prosecution history, but rather a

specification description of the term-at-issue.

In finding that the claim term "beads" restricted the claimed method to a

"beads-only process," the Court relied on the specification's description of beads

"as having 'smooth, spherical appearance.'" *Dippin' Dots*, 476 F.3d at 1343. The

Court then held that the term "comprising" does not render the recited claim steps

open-ended, "especially where, as here, the patentee has narrowly defined the

claim term . . . ." *Id.* Similar facts exist here, where the specification repeatedly

depicts interfaces disposed at "intermediate opposite ends" in a manner consistent

with the government's construction. *See, e.g.*, A17126, A17130-31 (Figs. 1, 4,

7).[12]

Liberty similarly asserts that the Federal Circuit in *Spectrum International,*

*Inc. v. Sterlite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998), held that the "use of

'comprising' could not reclaim subject matter given up during reexamination."

---

[12]    Similarly, the specification also describes the present invention as
eliminating "the provision of an outer jacket." A17132 (2:39-40); *see also* A17132
(1:42-43), A17134 (6:63-64), A17135 (7:39-44) (providing similar disclosures).

PBr. 28 n.17.  This is also inaccurate.  The Court actually rejected plaintiff's

arguments for a broader construction because such a construction both (1) read on

prior art asserted in the reexamination *and* (2) put "misplaced" reliance on the

transitional term "comprising."  *Spectrum Int'l*, 164 F.3d at 1379-80

(distinguishing *Moleculon Res. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir.

1986)).  Regarding the latter point, the Court made clear that "'[c]omprising' is not

a weasel word with which to abrogate claim limitations."  *Spectrum Int'l*, 164 F.3d

at 1380 (citation omitted).

Based on the same misuse of transitional language, the trial court

characterized the government's construction as importing claim limitations, A20-

21, when in reality the court's construction has removed an explicit limitation in

claim 32.  As Liberty correctly points out, certain dependent claims may

encompass interfaces that reach (and even enclose) a projectile end, but those

claims all depend from claim 1, which lacks the "intermediate opposite ends"

limitation. [13]  PBr. 9-10 (discussing claims 8-10); PBr. 20-21 (quoting A10).

Claim 32, however, specifically recites an "interface disposed [at] intermediate

---

[13]    The government also disputes Liberty's assertion that the '325 patent specifically discloses such interface embodiments.  PBr. 20-21.  The specification only discusses one interface embodiment—shown as a structure that does not stretch to either projectile end and, in turn, repeatedly described as being disposed at "intermediate opposite ends" of the projectile body.  *See, e.g.*, A17133 (4:24-29); DBr. 33.

opposite ends," an additional limitation that is essentially eliminated by the court's construction.

For these reasons, this Court should adopt the government's construction and reverse the trial court's ruling that the A1 projectiles infringe asserted claims 32 and 38-41.

### B. The Trial Court's Construction of "Reduced Area of Contact" Is Indefinite, Because It Fails to Reference the M855—the Only Example of a Traditional Jacketed Lead Projectile in the Specification.

Regarding independent claim 1, the government appeals the trial court's construction of "reduced area of contact" as meaning that "the area of contact between the interface and the rifling of the firearm is less than that of a traditional jacketed lead bullet of calibers .17 through .50 BMG." A56. The trial court nonetheless failed to reference the M855 in its construction, the only objective evidence in the specification of what constitutes a "traditional jacketed lead bullet." Accordingly, the court's construction is indefinite under the appropriate standards of 35 U.S.C. § 112, second paragraph, because it permits the patentee, in litigation, to employ whatever bullets it chooses as a yardstick for determining infringement.

For the limitation to be definite, the government's construction should be adopted: "the area of contact between the projectile and the rifling of the firearm is less than that of a traditional jacketed projectile, which includes the M855." A55.

Under this construction, the M855 is properly referenced, as it is the only example or criterion of a traditional jacketed lead projectile provided in the '325 patent. DBr. 38. Accordingly, the M855 should be the proper standard of comparison for the M855A1, a 5.56 mm bullet that is the NATO and Army successor to the M855. DBr. 39-40, 44. In turn, as the standard NATO and Army 7.62 mm bullet, the M80 should be the standard of comparison for its successor, the M80A1. DBr. 44.

Liberty opposes the government's construction on the basis that (1) the government waived this argument, and (2) the specification's reference to the M855 is somehow irrelevant to the construction of "reduced area of contact." PBr. 35-36. According to Liberty, the government has waived its proposed construction because it is asserting that the trial court's reference to "traditional jacketed" projectiles is indefinite, even though "this phrase came directly from the Government's proposed constructions." PBr. 35 (citing A55-56). Liberty further argues that "the one isolated reference to the M855 in the '325 patent's specification has nothing to do with the 'reduced area of contact' limitation." PBr. 35 n.21. Both arguments distort the government's construction and the unequivocal positions it took during *Markman* proceedings.

### 1. The Government Explicitly Argued for the Use of M855 As an Objective Standard and So Did Not Waive Its Arguments Regarding the Construction of "Reduced Area of Contact."

Liberty's "waiver" argument fails to acknowledge that the government explicitly included the M855 in its construction and detailed why it did so. The government proposed a construction that compared the area of contact to "that of a traditional jacketed projectile, *which includes the M855*." A55 (emphasis added). In its briefing, the government explained that "[b]ecause "reduced" is a term of degree, the M855 must be specifically designated as a traditional 5.56 mm projectile in the construction of a 'reduced area of contact,' in order to meet the definiteness requirement of 35 U.S.C. § 112, second paragraph." A140 (citing *Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1381 (Fed. Cir. 2001)); *see also* A129-31. The government further stated that "[b]ecause the M855A1 is the same caliber ammunition (5.56 mm) as the M855, the M855 is a proper standard for comparison in the present case."[14] A140 n.12. Government counsel reiterated this argument at the *Markman* hearing. A925-27; A1086-87 (hearing demonstratives).

---

[14] In later briefing, the government stated that "the M855A1 has a greater contact area or bearing surface than the M855, and thus does not have a 'reduced area of contact.'" A823-24 n.9 (citation omitted). At the time of the *Markman* proceedings in 2013, the M80A1 design had not been completed and thus was not addressed. DBr. 40 n.18.

In its *Markman* decision, the trial court acknowledged this aspect of the government's construction and clearly rejected it.  Noting that it excluded any reference to the M855, the court asserted that its construction was a "more precise description" than the government's proposed construction in that it was "limited to those projectiles comparable to the ones enabled by the '325 patent," namely all calibers between .17 through .50 BMG.  A56 (citing A17132 (2:28)).

At trial, both parties addressed numerous alleged "traditional jacketed lead bullets" in the 5.56 mm and 7.62 mm calibers as comparators to the accused A1 projectiles.  *See* DBr. 40.  Under the court's vague construction, the government still alleged that the M855 and the comparable M80 were the most suitable projectiles for comparison to the M855A1 and M80A1, respectively.  DBr. 44.  In its post-trial decision, the court rejected these arguments, stating that the M855 and M80 are not the "sole comparators" for the accused A1 projectiles "because the '325 patent is silent as to this additional limitation."[15]  A23.  During closing arguments, the court again acknowledged that this issue had been resolved during claim construction.  A12956-60.

---

[15]    The court ruled that Dr. Kitchens' other comparators were improper in that they were "shorts," non-military projectiles, and/or "partially jacketed," criteria omitted from the earlier construction and not discussed in the '325 patent.  A24 n.35.  Dr. Kitchens testified that his comparators were all "jacketed" as required by the court's construction, but had not considered these additional criteria used by the court.  A12201-02 (Kitchens); A15153 n.9 (citing, *inter alia*, A15967-88).

Accordingly, the government has not waived any arguments regarding its construction of "reduced area of contact."  Unlike the cases cited by Liberty, PBr. 35-36, the government is not providing "new theories" for the first time on appeal, but rather is taking the same positions presented during *Markman* proceedings. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359-60 (Fed. Cir. 2008); *cf. Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) (finding waiver for arguments first presented on appeal). Accordingly, Liberty had fair notice to address the government's arguments, which weighs against a finding of waiver.  *See Finnigan Corp. v. U.S. Int'l Trade Comm'n*, 180 F.3d 1354, 1362-63 (Fed. Cir. 1999).

### 2.    The Specification Clearly References the M855 (and Only the M855) As a Traditional Jacketed Lead Bullet.

Liberty also errs in arguing that the '325 patent's reference to the M855 has "nothing to do" with the "reduced area of contact" limitation and simply adds unjustified limitations to its construction.  PBr. 35 (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). According to Liberty, the one reference to the M855 in the '325 patent specification only relates to a discussion of the "elimination or reduction of lead" in a proposed projectile, A17132 (1:31-32), while increasing its weight.  PBr. 35 n.21.

This argument ignores that the M855 is specifically referenced as a "conventional jacketed lead projectile" in the same portion of the specification, the only such projectile discussed anywhere in the patent. A17132 (1:43). The '325 patent does then discuss an improved projectile that would have an increased weight, but with no "decrease in case volume." *Id.* (1:49-51). But the patent then discusses an "improved projectile" that "would have an exterior surface which engages the rifling along a reduced area of contact as compared to traditional projectiles." *Id.* (1:62-66). The critical relevance of the M855 to understanding the "reduced area of contact" limitation is clear.

### 3.    No Rationale Supports a Conclusion That the Trial Court's Construction Is Definite.

By taking these positions, Liberty fails to address the clear indefiniteness of the trial court's construction. Section 112, second paragraph, requires that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Accordingly, courts should construe claims to be definite. *See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996).

Nevertheless, Liberty offers no principled reasons for why the court's construction should be considered definite. In particular, Liberty does not explain how the A1 projectiles can literally infringe the "reduced area" limitation in view of undisputed evidence that: (1) the M855A1 has a 12.3% greater contact area

than the predecessor M855, and (2) the M80A1 has 24.8% and 10.3% greater contact areas, respectively, over the two variants of the leaded M80 produced by the Army. DBr. 42. Liberty also does not explain how the limitation is met by equivalents given that the claimed feature is designed to reduce barrel friction, thereby resulting in increased barrel life (*i.e.*, decreased erosion). Here, the Army deliberately increased contact area (and friction) of the A1 projectiles, thereby increasing barrel erosion by approximately 40% (M855A1) and 50% (M80A1) over their predecessors. A15227; A11396, A12018-22 (Hanzl); DBr. 14 (citing A17121-23; A12025-33 (Hanzl)).[16]

Under the trial court's ruling, it is unclear how the government could have avoided infringement (if at all). The trial court found that the A1 projectiles have a "reduced area of contact" because their contact areas are less than *a number* of jacketed bullets of the same caliber that the court deemed to be suitable for comparison. A24. Thus, the boundaries of the limitation are unclear, thereby creating an impermissible "zone of uncertainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014). As recently stated in *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014), *petition for cert. filed*, 83 U.S.L.W. 3873 (U.S. May 15, 2015) (No. 14-1362), "a term of degree fails to

---

[16]    Liberty's only equivalence arguments are based on its proposed (and rejected) construction of the "reduced area" limitation. A10608-11 (German); A17373 (¶58), A17375 (¶65).

provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'" *Id.* at 1371-72 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)). The trial court clearly relied upon litigation-inspired expert opinion in finding the "reduced area" limitation had been met. This is far from the reasonable certainty required under section 112(2). *See Dow Chem. Co. v. Nova Chems. Corp.*, No. 2014-1431, -1462, __ F.3d__, 2015 WL 5060947, *9-10 (Fed. Cir. Aug. 28, 2015).

For these reasons, this Court should adopt the government's construction and reverse the trial court's ruling that the A1 projectiles infringe asserted independent claim 1 and asserted dependent claims 2-3, 7-11, 18-20, 22, 25, and 28-31.

### C. The Trial Court Failed to Properly Construe "Controlled Rupturing" By Ignoring the "Present Invention" Language of the Specification and the Prosecution History.

The A1 projectiles also do not infringe any asserted claims under a proper construction of the "controlled rupturing" limitation, contained in both independent claims of the '325 patent. *See* DBr. 45-49. The trial court construed "controlled rupturing" to mean that "the interface portion is structured to rupture (*i.e.*, break) upon striking a target or object, separating two or more of the components of the

- 30 -

projectile."[17]  A55.  In so doing, the court rejected the portion of the government's

proposed construction that required an interface structured to "rupture" due to

"tumbling," *e.g.* in a yaw-dependent manner.[18]  A53.

Under the court's construction, interface rupturing can occur by any

mechanism, "through bursting, dislocating, or other action, even in the absence of

a tumbling motion."  A54.  This construction, however, runs counter to the

language of the specification and the prosecution history.  Specifically, the

patentee characterized interface "rupturing" due to "tumbling" as the "present

invention" in the specification, and in prosecution, distinguished "controlled

rupturing" from prior-art mechanisms for interface breakup encompassed by the

court's construction.  DBr. 46-49.

### 1.     The Specification Characterizes "Rupturing" Due to Tumbling As the "Present Invention."

The exact language "controlled rupturing" appears only in the claims of the

'325 patent, but the specification extensively discusses how interface "rupturing"

occurs in the patented projectile.  Specifically, the patent repeatedly describes how

---

[17]     In some instances, both parties have misstated the trial court's construction by adding the word "apart" after the word "break."  DBr. 45, 48; PBr. 30 (chart).  "Apart" does not appear in the court's construction.

[18]     Both the government's and the trial court's construction required "controlled rupturing" to lead to separation of the bullet components.  The government's construction specified that the nose and tail portions must separate, consistent with the language of claims 1 and 32.  A53.

"rupturing" occurs after penetration and "tumbling," and the specification discloses no other mechanisms to facilitate separation of the bullet components. A17125 (Abstract), A17134 (5:17-21). Most importantly, the "Summary of the Invention" states that "when the projectile body *of the present invention* penetrates a soft material target it begins to *'tumble' typically resulting in the interface rupturing*." A17133 (3:5-7) (emphases added).

Arguing that the government is importing limitations from the specification, Liberty asserts that these disclosures represent "a generalized observation of events on impact, not a specific limitation." PBr. 32. This ignores, however, the significance of the "present invention" language. Liberty correctly states that there was no requirement that the '325 patent disclose or claim "a specific rupturing mechanism," PBr. 32. Nevertheless, "[w]hen a patentee 'describes the features of the 'present invention' as a whole,' he alerts the reader that 'this description limits the scope of the invention.'" *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015) (quoting *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013)). That is the case with "controlled rupturing."

Rather than address the "present invention" language, Liberty only cites to the patent's discussion of an interface embodiment that "ruptures upon striking the target and/or during the tumbling procedure." PBr. 32 (quoting A17134 (5:25-

26)).  As previously discussed, however, both parties' experts agree that this passage only describes one mechanism:  "rupturing" due to tumbling.  DBr. 47 (citations omitted).  As Liberty's expert, Dr. Randall M. German, testified, a "bending" moment can create "rupturing" (i) due to tumbling after penetration or (ii) due to "a hit at an angle to a target" (such as a hard target).  A554-56.  Thus, though a bullet is structured to rupture by tumbling, rupturing may nonetheless occur very quickly "upon striking the target" at certain angles of impact.  A570-71; A196 (¶17).  Thus, the cited passage is consistent with the government's construction.

### 2. The Cooke Reference Discloses an Interface That Breaks Up on Impact, but Without Tumbling.

The government's construction is further supported by the prosecution history.  To obtain allowance of the claims, the patentee distinguished the Cooke reference, A181-85, from the pending claims by asserting that Cooke did not describe "controlled rupturing responsive to impact."  A17318-19.  Cooke discloses an interface (a casing labeled "main body section **14**," A184 (2:53-56)), which fragments into consistently sized pieces upon target penetration and detonation of explosive material (contained within the casing).  DBr. 48 (citing A184 (1:58-61), A185 (3:36-43)).  This indicates that "controlled rupturing" does not encompass any interfaces structured to "rupture" without tumbling.

Liberty, however, contends that Cooke was distinguished on the basis that it discloses "controlled rupturing responsive to detonation of the explosive material," rather than "responsive to impact." PBr. 33. This is incorrect. Cooke specifically discloses and claims an interface (casing) with threaded sleeves that fragment in a controlled manner only after launch *and target penetration*. A185 (3:38-43); A185 (4:7-13) (claim 1). Thus, while detonation is the immediate cause of fragmentation, it nonetheless occurs in response to target impact.[19]

## III. IF INFRINGED, THE ASSERTED CLAIMS ARE OBVIOUS BASED ON A COMPARISON OF THE PRIOR ART TO THE "CONTROLLED RUPTURING" LIMITATION AND UNDER THE CURRENT LAW OF OBVIOUSNESS.

We also appeal the trial court's decision that the asserted claims are nonobvious. The government's appeal is based on the trial court's errors (1) in applying its construction of "controlled rupturing" too narrowly and ignoring clear prior-art disclosures of it, and (2) in evaluating obviousness improperly by rigidly applying the teaching-suggestion-motivation test and by using the perspective of the inventor, rather than a person of ordinary skill. *See generally* DBr. 49-63.

---

[19]    While the mechanism to detonate the explosive material is not disclosed, A184 (2:59-62), Dr. Clarence W. Kitchens, Jr., an expert in terminal ballistics (A14902-15), stated that "it would typically occur as the result of employing a fuse that would function after sensing target impact, target proximity, deceleration history, time, or altitude." A199 (¶24).

### A.    The Trial Court Improperly Considered the Government's Primary Prior-Art References in Applying Its Construction of "Controlled Rupturing."

In challenging the nonobviousness ruling, the government has appealed the trial court's decision that none of the government's three chief prior-art references disclose an interface that is "structured to provide controlled rupturing." Specifically, the trial court improperly found that the Leussler '416 patent, the Nosler '420 patent, and the M855/M855 LFS projectiles, as disclosed by the McElroy '879 patent, all failed to disclose a projectile interface that met the limitation. The court erred by (1) applying a narrower construction of "controlled rupturing," or (2) ignoring clearly disclosed embodiments of such interfaces. DBr. 51-57. On appeal, Liberty makes similar errors.

### 1.    The Leussler '416 Patent and the Nosler '420 Patent Teach Interfaces That Meet the "Controlled Rupturing" Limitation.

As discussed above, the trial court's construction requires two basic items for an "interface structured to provide controlled rupturing": (1) that it "rupture (*i.e.*, break)" on impact, and (2) that this rupturing leads to the separation of "two or more components of the projectile." A55. Liberty argues that the Leussler '416 patent and the Nosler '420 patent disclose "dum-dum bullets that have a deformed nose, and a trapped slug that never separates from the interface." PBr. 40 n.24. In

Liberty's view, these patents disclose bullets that expand at their noses, but do not separate into their component parts.  This is incorrect.



*Fig. 5*

**Figure 5 of the Leussler '416 patent.  A15576.**

The Leussler '416 patent discloses a three-piece projectile where the nose (the point core) in some embodiments separates from other components on impact due to the inwardly projecting fold (labeled 3') in the jacket.  *See* DBr. 52.  "In actual practice the point core is often completely dispersed, and the point jacket is frequently sheared off at the angle where it joins the fold 3' . . . ."  A15578 (lines 22-26).

Liberty, however, cites to disclosures of alternative embodiments where the point core does not separate from other bullet components.  PBr. 40 n.24.  Specifically, Liberty argues that a Leussler projectile deforms "but continues to advance as a unit . . . ."  PBr. 40 (citing A15577 (lines 33-34)).  But the specification passage cited by Liberty makes clear that it is the tail (heel) section that continues as a unit, while the nose (point core) may "be deformed, flattened, or

*even disrupted* on impact." A15577 (lines 31-32) (emphasis added). Again, it is clear that the Leussler patent discloses projectile jackets that are structured to "rupture" or break on impact and release the nose (point core), thereby meeting both aspects of the trial court's construction.

For the Nosler '420 patent, Liberty cites a description of a projectile "with no sharp corners to encourage cracking or breaking, either upon firing or upon impact so the bullet 10 remains *a unitary structure throughout its use.*" PBr. 40 n.24 (citing A15565 (3:25-27)) (emphasis added).[20] Again, this disclosure must relate to an intact rear portion of the bullet, remaining after the nose portion is released. Nosler's figures and related disclosures make clear that, on impact, the nose portion (called "front lead") disintegrates and separates from the rest of the projectile. A15564 (1:55-56); A12239-40 (Kitchens); A15078 (¶¶37-38); A15182-83 (¶¶27-29).

---

[20]    The trial court did not find that the Nosler projectile remained intact on impact, but did find it was a mushrooming (expanding) bullet with a non-fragmenting jacket. A26 (quoting Liberty post-trial briefing). The court's construction of "controlled rupturing," however, does not preclude these features. *See* DBr. 57. Given that the Nosler jacket "splits" on impact, releasing a disintegrating nose portion, DBr. 56-57, Nosler clearly meets the court's construction.



**Figures 1 and 4 of the Nosler '420 patent. A15563.**

Moreover, even under a view of a unitary Nosler projectile, Liberty's own expert,

Dr. German, admitted that one of ordinary skill would have known how to modify

the Nosler jacket so as to release the front portion. A12813-14 (German).

### 2.    The Trial Court Incorrectly Distinguished the Leussler and Nosler Patents on Unclaimed Features.

Liberty further argues that the Leussler and Nosler patents were

distinguished on "additional grounds" other than the "controlled rupturing"

limitation. PBr. 43. In particular, Liberty notes the trial court's finding that the

"mushrooming" bullets, like the Leussler and Nosler projectiles, provide a "very

different style of lethal mechanism . . . compared to the fragmenting bullet of the

'325 patent." A26 (quoting A11475 (Newill)).[21] The trial court explained that the

---

[21]    The cited Newill testimony actually compared mushrooming bullets to the Army's L2 Concept (from the Green Ammunition Program), not the '325 patent. A11475.

lethality mechanism of such bullets "is that of deformation and expansion, rather than fragmentation . . . ."[22]  *Id.*

But contrary to Liberty's position, no claim limitations in the '325 patent, including "controlled rupturing," prohibits the deformation, mushrooming or disintegration of the nose portion so long as it separates from the other bullet components (due to interface "rupturing").  *See* DBr. 57.  Likewise, there is no requirement, under the court's construction of "controlled rupturing," that the interface (jacket) fracture or fragment, as is seen with the A1 projectiles.[23]  *Id.*

Accordingly, the Leussler and Nosler patents feature all required aspects of the construction of "controlled rupturing," and thus, contrary to Liberty's assertions, do not require a "modification or combination" to meet the limitation. PBr. 43-44.  While both patents teach additional features (*e.g.*, deformation) relating to terminal performance, this does not factor into the obviousness analysis,

---

[22]    There is some vagueness in the trial court's use of the word "fragmentation" in this context.  The court is apparently referring to both (1) a separation of bullet components (as described A17132 (1:62-67)) and (2) a breaking apart of the jacket itself.  Only the former is a requirement under the court's construction of "controlled rupturing."

[23]    Liberty relies on descriptions of fragmenting A1 reverse jackets, PBr. 14, while the government has chiefly referred to the "fracturing" of A1 jackets, DBr. 12.  For purposes of this appeal, the government sees no real distinction in the terminology.  *See* A13568 (M855A1 gel shot described at A11479-85 (Newill)).

which requires a comparison of the prior art to the claimed invention. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17 (1966).

### 3. Liberty Fails to Address the Explicit Disclosures of the M855/M855 LFS Projectiles in the McElroy '879 Patent.

Like the trial court, Liberty never addresses the prior art M855/M855 LFS projectiles as described by the McElroy '879 patent. Rather, Liberty focuses on the trial court's decision that "controlled rupturing" was not proven to be inherent in the M855/M855 LFS projectiles tested by Dr. Kitchens. PBr. 44. To prove "inherency," a party may introduce extrinsic evidence to show "whether a feature, while not explicitly discussed, is necessarily in a reference." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1328 (Fed. Cir. 2001). Though dismissed by the court, Dr. Kitchens did submit testing of sample 2003 M855/M855 LFS projectiles to show they inherently taught an interface "structured to provide rupturing." *See* A15920-30 (Kitchens' test results detailing M855's yaw-dependent behavior).

But the government (and Dr. Kitchens) also cited the McElroy '879 patent, A15777-84, which was never addressed by the court. The McElroy patent discusses specifics of the M855/M855 LFS projectiles and its jacket (interface) structure. It states that "due to the multicomponent structure the [M855/M855 LFS] projectile will generally break up upon striking either hard or soft targets due to the intrinsic weakness of the gilding metal jacket . . . ." A15779 (1:44-47). This

explicit disclosure meets both aspects of the trial court's construction: an interface structured (i) to "rupture" or break, and (ii) to thereby cause separation of two or more bullet components. A55.

### B. Despite Citing Appropriate Standards, the Trial Court Applied an Improper Legal Framework in Its Obviousness Analysis.

The government's appeal also challenges the legal framework applied by the trial court in evaluating obviousness. DBr. 58-63. Namely, the court rigidly applied the teaching-suggestion-motivation test, required more than a "reasonable expectation of success," and evaluated obviousness from the perspective of the inventor rather than from that of a hypothetical person of ordinary skill. DBr. 58-62. While Liberty essentially argues that the trial court cited the correct legal standards, it is clear that the court applied the wrong standards. *See* PBr. 44-46.

### 1. The Trial Court Improperly Applied the Pre-*KSR* Test for Obviousness.

Prior to the Supreme Court's decision in *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007), this Court applied the "teaching-suggestion-motivation test." Under this test, "a patent claim is only proved obvious if 'some motivation or suggestion to combine the prior art teachings' can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." *Id.* at 407 (citation omitted). *KSR*, however, rejected the rigid application of this test, and set forth a more flexible standard for evaluating obviousness.

Specifically, a motivation to combine may be shown by the "interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art." *Id.* at 418.

Applying the *KSR* standards, A15069-70 (¶¶16-21), the government's expert, Dr. Kitchens, provided explicit motivations to combine for each limitation provided in the asserted claims, including those limitations added by the dependent claims. A12286-88, A12311, A12314, A12316-17, A12318-20, A12322-23, A12329, A12332, A12336, A12353, A12356, A12359-60 (Kitchens); *see also* A15072-128. Nevertheless, the trial court ignored all of this evidence, and only acknowledged the general motivations cited by Dr. Kitchens. In the court's view, "the government only established that there was a motivation to increase performance in small-arms ammunition," rather than a motivation to combine particular references. A28 (citations omitted). In reaching this decision, the trial court incorrectly cited the pre-*KSR* teaching-suggestion-motivation test set forth by *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006), as the appropriate "test for obviousness." A28.

Liberty argues that the trial court's analysis is consistent with post-*KSR* law. Most notably, it highlights that "the trial court cited directly to *KSR* and four post-*KSR* Federal Circuit cases when laying out the applicable law for [the] obviousness

inquiry . . . ."  PBr. 46.  Liberty further notes that *KSR* did not eliminate all usage of the teaching-suggestion-motivation test, but instead the Court "cautioned against" its "rigid and formulaic application."  PBr. 45.

Nonetheless, it is clear that the trial court did rigidly apply the teaching-suggestion-motivation test in a manner contrary to *KSR*.  The court ignored the specific evidence presented by Dr. Kitchens for motivations to combine references for each asserted claim at the time of the alleged invention.[24]  As a result, the court broadly (and incorrectly) presumes that Dr. Kitchens' analysis was guided by "hindsight" and that he evaluated the claims part-by-part instead of "as a whole." A29; *see also* PBr. 38-40 (similarly alleging hindsight).

As further evidence of its overly rigid analysis, the trial court also stated that one must have *known* that Kitchens' prior-art combinations would provide certain benefits or otherwise, "there would be no reason to combine the prior art to arrive at the claimed device." A28 (quoting Liberty post-trial briefing, A17982); *see also* DBr. 60.  Thus, the trial court required more than a "reasonable expectation of success."  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

---

[24]     This includes the dependent claims specifically referenced in Liberty's brief.  PBr. 42 (citations omitted).

## 2.    The Trial Court Applied the Perspective of the Inventor, Rather Than of One of Ordinary Skill.

The trial court further erred by evaluating obviousness from the perspective of the inventor, Mr. Marx, rather than the hypothetical person of ordinary skill in the art.  DBr. 61-62.  Specifically, the court excluded many of the government's asserted prior-art combinations because "[i]t would be non-obvious for a person of ordinary skill in the art seeking to develop military ammunition to combine elements from projectiles that breach the laws of war . . . ."  A29-30 n.42 (distinguishing Leussler and Nosler patents).  This was consistent with Mr. Marx's testimony that he developed the patented technology in an effort to make a new bullet compatible with the Army's rifles, A10295, and then sought to commercialize it with Army components and SOCOM.  DBr. 14-19.

The claims of the '325 patent, however, are not limited to military ammunition and thus this narrow viewpoint is improper.[25]  As Liberty points out, the trial court repeatedly cites cases setting forth the appropriate perspective of one of ordinary skill in the art.  PBr. 46.  The court, however, did not apply that standard.

---

[25]    In fact, the '325 patent specification discusses features that would violate the laws of war, such as bullets with payloads containing anti-coagulants. A17134 (6:42-5); A12812-13 (German).

### 3.    Liberty's Evidence of Secondary Considerations Lacks a Nexus With the Claimed Invention.

Liberty begins its analysis of obviousness issues by first asserting evidence of secondary considerations:  specifically, long-felt need, commercial success, acclaim, and copying.  PBr. 36-37.  While the trial court attributed "significant weight" to such evidence, A31, secondary considerations nonetheless cannot overcome a strong *prima facie* case of obviousness, as the government has shown in the present case.  *See ABT Sys., LLC v. Emerson Elec. Co.*, No. 2014-1618, -1700, __ F.3d __, 2015 WL 4924160, *6-10 (Fed. Cir. Aug. 19, 2015); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008).  Moreover, Liberty had the burden to produce evidence of a nexus between such evidence and the claimed invention, which it did not do.  *See, e.g.*, *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

The evidence cited by the trial court was based on two unclaimed features of the A1 projectiles:  (i) its lead-free construction and (ii) its yaw-independent performance.  *See generally* A15177-79 (¶¶13-19), A15181 (¶¶24-26). Specifically, the trial court stated that Liberty has presented evidence of "(1) a long-felt need since 1993 for a lethal, lead-free replacement projectile for the standard ammunition, (2) the combat-proven success of the M855A1, and (3) the acclaim and recognition for the development of the A1 technology."  A31. Nevertheless, no claim of the '325 patent requires lead-free components, and some,

in fact, specify leaded materials. *See* A17136 (9:29-54) (claims 29-31). In turn, the improved lethality of the M855A1 is largely attributed to its yaw-independent performance, which has reduced incidents of through-and-through hits in combat.[26] A13938-39. No claim requires such performance, as the only terminal mechanism disclosed in the patent is yaw-dependent, "rupturing" caused by tumbling. *See* A17132-33 (2:62 to 3:7).

Lacking evidence of a nexus, Liberty relies on the trial court's finding that nexus was presumed because the A1 projectiles employ the claimed features and are coextensive with them. A31 (citation omitted). This reliance, however, is misplaced, as the evidence of these secondary considerations is not "coextensive" with the features actually claimed in the '325 patent. Again, no claim is specifically directed to a lead-free, yaw-independent bullet. While the trial court argues that the claims could cover such embodiments, A32, this does not make the evidence "coextensive." At most, it represents only a component of the claimed invention. *Demaco Corp.*, 851 F.2d at 1392.

Finally, with regard to "copying," Liberty claims that "[t]he trial court held that the U.S. had copied the Marx design." PBr. 15 (citing A31 n.43). The court actually stated that the Army had filed and abandoned a provisional patent

---

[26]    These features in turn have also been at the heart of the acclaim surrounding the M855A1, A13938-40, and why it has been produced in large numbers.

application "for a projectile that was similar in all pertinent respects to that covered by the '325 patent." Thus, the court compared the disclosure of the '325 patent to a patent application, even though "copying requires the replication of a specific product."[27] *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). The Army's provisional application, filed in May 2010, discloses only reverse-jacketed projectiles, but gives no information regarding their contact areas or terminal performance. *See* A16738-856; A11784-96 (Newill).

Such weak evidence does not support the nonobviousness of Liberty's asserted claims. Moreover, copying is "only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000). Such indicia are missing in this case.

## IV.    THE TRIAL COURT REASONABLY CALCULATED A ROYALTY RATE AFTER WEIGHING BOTH PARTIES' VALUATIONS UNDER THE *GEORGIA-PACIFIC* FACTORS.

On cross-appeal, Liberty challenges the trial court's calculation of a 1.4 cent royalty (for each A1 projectile) as damages for the government's infringement. PBr. 51-58. Under section 1498, the remedy for infringement is "reasonable and

---

[27]    Notably, the trial court never compares the 2005 EPIC prototypes (provided to the Army) to the A1 projectiles. These projectiles differ greatly in jacket (interface) structure, materials, weight, and performance (yaw-dependent versus yaw-independent). DBr. 5-20; A15180-81 (¶¶21-23).

entire compensation." The damages that are permitted, however, must be tempered by principles of equity to ensure that the patent owner is not granted a windfall. *See Tektronix, Inc. v. United States*, 552 F.2d 343, 351 (Ct. Cl. 1977).

At trial, both parties' experts calculated proposed reasonable royalties for A1 projectile orders that had been executed after July 6, 2010 (when the '325 patent issued) and a cut-off date in 2013.[28] Liberty's expert, Creighton Hoffman, calculated a royalty rate of 20 cents per round, an exorbitant figure amounting to patent damages of $246 million. A17442; A35-36 n.50. The government's expert, Christopher Bokhart, calculated a royalty rate of 1 cent per round, amounting to damages of roughly $11 million. A16542 (¶138); *see generally* A16497-543. Both experts reached their conclusions through hypothetical negotiations based on the *Georgia-Pacific* factors, 318 F. Supp. at 1120.

As there was no established royalty rate, A33, Mr. Hoffman calculated a baseline royalty rate of 51 cents per round based on cost savings related to the lead-free design (*i.e.*, decreased environmental remediation) and increased lethality of the patented Liberty bullet. A35. Applying a similar analysis, the court concluded that an appropriate baseline rate was 5 cents, as Mr. Hoffman overstated

---

[28]    Liberty incorrectly asserts that both experts used the same cutoff date of April 30, 2013. PBr. 17 n.14. Liberty's expert used that date, while the government's expert, Christopher Bokhart, used a later date of September 30, 2013 in his report, thereby considering slightly more total rounds. A16499 (¶2).

environmental remediation costs[29] as well as the costs of the alternative SOST round (used by SOCOM).  A35 (citing A12605-07, A12592-93 (Bokhart); A16533-35, A16537); *see* A16521-26 (addressing SOST as "next best alternative").

The trial court then reduced its baseline rate to 1.4 cents per round, a figure very close to the 1-cent rate proposed by Mr. Bokhart.  A37.  The court explained that "the government would not have been disposed to a high royalty rate."  A36.  Instead, Liberty "would have been offering only a bare, non-exclusive license because its patented projectile would have required substantial refinement and elaboration" before becoming suitable for Army use.  *Id*.  On appeal, Liberty is not challenging the reduction in the baseline rate from Mr. Hoffman's 51 cents to the court's 5 cents, but is challenging the court's further reduction of the rate to 1.4 cents.  In so doing, Liberty raises arguments not made at trial.

### A.    Liberty's 2010 License To the Army Would Have Been Bare and Non-Exclusive.

Focusing on the July 2010 date of the hypothetical negotiation, Liberty argues that its license would have been accompanied by substantial know-how and thus would not require substantial refinement or elaboration.  PBr. 51-55.  In

---

[29]    While the trial court noted that Liberty's expert overestimated the costs of lead remediation, A36, it also considered evidence showing that the Army does not actively remediate any of over 3,000 outdoor ranges it operates.  A12455-60 (David Spencer, the Army's Deputy TCM Ranges).

Liberty's view, the court cited untimely evidence provided by a 2007 SBIR report
(for the Phase I contract) dated three years before the hypothetical negotiation.
PBr. 54. Liberty further objects to the court's citation of a Phase II SBIR
document, A15338-86, and John Bennett's After-Action Report, A13946-47,
because both relate to a smaller 4.6 mm caliber product, rather than the 5.56 mm
caliber product sought by the government. PBr. 54-55 (discussing A36-37).

In order to be compensated for know-how, Liberty would have to have
succeeded on its contract claims, which it did not. Assuming, *arguendo*, that
know-how can be considered in arriving at a reasonable royalty for a bare-bones
patent license,[30] Liberty can provide no evidence that it possessed the requisite
know-how and manufacturing expertise in 2010. Nor is there any evidence that the
government availed itself of any know-how. Instead, it argues that such
information was evidenced by the Army's successful fielding of the M855A1 that
year. PBr. 55-56.

Even if know-how could be considered in the hypothetical negotiation, it
nonetheless must originate with Liberty, the licensor. *See, e.g.*, *i4i Ltd. P'ship v.
Microsoft Corp.*, 598 F.3d 831, 853 (Fed. Cir. 2010). In actuality, there is no
evidence that Liberty could manufacture ammunition on a large scale in 2010.
Liberty's current CEO, George Phillips, testified that at that time the company had

---

[30]     The government was only found liable for patent infringement.

six or seven employees and had only sold very small amounts of ammunition.

A10423-24, A10461, A10466-68 (Phillips).  In 2010, Liberty focused on simply

licensing their technology.  A10467.

Not surprisingly, both parties' experts asserted that a bare, nonexclusive

license was appropriate.  A16527 (¶92); A17451; A11190-91 (Hoffman).  Mr.

Hoffman's report, in fact, stated that "I have assumed . . . that the Government

needs only to negotiate a non-exclusive, bare license for the '325 technology."

A17451.  Thus, Liberty is asserting this factual argument for the first time, and it

should be deemed waived.  *See Wordtech Sys., Inc. v. Integrated Network*

*Solutions, Inc.*, 609 F.3d 1308, 1318 (Fed. Cir. 2010).

## B.    A *De Facto* Exclusive License Would Reduce the Royalty Rate.

Liberty falls back on the assertion that any license to the government would

be *de facto* exclusive because the ATF has prohibited them from selling their A1-

styled ammunition commercially.  Liberty asserts that this would raise the royalty

rate.  PBr. 57-58.  This argument is flawed for several reasons.  Liberty was free to

sell and license its product to foreign government and militaries, and indeed has

attempted to do so.  A12531-34 (Willis); A12732-34 (Former Liberty CEO Steven

Torma, A12701-12).  Moreover, even if Liberty's market was so limited, courts

have held that such a limited government-only market would actually tilt the

royalty rate down, not up.  *Wright v. United* States, 53 Fed. Cl. 466, 476 (2002);

*Standard Mfg. Co., Inc. v. United States*, 42 Fed. Cl. 748, 768 (1999), *abrogated on other grounds by Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011).

### C. Liberty's Unsupported "Market Risk" Argument Is Not Probative.

Citing no legal basis for its consideration, Liberty also argues for the first time that there was "no market risk," as the government "is its own 'purchaser' for infringing rounds."[31]  PBr. 57.  Yet, this ignores the considerable research the government had to put into making the accused bullet acceptable.  A36.  Presumably, Liberty is arguing that the government, unlike a private company, would pay a higher royalty rate as its own "market" is more predictable.  But, the success of the accused program was still very much dependent on the government solving problems such as "yaw dependence."  DBr. 7.

For these reasons, the court's award of a per-round royalty of 1.4 cents is not clearly erroneous.  *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) (providing legal standard).

---

[31]    This argument should also be deemed waived.  *Wordtech Sys.*, 609 F.3d at 1318.

## V.    THE TRIAL COURT LACKED JURISDICTION TO AWARD A PROSPECTIVE ROYALTY UNDER SECTION 1498.

The government has appealed the trial court's award of a running royalty for future procurement of the A1 projectiles.  28 U.S.C. § 1498 provides a cause of action for acts of infringement resulting from the government's unauthorized use or manufacture of patented technology.  In such instances, the government must provide "reasonable and entire compensation" under an eminent-domain theory of damages.[32]  28 U.S.C. § 1498; *Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed. Cir. 1984).  The government effectively "takes" a compulsory license for its past infringing activities, but section 1498 does not permit prospective relief, such as an injunction.  DBr. 63-65; *Leesona Corp. v. United States*, 599 F.2d 958, 966-67 (Ct. Cl. 1979) (addressing injunctive relief).

Liberty argues that the "reasonable and entire compensation" language in section 1498 should be interpreted to permit the award of "ongoing [future] royalties."  PBr. 49.  In Liberty's view, when injunctive relief is unavailable, the Court of Federal Claims has discretion "both in selecting the method of calculation and in calculating damages."  PBr. 48 (citation omitted).  In support, Liberty only

---

[32]    While the trial court acknowledges that "the government has consented to being sued only for the compulsory taking of a non-exclusive patent license," A15, it nonetheless awarded a future running royalty, citing no authority.

cites to private-litigation cases decided under 35 U.S.C. § 271, thereby ignoring the central issue of sovereign immunity.[33]  PBr. 48-49 (citations omitted).

The waiver of sovereign immunity created by section 1498 must be strictly construed in favor of the government and may not be enlarged beyond the waiver the statutory language expressly requires.  *See, e.g.*, *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33-35 (1992).  Accordingly, the government's ongoing manufacture of the A1 projectiles should be viewed as a series of separate takings, rather than one continuous taking.  *See Pitcairn v. United States*, 547 F.2d 1106, 1115 (Ct. Cl. 1976); *Irving Air Chute Co. v. United States*, 93 F. Supp. 633, 636-37 (Ct. Cl. 1950).

Liberty attempts to distinguish *Pitcairn* and *Irving Air Chute* decisions on the basis that the trial court "is not awarding Liberty speculative or hypothetical ***damages*** for future infringement, but rather . . . a ***rate to calculate*** those damages" if the government continues its infringing acts.  PBr. 48 & 48 n.27 (emphasis in original).  This is false.  The trial court has explicitly awarded future royalties based on a set rate, and has not simply set forth a royalty rate for calculating

---

[33]    Most notably, Liberty implies that the Supreme Court's decision in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), by applying more stringent standards for injunctions under section 271, has effectively created more opportunities for prospective relief (including running royalties).  PBr. 49.  This argument is wholly irrelevant to the issue of whether the Court of Federal Claims has jurisdiction to award a prospective running royalty under section 1498.

damages in future, anticipated suits. A37. Accordingly, the amount of future royalties that will be due annually to Liberty until 2027 is speculative because one cannot determine (1) the amount of A1 projectiles that will be procured and (2) whether (or how) the Army will change any technical features of the A1 projectiles during the term of the '325 patent.

Moreover, the cited cases do not make the distinction asserted by Liberty. Instead, the Court of Claims has expressly held that separate causes of action accrue for a continued manufacture of a patented article. *See Pitcairn*, 547 F.2d at 1115. In other words, at the time of the first taking, a cause of action does not accrue for all future government acquisition, as the trial court has presumed. *Irving Air Chute*, 93 F. Supp. at 636.

As stated previously, we are unaware of any section 1498 action where future royalty payments have been awarded. DBr. 64. Liberty argues that in *Gaylord v. United States*, 678 F.3d 1339 (Fed. Cir. 2012), this Court "instructed the trial court on remand . . . to determine whether evidence supports an ongoing royalty for unused stamps, and at what rate." PBr. 49. This is a misreading. In *Gaylord*, the Court held that section 1498(b) permits a royalty-based award (as measured by a percentage of revenue relating potentially to both used and unused stamps) for the U.S. Postal Service's past acquisition of stamps incorporating the copyrighted image-at-issue, and thereby reversed the trial court's award of a lump-

sum payment. 678 F.3d at 1341-42.[34] While the Federal Circuit found that royalties for past uses can be awarded for copyright infringement, it did not address whether prospective relief is permitted under section 1498. *Id.*

Liberty also challenges the government's assertion that neither expert presented testimony regarding a future running royalty, by citing short excerpts of testimony of Mr. Bokhart, the government's expert. PBr. 63-64. These snippets of testimony, however, only highlight the *sua sponte* manner by which the trial court awarded prospective relief. The brief testimony from Mr. Bokhart regarding the calculation of a future royalty rate was elicited by the trial court's own questions. PBr. 50 (quoting A12698 (Bokhart)). In turn, Mr. Bokhart's statements regarding the amount of total royalties that could potentially be paid are applicable under either party's view of prospective relief. PBr. 51 (quoting A12678 (Bokhart)).

More importantly, the principal issue is whether the trial court had the jurisdiction to award such relief, regardless of what testimony was given. Subject-matter jurisdiction cannot be conferred by the parties or their experts. *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701-02 (1982).

---

[34] The unused stamps had already been acquired. *See Gaylord*, 678 F.3d at 1345. The Postal Service retired the stamp in 2005, prior to when the plaintiff filed suit. *See Gaylord v. United States*, 98 Fed. Cl. 389, 391 (2011), *rev'd and remanded*, 678 F.3d 1339 (Fed. Cir. 2012).

## VI.   LT. COL. DEAN LACKED ACTUAL AUTHORITY TO SIGN AN NDA ON BEHALF OF THE GOVERNMENT.

Apart from its patent infringement claim, Liberty sued for breach of contract based on three NDAs signed by two government employees and two contractors. A38.  The trial court found that all three NDAs were signed by agents who lacked express and implied actual authority to bind the government in contract.  A38-42. In its cross-appeal, Liberty challenges only the trial court's finding that one signatory, Lt. Col. Dean, to one NDA, the Ft. Benning NDA, had authority to bind the government.  PBr. 58-59.

Without an authorized agent, no valid contract with the government exists. *See City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Accordingly, "[a]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."  *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).[35]  Unauthorized agents otherwise could bind

---

[35]    Liberty had the burden of ascertaining authority even if the agent himself is unaware of limitations on his authority.  *Trauma Serv. Grp.*, 104 F.3d at 1325.  Accordingly, Liberty's unsupported assertion that Lt. Col. Dean "did not believe that contracting officer approval was necessary" is irrelevant.  PBr. 63 n.33.

the government in contract and deplete public funds at will. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

Accordingly, Liberty bears the burden of proof for establishing contractual authority.[36] *Council for Tribal Emp't Rights v. United States*, 112 Fed. Cl. 231, 243-44 (2013), *aff'd*, 556 Fed. Appx. 965 (Fed. Cir. 2014) (citing *Fed. Crop. Ins.*, 332 U.S. at 384). Liberty had to establish at trial that Lt. Col. Dean had actual authority, express or implied, to bind the government to the NDA.

Express actual authority exists "only when the Constitution, a regulation, or a statute grants such authority in an unambiguous manner." *Roy v. United States*, 38 Fed. Cl. 184, 188 (1997); *see also Tracy v. United States*, 55 Fed. Cl. 679, 682 (2003) (citation omitted). As the trial court acknowledged, Liberty failed to "identify any statute, regulation, or constitutional provision conferring express contracting authority to Lt. Col. Dean." A39. On appeal, Liberty only asserts that Lt. Col. Dean had *implied* actual authority. *See* PBr. 25, 60-65.

## A.    Lt. Col. Dean Lacked Implied Actual Authority to Sign NDAs Because That Activity Was Not "Integral" To Any of His Duties.

While actual authority can be implied, it is only implied when such authority is considered to be an integral part of the duties assigned to that employee. *See H.*

---

[36]    In denying the government's motions *in limine* to exclude evidence relating to other NDAs, A1348-51, the trial court reminded Liberty of its burden prior to trial. A1349-50 (citation omitted).

*Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989).  Implied actual

authority is "integral" to a government employee's duties when the "employee

could not perform his or her assigned tasks without such authority and the relevant

agency regulation does not grant such authority to other agency employees."

*Flexfab, LLC v. United States*, 62 Fed. Cl. 139, 148 (2004), *aff'd*, 424 F.3d 1254

(Fed. Cir. 2005) (cited at A39).

The trial court explicitly found that Lt. Col. Dean lacked implied actual

authority to sign NDAs because he could perform his duties as Chief of the Small

Arms Branch without signing them.  A40.  Liberty argues that the trial court

"considered *only* evidence of Colonel Dean's express authority (*e.g.*, his lack of a

contracting warrant or contracting officer status)" in reaching this decision.  PBr.

25 (emphasis added).  Liberty further asserts that such evidence is "irrelevant" to

the type of authority needed to sign the NDA-at-issue, which does not relate to

government acquisitions.  PBr. 63.

Liberty's arguments, however, distort the court's explicit findings of fact.

As the trial court plainly stated, "Lt. Col. Dean's job required him to write

requirements and to facilitate discussions with the industry, which *does not imply*

*that it was necessary for him to execute NDAs* to discharge those duties

successfully."  A40 (citing A10132 (Dean)) (emphasis added).  In support, the trial

court cited Dean's testimony where he explained that he signed only "a few"

NDAs during his two years as Chief of the Small Arms Branch. A10065-66 (Dean) (cited at A40); *see also* A10131 (Dean). Instead, for the frequent occasions (on a weekly basis) he met with industry, industry representatives would typically mark presentation materials as "proprietary," and he would not sign an NDA. A10129-31 (Dean). Liberty does not address this particular evidence or explain how it nonetheless met its burden of proof.

Rather, Liberty focuses on the evidence relating to Lt. Col. Dean's lack of any express contractual authority. In addressing this issue, the trial court did highlight that Lt. Col. Dean was not a contracting officer, lacked a contracting warrant, and did not interact with contracting officers in conducting his duties. A40. The court then concluded that the "record was devoid of any evidence" that Lt. Col. Dean had authority to make any financial arrangements with industry representatives. *Id.* (citing, *inter alia*, A10488 (Amick)).

Liberty misstates the court's analysis as relying on evidence showing a lack of express actual authority rather than implied authority. The court relied on such evidence to distinguish cases where actual authority was implied based on some express (though more limited) financial authority. A39-40. Specifically, the trial court distinguished this case from *Brunner v. United States*, 70 Fed. Cl. 623 (2006). A40 (similarly distinguishing *Telenor Satellite Servs., Inc. v. United States*, 71 Fed. Cl. 114, 123 (2006)). In *Brunner*, the Court of Federal Claims

found that a DEA agent had implied authority to contract for the payment of informants' expenses and stipends, based on the agent's power to spend money for these purposes (evidenced by "numerous vouchers"). *Brunner*, 70 Fed. Cl. at 643. Here, Lt. Col. Dean possessed no authority to contract or to make payments.

Accordingly, the court did not reach the question of whether such contracting or financial duties could provide implied authority to sign NDAs.[37] *See* A40. But the court's reasoning was not limited to Lt. Col. Dean's lack of procurement or financial authority. By looking at all of his duties, the court correctly ruled that none of them necessarily require Lt. Col. Dean to sign NDAs to discharge his duties successfully. A40. Thus, this finding is not clearly erroneous.

## B.    Lt. Col. Dean's Title Does Not Establish That He or Anyone Else in His Office Had Implied Actual Authority.

Having failed to provide any evidence of implied actual authority, Liberty next argues that Lt. Col. Dean's position of Chief of the Small Arms Branch necessarily means that he must have had authority to sign NDAs as there were no "reasonably efficient alternatives" within his office. PBr. 60, 62 (quoting *Leonardo v. United States*, 63 Fed. Cl. 552, 560 (2005), *aff'd*, 163 Fed. Appx. 880

---

[37]    Liberty's position presumes that the authority to sign NDAs for business development purposes could not be implied based on some related acquisition authority provided to contracting officers under the F.A.R. The facts in this case do not raise this issue.

(Fed. Cir. 2006)). This argument assumes without any proof that someone in the Smalls Arms Branch must have had such authority.

In the cited *Leonardo* case, the court found that a Cultural Affairs Officer (overseeing cultural programs at the American Culture Center in Brussels) had implied authority to enter into bailment contract to store artwork because such authority was necessary to provide the Center's cultural programs.  63 Fed Cl. at 558-59.  Thus, the officer was a "reasonably efficient alternative" to an employee she supervised, who was found not to have implied authority.  *Id.* at 558 (citation omitted).

In this case, there is no evidence that the authority for signing NDAs was needed anywhere in the Small Arms Branch, so that such authority necessarily rested with Lt. Col. Dean as the Chief.  In effect, Liberty's arguments seek to find implied actual authority based merely on Lt. Col. Dean's title, without ever addressing how essential it was for him (or anyone in his office) to sign NDAs.

As no significant evidence was presented to show that signing NDAs was integral to Lt. Col. Dean's duties, this Court should affirm the trial court's finding of a lack of contractual authority.

## CONCLUSION

For the above reasons, the Court should reverse the trial court's judgment of patent infringement and validity, and vacate its award of prospective relief.  The

Court should further deny Liberty's cross-appeals and affirm the trial court's award of a per-round royalty of 1.4 cents as well as its ruling that Lt. Col. Dean lacked contractual authority.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOHN J. FARGO
Director


/s/Walter W. Brown

| | |
|---|---|
| Of Counsel: | WALTER W. BROWN |
| CONRAD J. DeWITTE, JR. | Attorney |
| Department of Justice | Commercial Litigation Branch |
| | Civil Division |
| | Department of Justice |
| | Washington, DC  20530 |
| September 4, 2015 | Telephone:  (202) 307-0341 |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing RESPONSE AND REPLY BRIEF OF

THE DEFENDANT-APPELLANT, THE UNITED STATES was filed

electronically using the Court's CM/ECF system.  All parties are represented by

registered CM/ECF users and will be served by the appellate CM/ECF system.


September 4, 2015                                    /s/Walter W. Brown

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(5)-(7) of the Federal Rules of Appellate Procedure, I

hereby certify that the Response and Reply Brief of the Defendant-Appellant, The

United States contains no more than 14,000 words, proportionally spaced, as

recorded in the document statistics for this document in Microsoft Word 2010,

which provides the following information:

Typeface:      Times New Roman, proportionally spaced, 14 point.

Word Count:    13,945 (excluding the parts of the Brief exempted by Rule
               32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure
               and Federal Circuit Rule 32(b)).

 /s/Walter W. Brown
WALTER W. BROWN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
Telephone:  (202) 307-0341

September 4, 2015          Attorney for the United States